**Exhibit A**

No *Shepard's* Signal™
As of: December 14, 2019 8:22 PM Z

# Berger v. Imagina Consulting, Inc.

United States District Court for the Southern District of New York

November 1, 2019, Decided; November 1, 2019, Filed

No. 18-CV-8956 (CS)

**Reporter**
2019 U.S. Dist. LEXIS 213321 *; 2019 WL 6695047

JASON BERGER, Plaintiff, - against - IMAGINA CONSULTING, INC., Defendant.

## Core Terms

death certificate, documentation, grandfather's, Declaration, requesting, sanctions, contempt, show cause, discovery

**Counsel:** **[*1]** For Jason Berger, Plaintiff: Richard Liebowitz, Liebowitz Law Firm, PLLC, Valleystream, NY USA.

For Imagina Consulting, Inc., Defendant: Craig Justin Albert, LEAD ATTORNEY, Albert PLLC, New York, NY USA.

**Judges:** CATHY SEIBEL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** CATHY SEIBEL

## Opinion

### ORDER and ORDER TO SHOW CAUSE

Seibel, J.

On April 5, 2019, Defendant filed a letter with the Court requesting a discovery conference. (Doc. 27.) That same day, I granted Defendant's request and scheduled a discovery conference for April 12, 2019 at 11 a.m. (Doc. 28.) I also ordered Plaintiff to respond to Defendant's letter by April 9, (*id.*), which Plaintiff did, (Doc. 30). On April 12, the Court held the discovery conference, but Plaintiff's counsel, Richard Liebowitz, did not appear and did not call or email the Court or Defendant's counsel to explain his absence. (Minute Entry dated Apr. 12, 2019.) That same day, I ordered Plaintiff to show cause in writing, on or before April 17, 2019, why he failed to appear for the conference and why he should not be required to pay Defendant's attorney's fees for the time expended to appear at the conference. (Doc. 31.) The Court also rescheduled the conference for April 18, 2019. (*Id.*)

By letter **[*2]** dated April 15, 2019, Mr. Liebowitz advised that he had missed the conference because of a death in the family

Berger v. Imagina Consulting, Inc.

which was an "unexpected urgent matter" to which he had to attend. (Doc. 32.) He also said he would be out of the office on April 18 and asked to appear by phone at the rescheduled discovery conference. (*Id.*)

The conference was held by phone on April 18. (*See* Minute Entry dated Apr. 18, 2019.) Mr. Liebowitz represented that the death in the family occurred on the morning of April 12 and apologized for not letting Defendant's counsel and the Court know. During the conference, issues were discussed that reflected negatively on Plaintiff's counsel's credibility. For example, Plaintiff had answered interrogatories saying his damages calculation had relied on "contracts, invoices, [and] licensing agreements," (Doc. 27 at 1), but when Defendant requested those documents, Plaintiff said he could not produce them without a protective order. After Defendant agreed to a protective order and the Court signed it, (Doc. 23), Plaintiff still produced nothing, despite twice promising to do so. (*See* Doc. 27.) Further, Defendant's counsel represented that Mr. Liebowitz had told Defendant's **[*3]** counsel that he could not comply because he was out of the country due to an emergency, when in reality he was at a trade show in Europe trying to drum up business. At that point, concerned about Mr. Liebowitz's credibility and the possibility that he was trying to increase costs for Defendant's counsel, I determined that I could not merely accept Mr. Liebowitz's representation that he missed the April 12 conference because of a death in the family, and directed that, among other things, by May 1, Mr. Liebowitz provide evidence or documentation regarding who died, when, and how he was notified. I also permitted Defendant's counsel to submit his billing records relating to the discovery dispute by May 1, with Mr. Liebowitz having until May

15 to submit opposition to Defendant's application that Plaintiff cover those fees.[1]

By letter dated May 1, 2019, Mr. Liebowitz represented that his grandfather had unexpectedly died on April 12, 2019 and that Mr. Liebowitz was needed to assist with certain customs for which arrangements had to be made in advance of the Sabbath. (Doc. 36.) That same day, I endorsed the letter as follows:

> This letter is not responsive to my instruction. Mr. Liebowitz **[*4]** was to *document* who passed away, when the person passed away and when Mr. Liebowitz was notified. The reason I requested documentation is that there is reason to believe Mr. Liebowitz is not being candid. So a letter from him does not advance the ball. When someone dies, there is documentation including a death certificate and (almost always) an obituary, and nowadays one's phone usually contains evidence of what one was told and when. Mr. Liebowitz may have until 5/3/19 to supplement this letter.

(Doc. 38 (emphasis in original)). On May 3, 2019, Plaintiff filed a notice of settlement. (Doc. 41.) On May 7, 2019, I advised as follows:

> I'm glad the parties have resolved the case (and, I presume, the issue of Plaintiff's counsel's expenses for the April 12 conference), but there remains one open issue: Mr. Liebowitz's failure to document the death in the family that he says caused him to miss the conference. (See Doc. 38.). He was supposed to address that issue by May 3, but I will give him until May 9. Even if Defendant has been made whole, I still need to satisfy myself that there is no

---

[1] I also expressed concern over how Plaintiff's claim of $5000 in damages could possibly have been made in good faith.

need for disciplinary or other inquiry.

(Doc. 45.) On May 9, Mr. Liebowitz filed a Declaration in which [*5] he "re-certif[ied]" that the statements in his April 15 and May 1 letters were true, and he stated that he believed that his Declaration discharged his obligation to the Court. (Doc. 46 ¶¶ 6-7.)

On May 13, I responded that Mr. Liebowitz's May 9 Declaration did not resolve the matter because, given the issues surrounding Mr. Liebowitz's credibility and his failure to provide any information or documentation regarding his grandfather's death, Mr. Liebowitz's reiteration could not sufficiently discharge his obligations to the Court. (Doc. 47.) I therefore issued an order to show cause, requiring Mr. Liebowitz to provide documentation or other evidence (apart from his own word) that demonstrated that a death in the family had occurred that prevented him from attending the April 12 conference and timely notifying the Court and Defendant's counsel of his inability to attend. (Id. at 3-4.)

Rather than comply with the Court's order to provide the above documentation, on May 16, Mr. Liebowitz again submitted a Declaration reiterating his belief that his statements contained in the April 15, May 1, and May 9 letters were sufficient to discharge his obligations in response to the Court's order to show cause. [*6] (Doc. 48 ¶ 3.)

On July 26, I ordered Mr. Liebowitz, under pain of contempt, to provide a copy of his grandfather's death certificate so as to support his claim that he could not attend the April 12 conference, nor provide timely notice to the Court or opposing counsel, as a result of his grandfather's death. (Doc. 49.) In response, Mr. Liebowitz submitted another Declaration on August 12, stating that he believed that his previous letters sufficed to fulfill his obligations to the Court (in spite of the fact that I explicitly requested documentation other than "his say-so," (see Doc. 47 at 4)), and that he should not be required to submit his grandfather's death certificate because it is "a personal matter." (Doc. 50 ¶¶ 3-4.) As I noted in my August 19 response to Mr. Liebowitz's letter, however, although the death of a family member is certainly a personal matter, questions regarding Mr. Liebowitz's candor before the Court are professional in nature. (Doc. 51.) I reassured Mr. Liebowitz that, if he was concerned about the death certificate being available on the public docket, he was welcome to provide the document directly to my chambers to ensure his privacy. (Id.) I also made clear [*7] that, should he fail to provide the requested documentation by August 26, he would be held in contempt of court and subject to sanctions, including monetary sanctions and/or referral to this Court's Grievance Committee. (Id.)

On August 26, the day Mr. Liebowitz was required to provide his grandfather's death certificate pursuant to my August 19 order, Mr. Liebowitz instead submitted another Declaration. (Doc. 52.) In this Declaration, Mr. Liebowitz argued that he was not in contempt because this Court's request for his grandfather's death certificate was unlawful, as it "likely constitutes a usurpation of judicial authority or a breach of judicial decorum," (id ¶ 14); his previous Declarations complied with my previous orders, (id. ¶ 15); "there [was] no basis to impose monetary sanctions," (id. ¶ 16); and the Court's assurance that his grandfather's death certificate would not be made public was insufficient to protect his right to privacy, (id. ¶ 17).

On September 27, I endorsed Mr. Liebowitz's latest Declaration, stating that:

Berger v. Imagina Consulting, Inc.

There is nothing unlawful about my August 19, 2019 order. There was also nothing unclear about it. Likewise, Mr. Liebowitz's failure to comply is apparent beyond [*8] any reasonable doubt. Finally, he has not diligently attempted to comply. To the contrary, while maintaining that the death occurred (and thus implicitly conceding the existence of a death certificate), he has repeatedly refused to provide it, even after the Court made clear that his "good faith declarations" were insufficient and after the Court agreed that the document need not be publicly filed. He has not shown or even alleged an inability to comply.

(Doc. 53.) I therefore declared Mr. Liebowitz to be in contempt of court, and ordered that, should he fail to comply with my order and provide the requested documentation by October 2, he would be subject to monetary sanctions of $100 each business day until he complied. (Id.) I also informed Mr. Liebowitz that, "[s]hould this sanction prove insufficient" to ensure his compliance, "additional or different sanctions [would] be considered." (Id.)

On October 2, Mr. Liebowitz wrote a letter to my chambers requesting an in-person conference to discuss my September 27 order, and also requesting a stay of that order "[f]or just cause" until the conference could be held. (Doc. 54.) I denied his request, noting that Mr. Liebowitz's letter had [*9] not stated what purpose would be served by an in-person conference, nor had it supplied any justification for a stay of my September 27 order. (Doc. 55.) Mr. Liebowitz submitted another letter the next day, October 3, reiterating his request for an in-person conference to discuss his grandfather's death certificate and for a stay "[f]or just cause." (Doc. 56.) I again denied the application, because Mr. Liebowitz had not

articulated any purpose that the conference would serve, nor did he supply any cause to stay my September 27 order. (Doc. 57.) I further ordered Mr. Liebowitz to refrain from filing any further requests for a conference unless he could explain specifically what purpose would be served by the conference and to refrain from filing any further requests for a stay of my September 27 order unless he could specifically state a justification for a stay. (Id.) I notified Mr. Liebowitz that his first payment under the contempt sanction was due to the Clerk of the Court on Monday, October 7. (Id.)

On October 7, Mr. Liebowitz sent a letter requesting a two-week extension to deliver his grandfather's death certificate and requesting that the monetary sanctions be stayed until after [*10] the extension had elapsed. (Doc. 58.) This request had come at 8:34 p.m. on October 7, well after the Clerk's Office had closed. (Doc. 59.) That same night, I denied Mr. Liebowitz's request for an extension. (Id.) As of November 1, 2019, Mr. Liebowitz has not made any of his required payments. By the Court's count, Mr. Liebowitz was obligated to pay $300 on October 7, 2019; $400[2] on October 15, 2019;[3] $400 on October 21, 2019;[4] and $500 on October 28.

Richard Liebowitz, Plaintiff's counsel in this case, is now in contempt of my August 19, 2019 and September 27, 2019 orders. (See Docs. 51, 53.) The $100 fine he accrues each business day has plainly been ineffective to coerce compliance with the August 19, 2019 Order. Accordingly, the daily contempt sanction is hereby increased to $500 a day, effective November 6, 2019. Starting on that

---

[2] I will not count Yom Kippur, which fell October 9, 2019, as a business day.

[3] Monday, October 14, was a national holiday.

[4] See note 3 above.

Berger v. Imagina Consulting, Inc.

date, Mr. Liebowitz will be sanctioned $500 per business day (payable on Monday of each week, or Tuesday if the office of the Clerk of Court is not open on Monday) until he has complied in full with my August 19, 2019 and September 27, 2019 Orders. Further, Mr. Liebowitz is hereby ORDERED to appear before this Court in person on November 13, 2019 at 10 a.m., **[\*11]** and there and then SHOW CAUSE why he should not be incarcerated until such time as he complies with the above-described orders (and, if applicable, the instant order). Failure to appear as directed will subject Mr. Liebowitz to arrest by the United States Marshals Service without further notice.[5]

**SO ORDERED**.

Dated: November 1, 2019

White Plains, New York

/s/ Cathy Seibel

CATHY SEIBEL, U.S.D.J.

_____

End of Document

_____

[5] Should Mr. Liebowitz already be committed to appear before another court on November 13, 2019 at 10 a.m., he shall — no later than November 6, 2019 - so advise the Court by letter and enclose proof of the commitment from a source other than Mr. Liebowitz (such as a court order or docket entry). No adjournment will be considered unless it is requested on or before November 6, 2019, and unless the request is accompanied by proof of the commitment from a source other than Mr Liebowitz. The letter shall also provide three dates and times within a week of November 13, 2019 when Mr. Liebowtiz is available to appear before this Court. If the Court finds the showing sufficient, the Court will advise Mr. Liebowitz of a new date and time. Unless he hears from the Court about a new date and time, he shall appear on November 13, 2019 at 10 a.m.

**Exhibit B**

 Positive

As of: November 6, 2019 6:37 AM Z

# *Craig v. UMG Recordings, Inc.*

United States District Court for the Southern District of New York

March 29, 2019, Decided; March 29, 2019, Filed

16-CV-5439 (JPO)

**Reporter**

380 F. Supp. 3d 324 *; 2019 U.S. Dist. LEXIS 53973 **; Copy. L. Rep. (CCH) P31,436; 2019 WL 1432929

GLEN CRAIG, Plaintiff, -v- UMG RECORDINGS, INC., et al., Defendants.

**Subsequent History:** Reconsideration denied by, Costs and fees proceeding at *Craig v. UMG Recordings, Inc., 2019 U.S. Dist. LEXIS 113771 (S.D.N.Y., July 9, 2019)*

## Core Terms

Album, infringing, Photographs, damages, summary judgment, statutory damages, meritless, profits, disqualification motion, registration, affiliate, sales, actual damage, bad faith, confidential, reproduction, unauthorized, Records, music, summary judgment motion, copyright infringement, alleged infringement, attorney's fees, releases, digital, genuine, abroad, reasonably related, the Copyright Act, the Liebowitz Law

**Counsel: [**1]** For Glen Craig, Plaintiff: Yekaterina Tsyvkin, Richard Liebowitz, Liebowitz Law Firm, PLLC, Valleystream, NY.

For UMG Recordings, Inc., Kingsid Ventures, Ltd., Estate of Riley B. King, Defendants: Barry Isaac Slotnick, LEAD ATTORNEY, Cheng Linna Chen, Loeb & Loeb LLP, New York, NY.

**Judges:** J. PAUL OETKEN, United States District Judge.

**Opinion by:** J. PAUL OETKEN

## Opinion

[*328] OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Glen Craig ("Craig") is a photographer who took a few good shots of the great musician Riley B. King, known as "B.B. King." He brought this lawsuit against UMG Recordings, Inc. ("UMGI"), Kingsid Ventures, Ltd. ("Kingsid"), and the Estate of Riley B. King (the "Estate") (collectively, "Defendants") for copyright infringement after UMGI released several music albums with Craig's photos in them. Defendants have moved for summary judgment in favor of Kingsid and the Estate and partial summary judgment in favor of UMGI. In addition, Defendants have moved for sanctions against Craig and his counsel, Richard Liebowitz and the Liebowitz Law Firm PLLC, for filing a meritless motion to disqualify Defendants' expert witness. For the reasons that follow, Defendants' summary judgment motion is granted in **[**2]** part and denied in part. Defendants' motion for sanctions is granted with respect to Richard Liebowitz and the Liebowitz Law Firm PLLC.

## I. Background

### A. Factual Background

The following facts are drawn from the complaint and the parties' Rule 56.1 statements and are not subject to genuine dispute unless otherwise noted.

The renowned Riley B. King ("King"), professionally known as B.B. King, "was one of the greatest guitarists and blues performers of all time." (Dkt. No. 92 ¶ 1.) Plaintiff, Glen Craig, is a photographer who took several pictures of King during King's music tours. (Dkt. No. 1 ("Compl.") ¶¶ 5, 9; *see also* Dkt. No. 92 ¶ 3.) Among the pictures Craig took, three appeared in a tour book published in 1971 featuring King. (Dkt. No. 92 ¶ 5.) It is these three photographs (the "Photographs") that are at issue in this case. (*See* Dkt. No. 1-1.)

Defendant UMGI is a Delaware corporation in the business of selling, manufacturing, distributing, and otherwise exploiting sound recordings in the United States. (Dkt. No. 92¶¶ 21, 23.) Craig alleges that UMGI published a series of recordings of King's music that used the Photographs without his permission. (Compl. ¶ 12.) He further alleges that Defendant **[**3]** Kingsid—a company organized to license King's name to third parties—and the Estate facilitated and benefitted from UMGI's sales. (*Id.*; Dkt. No. 92 ¶ 16.)

In his complaint, Craig specifies 43 allegedly infringing albums ("King Albums") that were released at various times between 1971 and 2015.[1] (*See generally* Compl. ¶¶ 13-55.) Among them, 29 albums **[*329]** are published outside the United States by foreign corporate entities. (Dkt. No. 92 ¶ 24.) All of these entities, except for one, share the "Universal" name or have some affiliation with UMGI's parent company. (Dkt. No. 92 ¶¶ 21, 25.) Between July 7, 2013 and July 7, 2016, UMGI sold copies of 13 of the allegedly infringing albums within the United States. (Dkt. No. 92 ¶ 35.)

Craig registered his copyright for the Photographs in March 2014. (Dkt. No. 92 ¶ 7.) In June 2014, Craig reached out to UMG to retrieve the originals of the Photographs for an exhibition and was provided with copies of certain King CDs that featured the Photographs. (Dkt. No. 92 ¶¶ 8, 10; *see also* Dkt. No. 80-3.) Craig's then-attorney subsequently sent a cease-and-desist letter to UMGI in September 2014, informing UMGI of the alleged infringement.[2] (Dkt. No. 92 ¶ 11; Dkt. **[**4]** No. 91-3.) Unable to resolve the matter amicably, Craig initiated this action against Defendants on July 7, 2016, asserting a Copyright Act claim and a *Digital Millennium Copyright Act ("DMCA")* claim.

**B. Procedural Background**

At the close of expert discovery, Craig filed a motion to disqualify Defendants' proposed expert witness, Professor Jeffrey Sedlik ("Sedlik"). (Dkt. No. 55.) After the parties had fully briefed this issue, the Court denied Craig's motion following an evidentiary hearing on May 25, 2018. (Docket Entry on May 25, 2018.) Defendants

---

[1] Defendants contend that there are only 42 albums at issue because the albums referred to in paragraphs 22 and 39 of the complaint are the same. But Craig disagrees. (Dkt. No. 92 ¶ 13.)

[2] Defendants contend that the cease-and-desist letter was received by UMGI in November 2014. (Dkt. No. 92 ¶ 11.)

then filed a motion for sanctions—pursuant to *28 U.S.C. § 1927* and this Court's inherent power—against Craig and his counsel, Richard Liebowitz and the Liebowitz Law Firm PLLC, for fees and expenses in connection with the motion to disqualify. (Dkt. No. 71.) Separately, they also moved for summary judgment. (Dkt. No. 77.) Both motions are now fully briefed and ripe for resolution.

**II. Legal Standards**

**A. Motion for Summary Judgment**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A fact is material if it "might affect the outcome of the suit under the governing **[**5]** law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *See Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009)*.

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman, No. 14 Civ. 4045, 2017 U.S. Dist. LEXIS 15547, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*. "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc., No. 12 Civ. 5262, 2014 U.S. Dist. LEXIS 132108, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014)*. The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." **[*330]** *Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995)* (second quoting *Lund's, Inc. v. Chem. Bank, 870 F.2d 840, 844 (2d Cir. 1989))*.

**B. Motion for Sanctions**

To succeed on a motion for sanctions under *§ 1927* or the court's inherent powers, the movant must

Craig v. UMG Recordings, Inc.

demonstrate "clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." *Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 79 (2d Cir. 2000)* (quoting *Agee v. Paramount Commc'ns Inc., 114 F.3d 395, 398 (2d Cir. 1997))*; *see also Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986)*. Bad faith can be established by inference from a party's decision to pursue completely meritless claims. *See In re 60 E. 80th St. Equities, Inc., 218 F.3d 109, 116 (2d Cir. 2000)*.

### III. Discussion

### A. Motion for Summary Judgment

The Court begins with **[\*\*6]** the claims under the *Copyright Act*, and then turns to the claims asserted under the DMCA.

### 1. Liability under the Copyright Act

Defendants move for summary judgment on the copyright claims in favor of Kingsid and the Estate; they move for partial summary judgment in favor of UMGI. Each is addressed in turn.

### a. Liability of Kingsid

Defendants move for summary judgment on Craig's claims against Kingsid on the ground that Craig does not adduce any evidence from which a reasonable juror could infer Kingsid's involvement in the alleged copyright infringement. (Dkt. No. 78 at 9-10.) Kingsid is simply a company organized "to license Mr. King's name to third parties." (Dkt. No. 92 ¶ 16.) Craig has failed to adduce any evidence to substantiate his claim that "Kingsid . . . improperly facilitated and wrongly benefited" from the alleged copyright infringement (Compl. ¶ 12), and in fact concedes that "the record is insufficiently developed as to [Kingsid's] involvement in the infringing activity" (Dkt. No. 90 at 2 n.1). Therefore, the Court grants summary judgment in Kingsid's favor. *See Lessem v. Taylor, 766 F. Supp. 2d 504, 515 (S.D.N.Y. 2011)* (granting summary judgment to entities that had "[no]thing to do with the copyright infringement alleged in th[e] **[\*\*7]** case").

### b. Liability of the Estate

Defendants next argue that summary judgment should also be granted in favor of the Estate because the record contains no evidence that the Estate has produced, distributed, or improperly benefited from any of the allegedly infringing albums. (Dkt. No. 78 at 9-10.) In response, Craig contends that a reasonable jury could potentially find the Estate liable because its trustee and executor, Louise LaVerne Toney ("Toney"), reviewed all album releases and received royalties from UMGI. (Dkt. No. 1 ¶ 8; Dkt. No. 90 at 5.)

To start with, Craig mischaracterizes the record. Nothing in the deposition excerpt cited by Craig supports his allegation that Toney "receive[d] all album releases from UMGI, *delivered to her for review*." (Dkt. No. 90 at 5 (emphasis added).) To the contrary, Toney testified that she has never had any approval power over UMGI's release of albums. (Dkt. No. 94-1 at 59:8-61:6.) Therefore, viewed in the light most favorable to Craig, the record can, at best, support the inference that the Estate has received royalties and communications about upcoming album releases. So, the question is whether receiving communications and royalties in connection **[\*\*8]** with the allegedly infringing albums can render the Estate liable for infringement. **[\*331]** The Court answers this question in the negative.

To establish direct liability for copyright infringement, a plaintiff must show that a defendant has "engaged in some volitional conduct sufficient to show that [it] actively" violated plaintiff's copyright. *Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009)*; *see also Cartoon Network LP v. CSC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008)* ("[V]olitional conduct is an important element of direct liability . . . .").

"Here, there is no evidence establishing direct liability, since [Craig] cannot point to volitional conduct by [the Estate] that caused" the alleged infringement. *Zappa v. Rykodisc, Inc., 819 F. Supp. 2d 307, 316 (S.D.N.Y. 2011)*. Rather than having any hand in producing or marketing the allegedly infringing actions, Toney only passively received royalties and communications about album releases from UMGI. *Cf. id. at 319*. No evidence in the record shows that Toney delivered the Photographs to UMGI or cooperated in any way with UMGI regarding the use of the Photographs in the album production. Absent such evidence, there is no genuine factual dispute as to whether the Estate has engaged in any volitional conduct that renders it potentially liable for direct infringement. *Cooley v. Penguin Grp. (USA) Inc., 31 F. Supp. 3d 599, 611*

(S.D.N.Y. 2014) (holding that even a vicarious liability claim predicated on the [**9] receipt of royalties from an infringing product requires some showing that the defendant "had the power to stop the infringements"). The Estate is entitled to summary judgment on all of Craig's claims against it.[3]

**c. Liability of UMGI (Foreign Albums)**

UMGI argues that it cannot be held liable for the 29 allegedly infringing albums ("Foreign Albums") released outside the United States by foreign corporate entities. UMGI makes three arguments: (1) UMGI did not manufacture or distribute the Foreign Albums, (2) UMGI and the foreign affiliates that released the Foreign Albums are separate corporate entities, and (3) the Copyright Act does not cover extraterritorial infringements. (Dkt. No. 78 at 10-12.) The Court begins with UMGI's argument regarding the extraterritorial application of the Copyright Act.

"It is well established that copyright laws generally do not have extraterritorial application." *Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 73 (2d Cir. 1988)*. But if a defendant (1) commits a predicate infringing act—such as the unauthorized manufacture of copyrighted material—in the United States, and (2) the act permits further reproduction abroad, the defendant might be liable for related infringing acts occurring outside the country. See *Robert Stigwood Grp. Ltd. v. O'Reilly, 530 F.2d 1096, 1101 (2d Cir. 1976)*.

Among [**10] the Foreign Albums, Craig fails to adduce any evidence to show that UMGI has committed any predicate act with regard to 21 of them. UMGI is therefore entitled to summary judgment with respect to claims related to these albums. As to the remaining eight Foreign Albums that are named as "Ladies and Gentlemen, Mr. B.B. King" (the "LG Albums"), the evidentiary record compels a different result. (Compl. ¶¶ 23-24, 33-38.)

In particular, the evidentiary record could support the inference that UMGI [*332] has, through its employee Ryan Null ("Null"), transmitted an unauthorized copy of one of the Photographs (the "Star Photograph") from within the United States to UMGI's UK affiliate to produce an album named "Ladies and Gentlemen, Mr.

B.B. King." (Dkt. No. 91-1 ("Null Depo.") at 129:4-9.) The evidentiary record would also allow a reasonable jury to conclude that the LG Albums have used the Star Photograph as their album covers.[4] (See Dkt. No. 1, ¶¶ 23-24, 33-38; compare Dkt. No. 1-1 at 2, with Dkt. Nos. 1-12, 1-13, 1-22-1-27.) The question is whether UMGI's transmission of an unauthorized copy of the Star Photograph from within the United States would constitute a domestic copyright infringement that [**11] "permits further reproduction abroad." *Robert Stigwood Grp. Ltd., 530 F.2d at 1101*.

UMGI argues that its conduct does not amount to a predicate act because it was "the UK [a]ffiliate, not Mr. Null or UMGI, [that] chose to use the [infringing photo]." (Dkt. No. 93 at 5.) Yet UMGI's argument is a non sequitur. Copyright laws protect a creator's reproduction right. *17 U.S.C. § 106(1)*. In particular, "[c]ourts have consistently held that the unauthorized duplication of digital . . . files over the Internet infringes a copyright owner's exclusive right to reproduce." *Capitol Records, LLC v. ReDigi Inc., 934 F. Supp. 2d 640, 648 (S.D.N.Y. 2013)*. In addition, "unauthorized transfer of a digital . . . file over the Internet" also "constitutes reproduction within the meaning of the Copyright Act." *Id.* Null admitted in his deposition that he pulled out the Star Photograph from UMGI's digital files and sent it to UMGI's UK affiliate to produce an album named "Ladies and Gentlemen, Mr. B.B. King." (Null Depo. at 128:15-129:9, 131:22-132:6; 132:12-22.) Null's acts of pulling the Star Photograph from a database and sending it over the Internet to the UK affiliate necessarily involve the acts of duplicating and transferring a digital file over the Internet. Therefore, even assuming that Null and UMGI did not make the decision to use [**12] this photo in the album, Null's unauthorized transfer of this photo—in which Craig allegedly holds the copyright—is sufficient to constitute a predicate act for purposes of the Copyright Act. *Capitol Records, 934 F. Supp. 2d at 648-51* (holding that unauthorized online transfer of digital musical files infringes copyright owner's reproduction right); *Update Art, Inc., 843 F.2d at 73* (observing that illegal reproduction of a copyrighted work in the United States constitutes a predicate act).

Having concluded that the evidence could support the inference that UMGI, through its employee Null, committed a predicate act of infringement in the United States, the Court next considers whether the act is one

---

[3] Craig does not make any allegations as to the Estate's vicarious or contributory infringement, so the Court need not discuss these alternative theories of liability.

[4] UMGI never disputes that the cover photos of the LG Albums are derived from the Star Photograph.

Craig v. UMG Recordings, Inc.

that "permits further reproduction abroad." *Robert Stigwood Grp. Ltd., 530 F.2d at 1101*. As a matter of law, sending a digital photograph to someone abroad enables that foreign user to make additional infringing copies. Consequently, UMGI could be liable for the sale of the LG Albums that have used an unauthorized copy of the Star Photograph.

Given that the bar on the extraterritorial application of the Copyright Act does not shield UMGI from liability in connection with the LG Albums, the Court next considers UMGI's other two arguments in support of partial summary judgment.

Those two arguments miss the **[**13]** point. The crux of Craig's theory of liability is **[*333]** not that UMGI manufactured or distributed the Foreign Albums or that the corporate veil between UMGI and its foreign affiliates ought to be pierced. Instead, Craig argues that UMGI's liability arises from its alleged reproduction and transmission of an infringing photograph to its UK affiliate. (Dkt. No. 90 at 7-8.) Therefore, even accepting that UMGI did not manufacture or distribute the Foreign Albums, and that the corporate distinctions between UMGI and its affiliates are to be respected, to the extent that a reasonable jury could find that UMGI committed a domestic infringement that enabled its foreign affiliates to commit further infringements abroad, UMGI can be liable for those further infringements under the governing law. *Robert Stigwood Grp. Ltd., 530 F.2d at 1101*; *Update Art, Inc., 843 F.2d at 73*.

Therefore, Defendants' motion for summary judgment is denied with respect to the claims against UMGI related to the LG Albums, and is granted with respect to the claims related to the remaining Foreign Albums.

## 2. Damages Under the Copyright Act

The Court next turns to the question of damages. Defendants seek to limit the scope of potential damages in several ways. They argue that (1) Craig's damages award **[**14]** should be limited to damages arising from sales that occurred between July 7, 2013 and July 7, 2016, (2) Craig's actual damages should be limited to $9,452.21, (3) Craig is not entitled to any of UMGI's profits, (4) Craig is not entitled to any statutory damages, and (5) even if Craig is granted statutory damages, Craig's award should be limited to the amounts recoverable for innocent infringement. The Court addresses each proposed limitation in turn.

### a. Statute of Limitations

Defendants first argue that, to the extent that any damages are awarded, they should be limited to those arising from sales that occurred within three years of the filing of this suit—sales that occurred between July 7, 2013 and July 7, 2016.[5] (Dkt. No. 78 at 12-13.) Craig contends that damages should be calculated on the basis of sales from July 7, 2013 to the present. (Dkt. No. 90 at 9.) The Court agrees with Craig that the period for which damages are available is July 7, 2013 to the present.

Any civil action asserting a claim based on a Copyright Act violation must be brought within three years after the accrual of the claim. *17 U.S.C. § 507(b)*. This Circuit has adopted the "discovery rule" to determine when a plaintiff's copyright **[**15]** claim accrues. *Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 124-25 (2d Cir. 2014)*. Under this rule, a plaintiff's claim accrues when "the copyright holder discovers, or with due diligence should have discovered, the infringement." *Id. at 124*. After a plaintiff has established the timeliness of his or her claim with respect to any one particular act, courts in this Circuit have taken a "rolling" approach to the calculation of damages with respect to any other acts of infringement, which allows a plaintiff to recover damages for only those infringing acts that occurred within three years of the filing of the complaint. *Papazian v. Sony Music Entm't, No. 16 Civ. 7911, 2017 U.S. Dist. LEXIS 164217, 2017 WL 4339662, at *4 (S.D.N.Y. Sept. 28, 2017)* (citing *Merchant v. Levy, 92 F.3d 51, 57 n.8 (2d Cir. 1996))*.

**[*334]** The parties agree that for purposes of calculating damages, the Court may rely on only those acts of infringement that have occurred since July 7, 2013—three years prior to the filing of this suit. (*Id.*) But they fight over whether Craig can collect damages for acts of infringement that have occurred *after* he filed his lawsuit. (Dkt. No. 90 at 9; Dkt. No. 93 at 5.)

Defendants' argument is counterintuitive. According to Defendants' logic, a plaintiff would have to file continuous complaints to capture damages from

---

[5] Defendants also argue that damages should be further limited to damages that arise from the sales of thirteen specific albums that, as Craig concedes (Dkt. No. 92 ¶ 35), were the only albums UMGI sold in the United States during this period. But, as the Court has already held, UMGI may also be liable for foreign sales of the LG Albums in addition to the domestic sales of these thirteen albums.

Craig v. UMG Recordings, Inc.

violations occurring *after* he or she has already filed the first lawsuit that put a defendant on notice of the alleged infringement. **[\*\*16]** Such a rule is contrary to the speedy and efficient resolution of disputes and conservation of judicial resources. Indeed, none of the authorities cited by Defendants supports their argument. Instead, those cases discuss how far *back* in time from the filing of the complaint damages would extend, rather than whether a plaintiff can recover damages for ongoing damages *after* the filing of the complaint. *Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 677, 134 S. Ct. 1962, 188 L. Ed. 2d 979 (2014)* ("[A] successful plaintiff can gain retrospective relief only three years back from the time of suit."); *Papazian, 2017 U.S. Dist. LEXIS 164217, 2017 WL 4339662, at \*6* ("Plaintiff cannot recover damages for infringing acts that occurred . . . three years before he filed his complaint.").

The Court declines to follow Defendants' invitation to limit the damages period to the filing of the complaint. Therefore, July 7, 2013 to the present (the "Relevant Period") is the proper time period for purposes of calculating damages. To sum up, Craig's maximum damages are limited to those arising from the sale of the 13 albums in the United States and the LG Albums abroad between July 6, 2013 and the present.

**b. Actual Damages**

The Copyright Act entitles copyright owners to two types of compensatory damages: actual damages and infringers' profits. *17 U.S.C. § 504(a)(1)*. These two types **[\*\*17]** of damages serve different purposes and are based on different financial data. *See On Davis v. The Gap, Inc., 246 F.3d 152, 159 (2d Cir. 2001)*. Here, Defendants seek to cap Craig's actual damages at $9,452.21 on the basis of their expert opinion. (Dkt. No. 78 at 13-15.) Craig objects to Defendants' figure by questioning the adequacy of Defendants' expert opinion. (Dkt. No. 90 at 11-12.)

Defendants' $9,452.21 calculation takes into account only the thirteen albums sold in the United States, and not any of the Foreign Albums. (Dkt. No. 62-7 at 9, 27-28.) As the Court explained above, UMGI's liability for the LG Albums sold abroad is still a triable issue. Therefore, the Court cannot conclude at the summary judgment stage that no factual dispute exists as to the maximum amount of actual damages to which Craig might be entitled. Defendants' motion for summary judgment with respect to the actual damages calculation

is denied.

**c. Infringers' Profits**

Next, the Court turns to infringers' profits. The Copyright Act awards infringers' profits to ensure that infringers do not benefit from their wrongdoing. *On Davis, 246 F.3d at 159*. The statute adopts a burden-shifting framework: first, "the copyright owner is required to present proof only of the infringer's gross revenue," and **[\*\*18]** second, "the infringer is [then] required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *17 U.S.C. § 504(b)*. The Second Circuit interprets "gross revenue" under the Copyright Act as "gross **[\*335]** revenue reasonably related to the infringement, not unrelated revenues." *On Davis, 246 F.3d at 160*.

Here, the parties dispute whether Craig has carried his initial burden of adducing evidence of any "revenues reasonably related to the infringement." *Id.* Craig has set forth the gross revenue earned by UMGI in 2014-2016 from the sale of the allegedly infringing albums in his expert's opinion. (Dkt. No. 80-6 at 5.) But Defendants attack the "causal connection" between the Photographs and UMGI's revenue from selling the allegedly infringing albums. (Dkt. No. 78 at 16.) According to Defendants, the Photographs and UMGI's revenue are not "reasonably related," *On Davis, 246 F.3d at 160*, because "all of UMGI's profits are attributable to Mr. King" (Dkt. No. 78 at 17).

The evidence in the record, interpreted in the light most favorable to non-movant Craig, is sufficient to lead a reasonable jury to conclude that UMGI's revenues from selling the King Albums are reasonably related to the allegedly infringing **[\*\*19]** photographs. The Photographs used as album covers feature prominently on those albums. Indeed, the Photographs are most likely the first things that catch a customer's eye when she is browsing the shelves either in a physical store or online. It is true that King is a great musician and that many people purchase his albums solely for the music. But it would be disingenuous to argue that the cover design does not affect the overall quality of an album, customers' willingness to buy, and, consequently, album sales. As UMGI itself admits, "[UMGI] really [is] careful about what [it] choose[s] for a cover." (Null Depo. 39:11-12.) Indeed, its employees are expected to "research as many [photographs] as [they] need to until [they] find the correct photo that's appropriate or the correct creative choice that the art director or the designer or anyone

Craig v. UMG Recordings, Inc.

else would approve to be used from a creative standpoint," because UMGI is "more concerned with the cover . . . than what shows up inside." (*Id.* 38:16-21, 39:14-15.) It cannot be said to be beyond genuine dispute that the revenues are not reasonably related to the photographs,

The cases cited by UMGI are inapposite. The out-of-circuit case *Mackie v. Rieser, 296 F.3d 909 (9th Cir. 2002)*, discusses [**20] the relationship between an infringing artwork used in a promotional brochure for the Seattle Symphony Orchestra and the current and future profits the Orchestra generated after using that photo, *id. at 911.* There, the infringing artwork was in only "one page in a multi-page brochure that advertised a series of concerts that were unrelated to the artwork itself." *Id. at 916.* It is distinguishable because the Photographs here feature King himself and are probably the most important image component of the albums. Also, unlike the three-second appearance of an infringing design in a 44-minute broadcast which "[o]ne could miss . . . in a blink of the eye," the Photographs used in the infringing albums are at the front and center of each album cover. *Mager v. Brand New Sch., No. 03 Civ. 8552, 2004 U.S. Dist. LEXIS 21686, 2004 WL 2413978, at *4 (S.D.N.Y. Oct. 28, 2004).* In short, the evidence in the record "is sufficient to lead a reasonable jury to conclude that [UMGI's album sales] are reasonably related to the allegedly infringing photographs." *Laspata DeCaro Studio Corp. v. Rimowa GmbH, No. 16 Civ. 934, 2018 U.S. Dist. LEXIS 103347, 2018 WL 3059650, at *7 (S.D.N.Y. June 20, 2018).* Therefore, UMGI's motion for summary judgment as to Craig's claim for infringers' profits is denied.

### d. Statutory Damages and Attorney's Fees

In addition to actual damages and infringers' profits, a copyright owner may **[*336]** elect instead to seek statutory damages against copyright infringers **[**21]** under the Copyright Act. *17 U.S.C. § 504(a)(2).* A court may also award a reasonable attorney's fees to a prevailing plaintiff. *17 U.S.C. § 505.* Nonetheless, as a precondition to obtaining statutory damages and attorney's fees, a plaintiff must have registered its copyright before the alleged infringement. *17 U.S.C. § 412; see also Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1012 (2d Cir. 1995).*

It is not disputed that Craig registered his copyright for the Photographs in March 2014. (Dkt. No. 92 ¶ 7.) Therefore, Craig is not entitled to recover statutory

damages or attorney's fees for those alleged infringements that occurred prior to March 2014. But Craig points out that in November 2015—after his registration—UMGI released yet another album named *Ladies and Gentlemen Mr. B.B. King* (the "2015 Album") containing one of the Photographs. (*See* Dkt. No. 92 ¶ 35(i).) Because the 2015 Album was released after the copyright registration, it could potentially entitle Craig to statutory damages. At issue is whether Craig would be entitled to seek statutory damages and attorney's fees for UMGI's 2015 Album if Craig succeeds in establishing UMGI's liability in this action.

Defendants argue that the 2015 release is merely a re-packaging of an earlier album named *Ladies and Gentlemen Mr. B.B. King* (the "2012 [**22]** Album") that was initially released in 2012, prior to Craig's copyright registration. (Dkt. No. 78 at 19.) As a so-called re-packaging of the 2012 Album, Defendants contend, the 2015 Album is a continuation of the alleged infringement that commenced prior to Craig's registration in 2014. (Dkt. No. 78 at 19.) In opposition, Craig claims that the 2015 Album constitutes a separate act of infringement that commenced after the registration of the copyright. (Dkt. No. 90 at 14-15.)

Courts in this District have consistently applied a bright-line rule in cases where the first act of infringement in a series of ongoing infringements occurred prior to the work's copyright registration. *See, e.g., Solid Oak Sketches, LLC v. 2K Games, Inc., No. 16 Civ. 724, 2016 U.S. Dist. LEXIS 101119, 2016 WL 4126543, at *2-4 (S.D.N.Y. Aug. 2, 2016); Steele v. Bell, No. 11 Civ. 9343, 2014 U.S. Dist. LEXIS 44056, 2014 WL 1979227, at *9 (S.D.N.Y. Mar. 28, 2014); U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc., No. 04 Civ. 6189, 2008 U.S. Dist. LEXIS 64297, 2008 WL 3906889, at *15-16 (S.D.N.Y. Aug. 21, 2008).* "[W]hen the same defendant infringes on the same protected work in the same manner as it did prior to the work's registration, the post-registration infringement constitutes the continuation of a series of ongoing infringements." *Solid Oak Sketches, 2016 U.S. Dist. LEXIS 101119, 2016 WL 4126543, at *3.* For example, an updated version of a video game released two years after its original is part of the same ongoing infringement. *See id.* Similarly, a "newly configured version of [a television] program" with a different title also constitutes [**23]** a continuation of the program's earlier infringement. *Irwin v. ZDF Enters. GmbH, No. 04 Civ. 8027, 2006 U.S. Dist. LEXIS 6156, 2006 WL 374960, at *2 (S.D.N.Y. Feb. 16, 2006); see also 2006 U.S. Dist. LEXIS 6156, [WL] at *6.*

Here, Craig does not cite any of these cases, much less attempt to distinguish them. The record clearly indicates that the 2015 Album is part of an ongoing infringement that commenced with the release of the 2012 Album. The 2015 Album has the same front cover and back cover as the 2012 Album, uses the same four photographs that appeared in the 2012 Album, and contains the same seventeen musical compositions and sound recordings that appeared in the 2012 Album. (Dkt. No. 83 ¶ 4.) The only difference is that the 2015 Album has fewer tracks and photographs **[*337]** than the 2012 Album. (Dkt. No. 83 ¶ 5.) In essence, by releasing the 2015 Album, UMGI infringed the same photographs in the same manner as it had done in releasing the 2012 Album. It is therefore beyond genuine dispute that the 2015 Album "constitutes the continuation of a series of ongoing infringements" that commenced with the 2012 Album. *Solid Oak Sketches, 2016 U.S. Dist. LEXIS 101119, 2016 WL 4126543, at *3.*

In arguing to the contrary, Craig maintains, based on Null's deposition, that "UMGI employees concede that by their own standards the 2015 release is considered a new compilation." (Dkt. No. 90 at 14.) But Craig's argument misrepresents the record. **[**24]** Nowhere in Null's deposition excerpt submitted in the record does Craig's counsel or Null directly refer to the 2015 Album. (*See generally* Null Depo.) Viewing all evidence in the light most favorable to Craig, the closest he has come to probing the question of the 2015 Album's novelty is when his counsel asked Null if it would be unusual for UMGI to use the same cover from an old album in a new compilation, implicitly referring to the 2012 Album and the 2015 Album. (Null Depo. 61:2-8.) But Null categorically rejected such a possibility, stating that "[a] compilation would have new art . . . . We wouldn't do that." (*Id.* 61:9-13.) According to Null, a new compilation would have new a cover photo, new title, and new track list, and would therefore constitute a completely new collection. (*Id.* 40:9-12, 40:25-41:2, 59:16-60:2, 61:17-20.) The 2015 Album, which pulls its cover, title, and songs from the 2012 Album, does not fit Null's "new compilation" description.

Craig argues that construing the concept of "continuing infringement" in this way will reduce the deterrent effect that the Copyright Act's statutory damages provision has against potential infringers. (Dkt. No. 90 at 14.) The Court **[**25]** is not persuaded. "A defendant who continues infringing after registration will be subject to liability for actual damages, disgorgement of profits," and a possible injunction. *Steele, 2014 U.S. Dist. LEXIS 44056, 2014 WL 1979227, at *9.* Such remedies are often sufficient to deter potential infringers and compensate copyright owners for their losses, thus serving the statutory purpose of deterring copyright infringement. In light of Craig's otherwise available remedies, the Court rejects Craig's argument and joins the other courts in this District that have adopted a bright-line rule. *Solid Oak Sketches, LLC, 2016 U.S. Dist. LEXIS 101119, 2016 WL 4126543, at *2-4; Steele, 2014 U.S. Dist. LEXIS 44056, 2014 WL 1979227, at *8-9; U2 Home Entm't, Inc., 2008 U.S. Dist. LEXIS 64297, 2008 WL 3906889, at *15-16.*

Because the alleged infringements occurred before Craig's registration of his copyright, UMGI is entitled to summary judgment on claims of statutory damages and attorney's fees. Because the Court denies statutory damages for Craig, the Court need not reach the remainder of Defendants' damages arguments.

### 3. Liability Under the DMCA

Finally, Defendants move for summary judgment on Craig's DMCA claims. "The DMCA prohibits, among other things, 'intentionally remov[ing] or alter[ing] any copyright management information.'" *Zalewski v. Cicero Builder Dev., Inc., 754 F.3d 95, 107 (2d Cir. 2014)* (alterations in original) (quoting *17 U.S.C. § 1202(b)*). Copyright management information ("CMI") includes the title and other information identifying the **[**26]** work and its author. *17 U.S.C. § 1202(c).* To establish a DMCA violation under *§ 1202(b)(1)*, a plaintiff must establish "(1) the existence of CMI on the [infringed work]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally." *Gattoni v. Tibi, LLC, 254 F. Supp. 3d 659, 664 (S.D.N.Y. 2017)* (alteration in original) (quoting **[*338]** *BanxCorp v. Costco Wholesale Corp., 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010)).* Alternatively, a defendant may be liable under *§ 1202(b)* for "distribut[ing] copyrighted work] . . . knowing that copyright management information has been removed or altered without authority of the copyright owner or the law." *17 U.S.C. § 1202(b)(3).*

Here, Craig fails to present sufficient evidence to satisfy the intention prong under *§ 1202(b)(1)* or the knowledge prong under *§ 1202(b)(3)*. Defendants argue that, even assuming the Photographs had CMI, it was removed by a third party prior to 1971, when the Photographs appeared without CMI in a music tour book. (Dkt. No. 78 at 24; *see also* Dkt. No. 79 ¶ 5; Dkt. No. 62-6 ("Craig

Craig v. UMG Recordings, Inc.

Depo.") 55:13-25.) Craig neither adduces any evidence nor presents any alternative theory to rebut Defendants' claim. Nothing in the evidentiary record indicates that Defendants either intentionally removed the CMI or had reason to know that the CMI had been improperly removed when releasing the infringing albums. There is not **[\*\*27]** even any evidence suggesting whether there was CMI on the Photographs when Defendants obtained them. Without any evidence from which the Court can draw a favorable inference for Craig, the Court must grant summary judgment in favor of Defendants with respect to the DMCA claim.

## B. Motion for Sanctions

Defendants invoke _28 U.S.C. § 1927_ and the court's inherent powers to sanction Craig, his counsel Richard Liebowitz, and the Liebowitz Law Firm PLLC for filing a meritless motion to disqualify Defendants' expert, Sedlik.

Under _§ 1927_, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." _28 U.S.C. § 1927_. To succeed under _§ 1927_, a plaintiff must demonstrate "clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." _Revson, 221 F.3d at 79_ (citing _Agee, 114 F.3d at 398_). The second prong—bad faith—can be established by inference from completely meritless actions. _In re 60 E. 80th St. Equities, Inc., 218 F.3d at 116_; _see also Oliveri, 803 F.2d at 1273_ ("[A]n award under _§ 1927_ is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken **[\*\*28]** for some improper purpose such as delay."). Awards pursuant to _§ 1927_ may be imposed only against the attorney, not the client. _Id._

As became obvious at the evidentiary hearing on May 25, 2018, Craig's motion to disqualify was entirely meritless. In order to have Sedlik disqualified, Craig had to show at least that (1) it was objectively reasonable for him to believe that he had a confidential relationship with Sedlik, and (2) he actually disclosed confidential information to Sedlik. _Rodriguez v. Pataki, 293 F. Supp. 2d 305, 311 (S.D.N.Y. 2003)._

In his motion to disqualify, Craig alleged through his counsel, and stated in a declaration, that he had

disclosed confidential information to Sedlik in a phone call which he thought was confidential. (Dkt. No. 56 at 1-2.) But the evidentiary hearing revealed that Craig did not disclose any confidential information to Sedlik. Contrary to what Craig's counsel has mischaracterized as "explain[ing] the whole theory of the case to Mr. Sedlik" (Dkt. No. 56 at 7), what Craig told Sedlik was simply the basic facts of the case, his career path, and his licensing history—none of which can be categorized as confidential (Dkt. No. 73-1 ("Hrg. Trs.") 6:7-23). The only allegedly **[\*339]** "confidential" information—the discussion **[\*\*29]** on Getty Image licensing fees—was not only told _by_ Sedlik _to_ Craig, but also publicly available. (_Id._ 13:24-14:2, 22:9-16.) In fact, Craig also admitted that he let Sedlik lead the conversation on pricing and had failed to contribute. (_Id._ 16:2-4, 24:4-7.) Nothing from Craig's testimony can be characterized as "litigation" or "settlement strategy." (Dkt. No. 64 at 6-7.)

In addition to the utter lack of merit to Craig's motion to disqualify, the Court concludes that the motion was made vexatiously and in bad faith. Bad faith can be inferred if the action is completely without merit. _In re 60 E. 80th St. Equities, Inc., 218 F.3d at 116_. Such is the case here. With the full knowledge that Craig had not disclosed any confidential information, Liebowitz went ahead and filed this meritless motion. Liebowitz's bad faith is most evident in the omission of the details of the alleged conversation in the moving papers. Those details were fatal to Craig's motion, and obviously so under a basic understanding of the applicable law.

Plaintiff's counsel forced Defendants to prepare papers opposing his motion, and required the Court to hold a wasteful evidentiary hearing. Such unnecessary delay and expense is precisely what Congress sought to eradicate **[\*\*30]** when enacting _§ 1927_. _Oliveri, 803 F.2d at 1273_ ("[T]he purpose of _[§ 1927]_ was to deter unnecessary delays in litigation." (quotation marks and citation omitted)). Therefore, an award against Liebowitz and his firm pursuant to _§ 1927_ is proper.

The inherent powers of the Court also allow it to sanction parties and attorneys who have "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." _Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975)_ (quoting _F. D. Rich Co. v. United States, 417 U.S. 116, 129, 94 S. Ct. 2157, 40 L. Ed. 2d 703 (1974))._ The standard for imposing sanctions pursuant to the Court's inherent power is the same as that under _§ 1927_: "(1) the offending party's claims were entirely meritless and (2) the party acted for improper

Craig v. UMG Recordings, Inc.

purposes." *Revson, 221 F.3d at 79*. The Court's inherent powers also support an award of sanctions here.

Because Liebowitz's "actions were indistinguishable from those of [the Liebowitz Law Firm PLLC] as a firm," *Enmon v. Prospect Capital Corp., 675 F.3d 138, 148 (2d Cir. 2012)*, the Court awards costs and fees against both Liebowitz and the Liebowitz Law Firm PLLC, jointly and severally.

The Court declines to sanction Craig himself. The basis for inferring bad faith is weaker as to Craig. *See In re 60 E. 80th St. Equities, Inc., 218 F.3d at 116* (allowing the inference of bad faith from completely meritless actions in the context of *§ 1927*). As distinct from Liebowitz, Craig is a layperson who lacks the legal acumen to assess the viability of his disqualification motion **[**31]** under the law. He may not have known that the motion was legally colorless before agreeing to its filing. Without any particularized showing of bad faith as to Craig, the Court will not impose sanctions on Craig.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. All claims against Defendants Kingsid Ventures, Ltd. and the Estate of Riley B. King are dismissed.

Defendants' motion for sanctions is GRANTED as to Richard Liebowitz and the Liebowitz Law Firm PLLC, and DENIED as to Plaintiff Glen Craig. Defendants **[*340]** shall submit, on or before April 26, 2019, a declaration with detailed contemporaneous time and disbursement records to substantiate the amount of fees and costs incurred in opposing Craig's motion to disqualify and preparing for and attending the evidentiary hearing.

The Clerk of Court is directed to close the motions at Docket Numbers 71 and 77.

SO ORDERED.

Dated: March 29, 2019

New York, New York

/s/ J. Paul Oetken

J. PAUL OETKEN

United States District Judge

**End of Document**

**Exhibit C**

 Neutral
As of: November 6, 2019 6:37 AM Z

# *Stelzer v. Lead Stories LLC*

United States District Court for the District of Colorado

July 3, 2019, Decided; July 3, 2019, Filed

Civil Action No. 19-cv-00473-PAB-KMT

**Reporter**
2019 U.S. Dist. LEXIS 178345 *; 2019 WL 5095689

BRIGITTE STELZER, Plaintiff, v. LEAD STORIES LLC, Defendant.

**Prior History:** *Stelzer v. Lead Stories LLC, 2019 U.S. Dist. LEXIS 178344 (D. Colo., June 11, 2019)*

## Core Terms

magistrate judge, scheduling, scheduling order, deadlines, administrative error, recommendation, missed, court order, sanctions, telephone, conferred, warned, failure to comply, defense counsel

**Counsel: [*1]** For Brigitte Stelzer, Plaintiff: Richard P. Liebowitz, Liebowitz Law Firm, PLLC, Valley Stream, NY USA.

For Lead Stories Llc, Defendant: Justin Tyler Bailey, Sanders Law Firm, LLC-Colorado Springs, Colorado Springs, CO USA.

**Judges:** PHILIP A. BRIMMER, Chief United States District Judge.

**Opinion by:** PHILIP A. BRIMMER

## Opinion

### ORDER

This matter is before the Court on plaintiff's Declaration of Richard Liebowitz [Docket No. 20] filed on June 25, 2019. The Court construes this declaration as an objection to the Recommendation of United States Magistrate Judge [Docket No. 19] entered on June 11, 2019. Magistrate Judge Kathleen M. Tafoya recommends that the Court dismiss this action with prejudice due to plaintiff's failure to comply with the

Federal Rules of Civil Procedure and the magistrate judge's orders. Docket No. 19 at 5.

### I. BACKGROUND

The relevant background facts of this case are recited in the magistrate judge's recommendation and will not be repeated here. *See* Docket No. 19 at 1-3. On April 5, 2019, the magistrate judge set a scheduling conference for May 13, 2019. Docket No. 8. The magistrate judge ordered the parties to file a proposed scheduling order, along with the magistrate judge consent form, on or before **[*2]** May 6, 2019. *Id.* at 2. On May 6, defendant filed a proposed scheduling order, stating that, at the time of the filing, "Counsel for Plaintiff ha[d] not conferred with Counsel for Defendant." Docket No. 10. at 8. Defendant also filed a notice of consent to the magistrate judge's jurisdiction, Docket No. 9, in which it again stated that plaintiff's counsel had not yet conferred with defendant. Docket No. 9 at 1.

The next day, on May 7, 2019, plaintiff's counsel moved for leave to appear by telephone at the May 13 scheduling conference. Docket No. 13. The magistrate judge granted the motion and provided plaintiff's counsel with instructions for attending the conference by telephone. Docket No. 15.

On May 13, plaintiff's counsel did not appear at the scheduling conference by telephone or in person. Docket No. 16 at 1. Telephone calls to plaintiff's counsel's law office and cell phone in an attempt to reach counsel were unsuccessful. *Id.* The magistrate judge reset the scheduling conference for June 5, 2019, and ordered plaintiff's counsel to appear in person. *Id.* at 2. The magistrate judge read into the record the factors for entering sanctions against a party set out in *Ehrenhaus v. Reynolds, 965 F.2d 916 (10th Cir. 1992)*, and noted that many of the factors **[*3]** were met in this

Stelzer v. Lead Stories LLC

case. Docket No. 16 at 1. She further stated that "[c]ounsel is therefore warned that dismissal of the case with prejudice is a possibility for failure to participate in the case. Further failures in this case could result in a recommendation to the District Court that the case be dismissed." *Id.*

Plaintiff's counsel was also ordered to contact defense counsel by May 15, 2019 to draft an amended proposed scheduling order, which was to be filed by May 29, 2019. *Id.* at 2. On May 29, defendant again filed a proposed scheduling order with no input from plaintiff. Docket No. 17. Defendant stated that the parties conferred on May 14, 2019 to discuss the scheduling order and, after the meeting, defense counsel sent a proposed scheduling order to plaintiff's counsel and highlighted portions to be edited by plaintiff. *Id.* at 4. Plaintiff did not respond. *Id.* The magistrate judge then vacated the June 5 hearing, Docket No. 18, and now recommends that this case be dismissed with prejudice due to plaintiff's failure to comply with multiple court orders. Docket No. 19 at 5.

## II. STANDARD OF REVIEW

"The Court will 'determine de novo any part of the magistrate judge's disposition that has been properly **[*4]** objected to' by plaintiff." *Turner v. Falk, No. 13-cv-02957-PAB-MJW, 2014 U.S. Dist. LEXIS 178820, 2014 WL 7451698, at *1 (D. Colo. Dec. 31, 2014)* (citing *Fed. R. Civ. P. 72(b)(3)*). "[A] party's objections . . . must be both timely and specific to preserve an issue for de novo review by the district court." *United States v. One Parcel of Real Property Known as 2121 East 30th St., 73 F.3d 1057, 1060 (10th Cir. 1996)*.

## III. ANALYSIS

Plaintiff objects to the magistrate judge's recommendation on the grounds that merits decisions are generally favored and that dismissal is too harsh a sanction for this case. Docket No. 20 at 1-2, ¶¶ 4, 6. She states that any missed deadlines "were a result of administrative error and were short in duration," that she has "repeatedly engaged with the Court and defense counsel and has not constructively abandoned the case," and that, prior to the magistrate judge's recommendation, she "never received warning that the case would be subject to dismissal for failure to prosecute." *Id.* at 2-3, ¶¶ 7-9. She also asserts that

defendant will not suffer any prejudice should the Court permit this case to proceed on the merits. *Id.* at 3, ¶ 9. Finally, plaintiff argues that no sanction is warranted because "administrative errors . . . are not grounds for sanctions against attorneys." *Id.*, ¶ 11. The Court will first address plaintiff's arguments and **[*5]** then determine what sanction, if any, is proper under *Ehrenhaus*.

The Court finds plaintiff's arguments conclusory and not credible. Plaintiff argues that "any deadlines missed were a result of administrative error and were short in duration." *Id.* at 2, ¶ 7. Plaintiff filed this lawsuit on February 17, 2019, Docket No. 1, and failed to confer with counsel until May 14, 2019. *See* Docket Nos. 9 at 1; 10 at 4; 17 at 4. Because of this, plaintiff missed her filing deadlines for the magistrate judge consent notice and the proposed scheduling order. *See* Docket Nos. 9 and 10. Plaintiff then filed a motion for leave to appear at the May 13 scheduling conference by telephone, indicating that plaintiff was aware that this conference was scheduled for May 13 at 9:00 a.m. Docket No. 13 at 1 ("Plaintiff . . . moves this Court to allow Richard Liebowitz to appear by telephone at the May 13, 2019 at 9am. [sic] Scheduling Conference."). Plaintiff failed to appear at this conference and the magistrate judge's subsequent attempts to contact plaintiff were unsuccessful. Docket No. 16 at 1. Further, after then being warned that dismissal was a potential sanction in this case, plaintiff missed her deadline to file **[*6]** the amended proposed scheduling order. Docket No. 17.

Plaintiff has offered no explanation as to why these missed deadlines were mere "administrative errors," and the Court is not convinced that these missed deadlines were mere excusable mistakes. Further, the Court does not find that plaintiff's filing of a motion to appear by telephone and conferring once with defense counsel, after being ordered to do so by the magistrate judge, amounts to plaintiff "repeatedly engag[ing] with the Court and defense counsel," particularly when viewed in light of the numerous other times that plaintiff failed to engage in this case.

Moreover, plaintiff's contention that she was never warned that dismissal was a possible sanction is plainly contradicted by the record. After plaintiff failed to appear at the May 13 scheduling conference, the magistrate judge, in the courtroom minutes, warned plaintiff "that dismissal of the case with prejudice is a possibility for failure to participate in the case." Docket No. 16 at 1. The Court is also not convinced by plaintiff's argument that defendant will not suffer any prejudice if the Court

Stelzer v. Lead Stories LLC

allows this case to go forward on the merits. Plaintiff has repeatedly **[*7]** missed deadlines even in the early stages of this case. Further, plaintiff's failure to take responsibility for those missed deadlines, or to acknowledge her errors, indicates that it is probable that plaintiff will continue to violate court orders if this litigation were to proceed.

Finally, plaintiff argues that not only should this case not be dismissed, but that no sanctions are warranted because her multiple failures to obey court orders in this case were mere "administrative errors." Docket No. 20 at 3, ¶ 11. Plaintiff provides no explanation of what she considers an "administrative error" to be and cites no Tenth Circuit authority or case from this district to support the proposition that an "administrative error" does not merit sanctions or dismissal.[1] In fact, repeated failure to comply with court orders is proper grounds for dismissal of a case. *See Olvera v. Douglas County Sheriff OSN 1520, No. 16-cv-02419-PAB-KLM, 2018 U.S. Dist. LEXIS 88185, 2018 WL 2382319, at *2 (D. Colo. May 24, 2018)* ("Dismissal with prejudice is warranted because of plaintiff's repeated failures to comply with court orders and deadlines.").

The Federal Rules of Civil Procedure provide that "[o]n motion or on its own, the court may issue any just orders, including those authorized **[*8]** by *Rule 37(b)(2)(A)(ii)-(vii),* if a party or its attorney . . . fails to appear at a scheduling or other pretrial conference . . . or . . . fails to obey a scheduling or pretrial order." *Fed. R. Civ. P. 16(f).* Sanctions for either violation may include "dismissing the action or proceeding in whole or in part." *Fed. R. Civ. P. 37(b)(2)(A)(v).*

Under *Ehrenhaus,* before choosing dismissal as a sanction, a court should consider "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; . . . (3) the

culpability of the litigant; . . . (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; . . . and (5) the efficacy of lesser sanctions." *Ehrenhaus, 965 F.2d at 920-21* (internal citations omitted). The magistrate judge determined that, balancing these factors, dismissal of the case is appropriate.

The Court agrees that dismissal is warranted here. First, defendant has been prejudiced by plaintiff's behavior, as defendant has had to file two scheduling orders, attend a scheduling conference at which plaintiff failed to appear, and attempt to confer with plaintiff to prepare a scheduling order, only to have plaintiff once again be unresponsive. *See **[*9]** Harrington v. Ozark Waffle Inc.,* No. 16-cv-01236-MJW, 2017 WL 6551193, at *3 (D. Colo. Oct. 19, 2017)* ("Defendant has been prejudiced by having to expend resources trying to move forward a case that was initiated by Plaintiff."). Plaintiff's behavior has also interfered with the judicial process. Though this case is in its early stages, plaintiff's behavior has already prejudiced defendant and inconvenienced the court, as the magistrate judge has undertaken multiple efforts in an attempt to get plaintiff to comply with her orders. *See Steckel v. Doe,* No. 08-cv-01652-LTB-CBS, 2009 WL 1174479, at *2 (D. Colo. Apr. 29, 2009)* ("Judicial resources have been expended on setting, resetting, monitoring, and issuing orders in this civil action.").

The Court also finds that plaintiff is culpable, as her failure to comply with multiple deadlines and court orders evidences not an administrative error, but a pattern of disrespect for the magistrate judge's authority. Further, plaintiff's lack of respect for the judicial process indicates that any lesser sanction would have little to no effect. Plaintiff's counsel has previously been sanctioned in another district for similar behavior, which clearly has had no deterrent effect. *See Steeger v. JMS Cleaning Services, LLC, 2018 U.S. Dist. LEXIS 32730, 2018 WL 1136113, at *3 (S.D.N.Y. Feb. 28, 2018),* vacated in part on reconsideration by *Steeger v. JMS Cleaning Services, LLC, 2018 U.S. Dist. LEXIS 42797, 2018 WL 1363497 (S.D.N.Y. Mar. 15, 2018)* ("Mr. Liebowitz's claim that his failure to serve [defendant] **[*10]** with the Notice of Pretrial Conference was 'inadvertent' and an 'honest mistake' is unpersuasive given his prior practice before this Court and in this district."). Under these circumstances, no lesser sanction is appropriate and dismissal is the proper result.

**IV. CONCLUSION**

---

[1] Further, the case that plaintiff cites in support, *In re Sutter, 543 F.2d 1030 (2d Cir. 1976),* is unhelpful to her position. In that case, the Second Circuit upheld a $1,500 fine assessed to an attorney who had acted "recklessly" by failing to inform the court of a potential conflict in the scheduling of his criminal trials, which resulted in one trial being delayed three days. *Id. at 1032.* In upholding the sanction, the court stated that the professional rules "require[] of attorneys at least a reasonable degree of attentiveness to their responsibilities to the court." *Id. at 1035.* Plaintiff's counsel's failure to comply with at least three court orders in a span of four months cannot be described as reasonably attentive to his responsibilities to the court.

Stelzer v. Lead Stories LLC

For these reasons, it is

**ORDERED** that the Recommendation of United States Magistrate Judge [Docket No. 19] is **ACCEPTED**. It is further

**ORDERED** that this case is **DISMISSED WITH PREJUDICE**. It is further

**ORDERED** that each party shall bear its own costs. It is further

**ORDERED** that this case is closed.

DATED July 3, 2019.

BY THE COURT:

s/Philip A. Brimmer

PHILIP A. BRIMMER

Chief United States District Judge

---

End of Document

**Exhibit D**

 Warning
As of: December 14, 2019 7:35 PM Z

# Steeger v. JMS Cleaning Servs. LLC

United States District Court for the Southern District of New York

February 28, 2018, Decided; February 28, 2018, Filed

17cv8013(DLC)

## Reporter

2018 U.S. Dist. LEXIS 32730 *; 126 U.S.P.Q.2D (BNA) 1043 **; 2018 WL 1136113

PAUL STEEGER, Plaintiff, -v- JMS CLEANING SERVICES LLC, Defendant.

**Subsequent History:** Reconsideration granted by, in part, Vacated by, in part Steeger v. JMS Cleaning Servs., LLC, 2018 U.S. Dist. LEXIS 42797 (S.D.N.Y., Mar. 14, 2018)

**Prior History:** Steeger v. JMS Cleaning Servs. LLC, 2018 U.S. Dist. LEXIS 13207 (S.D.N.Y., Jan. 26, 2018)

## Core Terms

Notice, pretrial conference, sanctions, settlement, failure to serve, needlessly, parties, cases, costs

**Counsel:** [*1] For plaintiff: Richard P. Liebowitz, Liebowitz Law Firm, PLLC, Valley Stream, NY.

For defendant: Stephanie Furgang Adwar, Furgang & Afwar, LLP, West Nyack, NY.

**Judges:** DENISE COTE, United States District Judge.

**Opinion by:** DENISE COTE

## Opinion

[**1043] MEMORANDUM OPINION AND ORDER

DENISE COTE, District Judge:

On October 18, 2017, Paul Steeger filed this copyright action. He is represented by Richard Liebowitz, who has been labelled a copyright "troll." McDermott v. Monday Monday, LLC, 17cv9230(DLC), 2018 U.S. Dist. LEXIS 28664, 2018 WL 1033240, at *3 n.4 (S.D.N.Y. Feb. 22, 2018).[1] The defendant is a "mom and

---

[1] Mr. Liebowitz has filed over 500 cases in this district in the past twenty-four months. Sixteen of those cases have been before this

Steeger v. JMS Cleaning Servs. LLC

pop" office cleaning service. As became apparent over the brief history of this litigation, the defendant had downloaded a photograph of a leaf from a free download site. It displayed that photograph on its website sometime in 2013. The copyright for the photo was filed on March 11, 2017, well after the allegedly infringing use. Similar photos of leaves are available online for a license of about $12. The defendant removed the photo from its website as soon as it was notified, in July, that the plaintiff might file suit.

A Memorandum Opinion and Order of January 26, 2018 ("January 26 Order") required Mr. Liebowitz to show cause by February 2 why he should not be sanctioned, pursuant to Rule 11 and the Court's inherent **[*2]** power, for the following conduct:

> 1) his failure to serve the November 9, 2017 Notice of Pretrial Conference;
> 2) the misrepresentations and omissions in his January 13, 2018 letter to the Court; and
> 3) costs needlessly imposed on the defendant.

The January 26 Order outlined the procedural history of the case, including Mr. Liebowitz's failure to serve the Notice of Pretrial Conference on defendant, his delay in serving the Complaint on the defendant, and his failure to communicate with the defendant effectively concerning settlement.

In his February 2 response, Mr. Liebowitz acknowledges that he failed to serve the Court's Notice of Pretrial Conference on the defendant, as he was required to do. He contends that the failure was "inadvertent," and argues that the defendant was not prejudiced since it independently learned of the date of the conference.

Court.

Mr. Liebowitz argues that his January 13 letter to the Court contained no misrepresentations and that the law did not impose upon him the duty to say more than he did. The **[**1044]** January 13 letter had requested an adjournment of the initial pretrial conference scheduled to occur on January 19, on the ground that the defendant had not responded to **[*3]** the complaint and the plaintiff intended to file a motion for a default. That letter did not reveal that plaintiff's counsel had been in communication with attorneys for the defendant since July, as described in the January 26 Order. Mr. Liebowitz argues that, in the event the Court finds that he should have included more information in the January 13 letter, his omissions did not rise to the level of bad faith.

Finally, Mr. Liebowitz argues that it was the defendant who needlessly made the litigation more expensive by (among other things) failing to waive service, to update its address with the Secretary of State, and to answer or request an extension of the time to answer.

On February 5, counsel for the defendant requested that the Court grant the defendant its costs and attorney's fees, and impose a bond requirement on the plaintiff to cover the defendant's costs or dismiss this action. Among other things, the submission took issue with the accuracy of several representations in Mr. Liebowitz's February 2 submission. The plaintiff was required to respond by February 12. In an application of February 6, the defendant retracted its February 5 requests in order to proceed with a settlement **[*4]** agreement reached between the plaintiff and defendant.

In a February 12 submission, Mr. Liebowitz argued again that there was insufficient evidence that he acted in bad faith. On

February 22, the plaintiff voluntarily dismissed this action with prejudice pursuant to Rule 41(a)(1)(A)(i).

This is not the first time Mr. Liebowitz has failed to serve a Notice of a Pretrial Conference on a defendant. Although not disclosed by Mr. Liebowitz, defendant informed the Court that Mr. Liebowitz failed to serve a similar notice of pretrial conference in a case before The Honorable Ronnie Abrams. See Al Pereira v. Kendall Jenner, Inc., 17cv6945(RA). On November 28, 2017, two days before the conference was scheduled, the defendant in that case wrote to Judge Abrams to request to attend by telephone, as it had only learned of the conference that day. The plaintiff, represented by Mr. Liebowitz, had not served defendant with the court's September 14 pretrial Order, even though it was instructed to do so.

This Court's Notice of Pretrial Conference was issued on November 9. After the Al Pereira defendant's November 28 letter, Mr. Liebowitz was on notice to review his cases for pretrial orders and notices and to, when ordered **[*5]** to do so, serve them on defendants. In fact, on November 28, a Notice of Pretrial Conference was filed in another copyright case before this Court filed by Mr. Liebowitz. McDermott v. Monday Monday, 17cv9230(DLC), LLC, ECF No. 5. And yet, Mr. Liebowitz also failed to serve the Notice of Pretrial Conference in that case. McDermott v. Monday Monday, LLC, 17cv9230(DLC), 2018 U.S. Dist. LEXIS 28664, 2018 WL 1033240, at *1 n.1 (S.D.N.Y. Feb. 22, 2018).

A "Court may impose an appropriate sanction on any attorney" if it determines that Rule 11(b) has been violated. Fed. R. Civ. P. 11(c)(1). An attorney has violated Rule 11(b) when he "present[s] to the court a pleading, written motion, or other paper" that is "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b). Sanctions are considered a "deterrent" and, "if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty." 1993 Advisory Committee Notes to Fed. R. Civ. P. 11. A court can weigh multiple, non-exclusive factors in determining if an imposition of sanctions is appropriate:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether **[*6]** the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants: all of these may in a particular case be proper considerations. The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions **[**1045]** should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons.

Id. (emphasis added). Moreover,

[t]he court has inherent power to sanction parties and their attorneys, a power born of the practical necessity that courts be able to manage their own affairs so as to achieve the orderly and expeditious disposition of

cases. This power may likewise be exercised where the party or the attorney has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. [*7]

<u>Revson v. Cinque & Cinque, P.C.</u>, 221 F.3d 71, 78 (2d Cir. 2000).

Mr. Liebowitz should be sanctioned for his failure to serve the Notice of Pretrial Conference. Mr. Liebowitz's claim that his failure to serve JMS Cleaning Services, LLC with the Notice of Pretrial Conference was "inadvertent" and an "honest mistake" is unpersuasive given his prior practice before this Court and in this district.

Service of such a Notice is essential to the efficient administration of cases before this Court. The Notice of Pretrial Conference is often a defendant's first introduction the Court. Accordingly, a copy of the Court's individual practices is required to accompany service of the Notice. Of course, the Pretrial Conference itself is an integral component of a trial: the parties have an opportunity to discuss the case with the Court, a discovery and motion practice schedule is set, and, often, a trial date is selected. To deprive an adversary of notice of such a conference -- and to assume that it will discover the details by looking on the Electronic Case Filing ("ECF") system -- is to interfere with the ability of a court to manage its docket and with the parties' ability to manage their litigation.

In the Court's experience, a properly served Notice of Pretrial [*8] Conference often prompts a defendant to answer, to request an extension to answer, to obtain counsel, or to otherwise begin active participation in the litigation. Indeed, that is precisely what happened in this case: defendant sprang into action after learning about the conference. The

defendant's principal, upon learning of the conference two months after the Notice was filed on ECF and only one week before the scheduled conference, appeared for the conference even though he had not yet officially responded to the complaint.

Sanctions are also warranted for Mr. Liebowitz's omissions in his January 13 letter. The January 13 letter omitted key details of the parties' communications. The letter stated only that the defendant had yet to respond to the complaint, suggesting that the defendant was wholly unresponsive or otherwise absent from the litigation and, as a result, the plaintiff was prepared to file a motion for a default judgment.

This characterization was misleading. Plaintiff had spoken with defendant's counsel on multiple occasions before filing the January 13 letter. The defendant had attempted settlement negotiations.By requesting an adjournment of the conference and suggesting [*9] that he move for a default judgment, without this key context, Mr. Liebowitz needlessly delayed and prolonged litigation. A conference would have allowed Court to discuss service issues with the parties, as well as a settlement schedule, and a parallel discovery and dispositive motion practice schedule if settlement were not to succeed. Moreover, Mr. Liebowitz's letter gave the impression that the defendant was delinquent when, in fact, the defendant had tried on multiple occasions to avoid, and eventually resolve, litigation. Indeed, the defendant, having independently learned of the initial conference (but not its adjournment) appeared at court for the initial conference. In sum, the January 13 letter misled the Court as to the defendant's participation in the litigation.

Finally, Mr. Liebowitz has needlessly imposed costs on the defendant. The defendant had

expressed a desire to avoid litigation through settlement before Mr. Liebowitz even filed this lawsuit. Now, Mr. Liebowitz has abandoned litigation and, presumably, resolved this case privately with the defendant. The defendant has likely expended significant financial -- and emotional -- resources defending this lawsuit. The **[*10]** defendant consulted with at least two attorneys and its owner appeared at a court conference which had been cancelled pursuant to Mr. Liebowitz request.

Mr. Liebowitz's failure to serve the Notice of Pretrial Conference, his material omissions in his January 13 letter, and his needless infliction of costs on the defendant are each independently **[**1046]** sufficient to justify sanctions imposed pursuant to Rule 11 and the Court's inherent power. Taken together, Mr. Liebowitz's actions throughout the course of this litigation compel the Court to impose sanctions. Accordingly, it is hereby

ORDERED that, pursuant to this Court's inherent authority, and having weighed the factors listed in the Advisory Committee Notes to the 1993 Amendment to Rule 11, sanctions shall be imposed on Richard Liebowitz in the amount of $10,000. Mr. Liebowitz and Liebowitz Law Firm, PLLC are jointly and severally liable for the $10,000 sanction.

IT IS FURTHER ORDERED that by, Friday, March 9, the $10,000 sanction shall be paid to the Clerk of Court, U.S. District Court, Southern District of New York.

Dated: New York, New York

February 28, 2018

/s/ Denise Cote

DENISE COTE

United States District Judge

**End of Document**

Exhibit E

 Neutral

As of: December 15, 2019 5:04 PM Z

# *Steeger v. JMS Cleaning Servs., LLC*

United States District Court for the Southern District of New York

March 14, 2018, Decided; March 15, 2018, Filed

17cv8013(DLC)

**Reporter**

2018 U.S. Dist. LEXIS 42797 *; 2018 WL 1363497

PAUL STEEGER, Plaintiff, -v- JMS CLEANING SERVICES, LLC, Defendant.

**Prior History:** *Steeger v. JMS Cleaning Servs. LLC, 2018 U.S. Dist. LEXIS 32730 (S.D.N.Y., Feb. 28, 2018)*

## Core Terms

sanctions, settlement, inherent power, reconsideration motion, monetary sanctions, misconduct, order to show cause, defense counsel, attorneys', parties, argues

**Counsel: [*1]** For the plaintiff: Richard Liebowitz, Liebowitz Law Firm, PLLC, Valleystream, NY.

**Judges:** DENISE COTE, United States District Judge.

**Opinion by:** DENISE COTE

## Opinion

OPINION AND ORDER

DENISE COTE, District Judge:

An Opinion and Order of February 28 imposed $10,000 in sanctions on Richard Liebowitz and his law firm pursuant to *Rule 11, Fed. R. Civ. P.*, and this Court's inherent power, payable to the Clerk of Court. *Steeger v. JMS Cleaning Servs. LLC, No. 17cv8013(DLC), 2018 U.S. Dist. LEXIS 32730, 2018 WL 1136113 (S.D.N.Y. Feb. 28, 2018).* On March 9, the plaintiff moved for reconsideration and an order vacating the February 28 Order.[1] The motion is granted in part. Mr. Liebowitz will be required to complete by July 31, 2018 continuing legal education ("CLE") coursework giving him 4 additional CLE credit hours in ethics and professionalism beyond those required by the New York State bar authorities. In addition, the monetary sanction in the amount of $10,000 is reduced to $2,000.

In his motion for reconsideration, Mr. Liebowitz argues that the February 28 Opinion errs in two respects. First, he argues that a court may not sua sponte issue an order to show cause under *Rule 11(c)(2)(B), Fed. R. Civ. P.*, after the parties have settled their claims.[2] The parties notified the Court that they had reached a "settlement in principle" on January 24, and the Court **[*2]** issued the order to show cause why sanctions should not be imposed on January 26.

---

[1] Although the notice of motion purports to require the defendant to submit any opposition to this motion by March 26, the sanctions were imposed pursuant to an order to show cause issued by the Court. The defendant is under no obligation to respond to this motion for reconsideration. The action against the defendant was dismissed with prejudice on February 22.

[2] The provision of *Rule 11* at issue appears in *subsection (c)(5)*, not in the subsection on which the motion relies, that is, *subsection (c)(2)*.

Steeger v. JMS Cleaning Servs., LLC

Second, plaintiff argues that the Court may only impose compensatory and not punitive sanctions under its inherent powers. These issues will be addressed in turn.

Rule 11(c)(5)(B) provides:

> The court must not impose a monetary sanction . . . on its own, unless it issued a show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

Fed. R. Civ. P. 11(c)(5)(B). As the Advisory Committee Notes explain, "[p]arties settling a case should not be subsequently faced with an unexpected order from the court leading to monetary sanctions that might have affected their willingness to settle or voluntarily dismiss a case." Fed. R. Civ. P. 11, advisory committee notes (1993).

The January 26 order to show cause was triggered by the information contained in a January 24 letter from an attorney representing the defendant. On January 24, at 11:38 am, the defendant's counsel filed an application for an order to show cause why the plaintiff should not be required to post security as a condition for proceeding further.[3] The letter recited the history of communications between Mr. Liebowitz **[*3]** and the defendant's attorney and disclosed, inter alia, that Mr. Liebowitz had never served the Notice of Pretrial Conference on the defendant, and had never responded to the defendant's settlement offer. This letter apparently prompted Mr. Liebowitz to contact the defendant's attorney. After 6 p.m. that afternoon,[4] the parties reached their agreement to settle the lawsuit. In his brief letter to the Court of January 24, filed at 6:28 pm,[5] Mr. Liebowitz advised that the parties "have reached a settlement in principle and respectfully request that this Court administratively dismiss the action with leave to reopen the case by April 1, 2018 to allow Defendant to make the settlement installments." Before January 24,

the Court had been informed that the plaintiff wished to seek entry of a default judgment against the defendant: through an Order of January 16, the motion for entry of the default was due to be filed on January 26. In light of the parties' settlement, no such motion was filed. The Court, however, did not administratively close the case. Instead, on January 26, the Court issued its Order directing Mr. Liebowitz to show cause why he should not be sanctioned.

It is unclear whether **[*4]** Rule 11(c)(5)(B) limits a court's authority to impose monetary sanctions sua sponte for conduct that violates Rule 11 in circumstances like those at issue here. There was no dismissal or settlement before the order to show cause was issued. The same day that the misconduct was brought to the Court's attention, the defendant notified the Court only that it had reached a settlement in principle. The order to show cause giving Mr. Liebowitz notice of the sanctions was issued promptly -- just two days later. The case was not dismissed pursuant to the settlement until nearly four weeks later. But it is unnecessary to resolve this issue. Any limitation imposed by (c)(5)(B) does not restrict a court's authority to impose non-monetary sanctions. The February 28 Opinion is therefore vacated to the extent it based the $10,000 sanction on Rule 11. Instead, pursuant to Rule 11 and the Court's inherent powers, Mr. Liebowitz will be required to attend a CLE ethics program.

Mr. Liebowitz also argues that Goodyear Tire & Rubber Co. v. Haeger, 137 S. Ct. 1178, 197 L. Ed. 2d 585 (2017), requires that any monetary sanctions imposed pursuant to a court's inherent power be compensatory rather than punitive. Therefore, he argues, the sanctions had to paid to the defendant based on the costs incurred by the defendant as **[*5]** a result of the misconduct by plaintiff's counsel, and could not be paid to the Clerk of Court. He is wrong.

In Goodyear, the Supreme Court held that sanctions in the form of attorneys' fees granted under a court's inherent power must be limited to the fees incurred as a result of the offending behavior. Id. at 1186. The defendant in Goodyear had withheld test results requested by the plaintiff in discovery, and was sanctioned by the court for litigation misconduct. Id. at 1184. Because the chosen sanction was the reimbursement of legal fees and costs incurred by the plaintiff, the plaintiff was allowed to recover "the portion of his fees that he would not have paid but for the misconduct." Id. at 1187 (citation omitted).

---

[3] The defendant's counsel made a limited appearance in order to file the January 24 letter.

[4] Mr. Liebowitz has attached two emails sent after 6:00 pm to his motion for reconsideration. One reflects that defense counsel had reached her client, who agreed to pay an amount in settlement in two installments. As reflected in his own email, Mr. Liebowitz accepted the offer within ten minutes.

[5] Mr. Liebowitz filed the letter to the Court five minutes after he accepted the defendant's settlement offer.

Steeger v. JMS Cleaning Servs., LLC

But, as the Court acknowledges, attorneys' fees are but "one permissible sanction" available when a court exercises its inherent powers "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id. at 1186* (citation omitted). The nature of the $10,000 sanction imposed here is not an award of attorneys' fees to compensate the defendant. Instead, as the February 28 Opinion makes clear, the sanction is to be paid to the Clerk of Court. The sanction was imposed under the Court's **[*6]** "inherent power to manage its own affairs," and specifically to "sanction misconduct by an attorney that involves that attorney's violation of a court order or other misconduct that is not undertaken for the client's benefit." *United States v. Seltzer, 227 F.3d 36, 41-42 (2d Cir. 2000)* (citation omitted). Such sanctions may be appropriate when a lawyer, through negligence or recklessness, fails "to perform his or her responsibility as an officer of the court." *Id. at 41*.

It is troubling that the motion for reconsideration continues the pattern of omissions and misrepresentations that has plagued Mr. Liebowitz's earlier submissions in this action. In setting forth the background to his motion for reconsideration, he repeats misleading or inaccurate statements that he made in earlier submissions. For example, he indicates that defendant's first counsel never responded to Mr. Liebowitz's request on November 7 to waive service, but fails to mention that he was contacted the very next day, on November 8, by new counsel for the defendant (who had the defendant with her during the telephone call) and that he never asked that new counsel whether the defendant would waive service. As another example, Mr. Liebowitz indicates that he did not hear anything from **[*7]** that new defense counsel in the two months that followed, without revealing that it was Mr. Liebowitz himself who owed defense counsel a return call to indicate whether the plaintiff would accept the settlement offer made by the defendant in the November 8 call. Each of these errors was previously pointed out by the defendant's attorney and Mr. Liebowitz has never disputed the accuracy of those representations by defense counsel.

It is also noteworthy that the motion for reconsideration does not engage with the facts that undergird the February 28 imposition of sanctions. For instance, Mr. Liebowitz does not dispute that in at least three separate cases in this district he failed to serve the notices of initial conference, thereby failing to comply with three separate court orders. Nor does he express any regret or acknowledgement that he has failed to

adhere to the standards expected of officers of this court.

Taking this motion for reconsideration as an opportunity to craft sanctions that will more directly address the deficiencies in performance described above and deter their repetition, the sanctions are modified as follows. The monetary sanctions imposed on February 28 are reduced **[*8]** to $2,000 and are imposed solely under the Court's inherent powers. The Court also imposes an educational sanction under both its inherent powers and *Rule 11, Fed. R. Civ. P.* Mr. Liebowitz must complete by July 31, 2018 four CLE credit hours in ethics and professionalism in addition to the amount required biennially by the New York State bar authorities.

Dated: New York, New York

March 14, 2018

/s/ Denise Cote

DENISE COTE

United States District Judge

---

**End of Document**

**Exhibit F**

 Neutral

As of: December 14, 2019 7:54 PM Z

# Rice v. NBCUniversal Media, LLC

United States District Court for the Southern District of New York

July 10, 2019, Decided; July 10, 2019, Filed

19-CV-447 (JMF)

## Reporter

2019 U.S. Dist. LEXIS 114690 *; 2019 WL 3000808

JOHN CURTIS RICE, Plaintiff, -v-NBCUNIVERSAL MEDIA, LLC, Defendant.

**Subsequent History:** As Amended July 15, 2019.

Reconsideration denied by, Request denied by Rice v. Media, 2019 U.S. Dist. LEXIS 134022 (S.D.N.Y., Aug. 8, 2019)

## Core Terms

mediation, sanctions, orders, inherent authority, attorney's fees, court order, failure to comply, impose sanctions, license, parties, defense counsel, quotation, marks, monetary sanctions, inherent power, Photograph, Records, non-compliance, pretrial, hourly rate, show cause, scheduling, settlement, attend, cases

**Counsel: [*1]** For John Curtis Rice, Plaintiff: Richard Liebowitz, Liebowitz Law Firm, PLLC, Valleystream, NY.

For NBCUniversal Media, LLC, Defendant:

Alanna B. Newman, Mark Alan Lerner, Satterlee Stephens LLP, New York, NY.

**Judges:** JESSE M. FURMAN United States District Judge.

**Opinion by:** JESSE M. FURMAN

## Opinion

### OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

In his relatively short career litigating in this District, Richard Liebowitz has earned the dubious distinction of being a regular target of sanctions-related motions and orders. Indeed, it is no exaggeration to say that there is a growing body of law in this District devoted to the question of whether and when to impose sanctions on Mr. Liebowitz alone. *See, e.g., Pereira v. 3072541 Canada Inc.*, No. 17-CV-6945 (RA), 2018 U.S. Dist. LEXIS 195406,

2018 WL 5999636, at *2 (S.D.N.Y. Nov. 15, 2018); *McDermott v. Monday Monday, LLC*, No. 17-CV-9230 (DLC), 2018 U.S. Dist. LEXIS 184049, 2018 WL 5312903, at *2-3 (S.D.N.Y. Oct. 26, 2018) (citing cases); *Steeger v. JMS Cleaning Servs., LLC*, No. 17-CV-8013 (DLC), 2018 U.S. Dist. LEXIS 42797, 2018 WL 1363497, at *3 (S.D.N.Y. March 15, 2018); *Craig v. UMG Recordings, Inc.*, No. 16-CV-5439 (JPO), 380 F. Supp. 3d 324, 2019 U.S. Dist. LEXIS 53973, 2019 WL 1432929, at *10 (S.D.N.Y. Mar. 29, 2019). This Opinion is the latest contribution to that body of law. For the reasons stated below, the Court concludes that sanctions should indeed be imposed on Mr. Liebowitz for his repeated failure to comply with this Court's orders, failures that imposed considerable and unwarranted costs on the Court, its staff, and Defendant NBCUniversal Media, LLC.

## BACKGROUND

Plaintiff John Curtis Rice filed this Complaint, bringing claims under the Copyright Act, 17 U.S.C. § 101 *et seq.*, on January 16, 2019. *See* Docket **[*2]** No. 1. The Complaint alleges that Defendant NBCUniversal Media, LLC, infringed Rice's rights by displaying a copyrighted photograph — depicting the removal of a wild racoon from a beauty shop in the Bronx — on one of its websites. *See id.* More specifically, the Complaint alleges that "NBC did not license the Photograph from Plaintiff for its article, nor did NBC have Plaintiff's permission or consent to publish the Photograph on its Website." *Id.* ¶ 11; *see also id.* ¶ 13 ("NBC is not, and has never been, licensed or otherwise authorized to reproduce, publically display, distribute and/or use the Photograph."). On January 17, 2019, the Court ordered that the parties appear for an initial conference on May 2, 2019, and ordered them to conduct a mediation session prior to that initial conference. *See* Docket Nos. 6, 7.

NBCUniversal maintains — as it has since early in the case, *see* Docket No. 34 ("Transcript" or "Tr."), at 2-3 — that it did not infringe Plaintiff's copyright because it had a license for online use of Plaintiff's photograph. *See, e.g.*, Docket No. 15, at 3 ¶ 1 (providing the affirmative defense that "NBCUniversal had the express and/or implied license to utilize the Photograph"); **[*3]** Docket No. 16, at 2. In or about mid-March 2019, according to defense counsel, NBCUniversal "produced the evidence supporting its complete license defense" by disclosing to Liebowitz a $200 invoice for "the online Today Show use of the . . . image of Raccoon capture, Bronx, NY." Docket No. 27 ("Lerner Decl.") ¶¶ 2, 6; *see also* Docket No. 27-1 (invoice). Following a discussion with his client, Liebowitz took the position that the license was for one year and that the one-year license had been exceeded. *See* Lerner Decl. ¶ 6; *see also* Docket No. 26 ("Liebowitz 1st Decl.") ¶ 6. Liebowitz did not, however, "produce any documentary evidence to support his position . . . nor did [he] amend [the] Complaint to correct the allegation that there was no license or permission to publish the Photograph." Lerner Decl. ¶ 7.

On April 1, 2019, the Court-annexed Mediation Program closed the mediation referral, noting in the docket entry that "one or both parties failed, refused to attend, or refused to participate in the mediation." Docket No. 14. In a joint letter to the Court in advance of the initial conference, defense counsel represented that NBCUniversal had "indicated that it was willing to participate **[*4]** in mediation and provided available dates to the mediation office, but Plaintiff did not." Docket No. 16. Liebowitz now blames his client's

Rice v. NBCUniversal Media, LLC

unavailability for his own failure to attend mediation, *see* Liebowitz 1st Decl. ¶ 17 ("Sanctions should not be imposed for Rice's inability to attend mediation."), but Liebowitz did not inform the Mediation Office (let alone the Court) of this conflict, *see* Lerner Decl. ¶ 10. Instead, as defense counsel notes, Liebowitz "simply did not respond" to the Mediation Office's scheduling emails. *Id.* As of the initial conference, no mediation session was held and no relief from the mediation order had been sought or granted — a clear violation of the Court's January 17th Order.

On May 1, 2019, Liebowitz filed two requests with respect to the May 2nd initial pretrial conference. First, at 3:19 p.m., Liebowitz filed a letter motion requesting that the Court change the time of the conference from 3:45 p.m. to 10:45 a.m. *See* Docket No. 18. The Court grudgingly granted the request, noting that it "would have been on firm ground denying counsel's request — on the ground that it is untimely and inadequately explained." Docket No. 19. The Court warned that at the **[\*5]** May 2nd conference, "counsel should be prepared to explain the timing and reason for the request." *Id.* Later the same day, at 11:09 p.m., Liebowitz filed a stipulation of voluntarily dismissal signed by both parties, *see* Docket No. 20, and six minutes later, a letter motion to cancel the May 2nd conference, *see* Docket No. 21. The Court denied the request to cancel the conference the next morning at 9:29 a.m. Docket No. 22. In denying the request, the Court ordered that "[c]ounsel (including Mr. Liebowitz himself) shall appear as scheduled, in part so Plaintiff's counsel can answer for his apparent failure to comply with this Court's orders and rules, including its orders regarding early mediation." *Id.*

Despite the Court's clear order, Liebowitz did not appear for the May 2nd conference. When the Court's staff contacted Liebowitz's office, it "got somewhat conflicting information about whether he was out of town or on his way." Tr. 2. At the conference, the Court asked defense counsel to explain what had occurred on May 1st and before. *Id.* (Notably, defense counsel advised that, "until the eve of the initial pretrial conference, Plaintiff continued to press for settlement, despite the **[\*6]** evidence of a valid license." Lerner Decl. ¶ 11; *see also* Tr. 3-4.) The Court also noted at the conference that it would "sign the stipulation of dismissal retaining jurisdiction to adjudicate any sanctions issue." Tr. 7. Later that day, at 4:04 p.m., the Court signed and docketed the parties' stipulation of dismissal. *See* Docket No. 23. By endorsement, the Court specifically "retain[ed] jurisdiction to consider whether sanctions should be imposed upon Plaintiff's counsel." *Id.* The Court also ordered Liebowitz to show cause in writing why sanctions should not be imposed pursuant to Rules 11 and 16 of the Federal Rules of Civil Procedure and the Court's inherent authority. *See* Docket No. 25. In response, Liebowitz submitted two declarations, *see* Liebowitz 1st Decl.; Docket No. 30 ("Liebowitz Reply Decl."), and defense counsel submitted a declaration and a letter with contemporaneous billing records, *see* Lerner Decl.; Docket No. 33 ("Time Records").

## DISCUSSION

It is well established that, when counsel violates a court order or fails to appear at a conference, sanctions may be imposed pursuant to either Rule 16 of the Federal Rules of Civil Procedure or the Court's inherent authority. *See* Fed. R. Civ. P. 16(f)(1); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). Such sanctions may be imposed in response to a motion or by the

Rice v. NBCUniversal Media, LLC

Court *sua sponte*. *See* Fed. R. Civ. P. 16(f)(1) (noting [**7**] that the Court may impose sanctions "[o]n motion or on its own"); *Chambers*, 501 U.S. at 43-44. Moreover, the Court may impose sanctions on the lawyer or the lawyer's firm. *See, e.g., Pichardo v. C.R. Bard, Inc.*, No. 09-CV-7653 (SHS), 2015 U.S. Dist. LEXIS 10722, 2015 WL 13784565, at *7 (S.D.N.Y. Jan. 26, 2015); *Shiu v. Jung & Assocs. Law Office P.C.*, 559 F. App'x 105, 106 (2d Cir. 2014) (summary order) (affirming imposition of Rule 16(f) sanctions "jointly and severally" on a law firm). The decision whether to impose sanctions is left to the Court's discretion. *See, e.g., Macolor v. Libiran*, No. 14-CV-4555 (JMF), 2015 U.S. Dist. LEXIS 7958, 2015 WL 337561, at *2 (S.D.N.Y. Jan. 23, 2015).

**A. Sanctions Pursuant to Rule 16(f)**

The Court begins with Rule 16. Rule 16(f) authorizes sanctions for, among other things, the "fail[ure] to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). "In deciding whether a sanction is merited [under Rule 16(f)], the court need not find that the party acted in bad faith." *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 53 (2d Cir. 2018) (internal quotation marks omitted). The Court need find only that there is clear and convincing evidence that counsel disregarded a clear and unambiguous scheduling or other pretrial order. *See id.* ("The fact that a pretrial order was violated is sufficient to allow some sanction." (internal quotation marks omitted)); *see, e.g., S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 145 (2d Cir. 2010).

The Court has no trouble making that finding here. *See* Docket Nos. 6, 7. On January 17, 2019, the Court ordered that, "[u]nless and until the Court orders otherwise, the parties shall schedule a mediation to take place no later than two weeks before the initial [**8**] pretrial conference." Docket No. 6, at 1 (emphasis omitted). The January 17th Order further stated that, "[i]f the parties believe that early mediation would not be appropriate . . . , they shall file a letter motion seeking relief from the foregoing requirements no later than the deadline to answer." *Id.* The deadline to answer, after extension, was April 3, 2019. *See* Docket No. 12. Neither party sought relief from the early mediation requirement by that date; instead, on April 1, 2019, the Mediation Office reported that "the court-ordered mediation was not held as one or both parties failed, refused to attend, or refused to participate in the mediation." Docket No. 14.

The record reveals that Liebowitz is to blame for the failure to comply with the Court's January 17th order. Defense counsel explained that "[w]hen the mediation office reached out, we reached out and tried to get a phone call together with both attorneys and the mediation office. Mr. Liebowitz did not respond to the mediation office, leading to the subsequent closing of that file by the mediation office." Tr. 5-6; *see also* Docket No. 16 (statement in joint letter that "Defendant indicated that it was willing to participate [**9**] in mediation and provided available dates to the mediation office, but Plaintiff did not"); Lerner Decl. ¶ 10 (Liebowitz "did not respond to the requests of the Mediation Office to respond regarding the status of the matter and possible dates for mediation"). Notably, Liebowitz does not dispute this; instead, he argues that sanctions should not be imposed for the failure to mediate because his client "was not able to find the availability to take off a full day from work." Liebowitz 1st Decl. ¶ 17. But Rice's purported lack of availability does not excuse Liebowitz's failure to comply with the January 17th Order.

Rice v. NBCUniversal Media, LLC

Liebowitz could have sought relief from the Court's Order on account of Rice's unavailability, but he did not do so; he simply failed to respond to the Mediation Office. That clear violation of the January 17th Order — which was intended to facilitate early resolution of the case — merits the imposition of sanctions under Rule 16(f). *See* Fed. R. Civ. P. 16(f)(1)(C); *see also Huebner*, 897 F.3d at 53; *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d 437, 455 (S.D.N.Y. 2011) (finding sanctions to be merited because the "unwillingness to follow this Court's orders has wasted the time of both the Court and Defendants").

## B. Sanctions Pursuant to the Court's Inherent Authority

The Court also imposes sanctions for **[*10]** Liebowitz's failure to comply with the Court's orders pursuant to the Court's inherent power to award sanctions. "[D]istrict courts have the inherent power" to sanction a party "for bad faith conduct violating the court's orders even if procedural rules exist which sanction the same conduct." *S. New England Tel*, 624 F.3d at 144 (internal quotation marks omitted); *see also Chambers*, 501 U.S. at 50 ("[N]either is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules."). Under this "inherent power . . . , a court may assess attorney's fees as a sanction for the willful disobedience of a court order." *Chambers*, 501 U.S. at 45 (internal quotation marks omitted). To warrant an award of attorney's fees pursuant to the Court's inherent authority, the Court must find that Liebowitz acted in bad faith or that he willfully disobeyed the Court's orders. *See id.* at 50; *cf. Huebner*, 897 F.3d at 53 (finding of bad faith is not necessary to impose sanctions under

Rule 16(f)).[1]

Applying those standards here, the Court finds it appropriate to impose sanctions pursuant to its inherent authority for Liebowitz's failure to comply with both the January 17th Order mandating early mediation, discussed **[*11]** above, and his failure to appear at the May 2nd conference. In response to Liebowitz's (literal) 11th hour request to adjourn the conference in light of the stipulated dismissal, *see* Docket No. 21, the Court explicitly ordered that "[c]ounsel (including Mr. Liebowitz himself) shall appear as scheduled," Docket No. 22. Yet Liebowitz failed to comply with that unambiguous order.

Liebowitz now claims that his absence was excusable because he believed that "the Court lacked jurisdiction to conduct a Rule 16 conference" after the parties signed the stipulation of dismissal. *See* Liebowitz 1st Decl. ¶ 15. That claim is unpersuasive and, the Court finds, disingenuous. First, it is hard to credit given the letter — filed by Liebowitz himself — requesting adjournment of the conference six minutes after filing the stipulation of dismissal. *See* Docket Nos. 20, 21. Second, the claim is without merit as a matter of law because voluntary dismissal "does not preclude the district court from considering collateral issues such as sanctions." *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 134 (2d Cir. 2014); *see In*

---

[1] To the extent that notice is required to impose sanctions pursuant to the Court's inherent authority, *see, e.g., Chambers*, 501 U.S. at 56; *S. New England Tel. Co.*, 624 F.3d at 148, there is no dispute that the Court's detailed Order to Show Cause provided Liebowitz with the requisite notice, *see* Docket No. 25 ("Plaintiff's counsel is ordered to show cause . . . why sanctions should not be imposed — pursuant to Rules 11 and 16 of the Federal Rules of Civil Procedure and/or the Court's inherent authority — for filing a meritless lawsuit; for continuing to prosecute that lawsuit even after being presented with evidence of its lack of merit; for failure to comply with this Court's orders; and for failure to appear as directed at the conference earlier today.").

Rice v. NBCUniversal Media, LLC

re Austrian & German Bank Holocaust Litig., 317 F.3d 91, 98 (2d Cir. 2003) ("Whenever a district court has federal jurisdiction over a case, it retains ancillary jurisdiction after dismissal to adjudicate collateral matters."). Thus, even **[\*12]** if the Court no longer had jurisdiction to order attendance at a Rule 16 conference — a dubious premise — it plainly had authority to consider sanctions and to mandate counsel's appearance at a conference related to sanctions, as the May 2nd conference was. *See* Docket No. 22 (stating that the conference was "in part so Plaintiff's counsel can answer for his apparent failure to comply with this Court's orders and rules"). Third, Liebowitz's claim is hard to credit because other courts in this District have imposed sanctions on him even after settlement and dismissal. *See, e.g., Steeger*, 2018 U.S. Dist. LEXIS 42797, 2018 WL 1363497, at \*1-2 (affirming sanctions imposed after settlement and imposing new sanctions even though the case had already been dismissed). And finally, "attorneys have no absolute right to be warned that they disobey court orders at their peril." *Huebner*, 897 F.3d at 54 (internal quotation marks omitted). Accordingly, the Court declines to credit Liebowitz's statement that he believed the Court lacked jurisdiction to hold a conference and declines to excuse Liebowitz's absence on that basis.

Additionally, the Court finds, for several reasons, that Liebowitz's disobedience of the Court's Orders — both the Orders requiring mediation and Liebowitz's appearance **[\*13]** on May 2 — was willful. First, "these orders were explicit and there is no suggestion that [Liebowitz] misread or misunderstood them." *Petrisch*, 789 F. Supp. 2d at 455 (finding a willful violation of the Court's order under Rule 16). Second, because the Court declines to credit Liebowitz's excuses for his behavior,

there is no "good-faith explanation" for his failure to comply. *See S. New England Tel.*, 624 F.3d at 148; *see also, e.g., Petrisch*, 789 F. Supp. 2d at 455; *Dumann Realty, LLC v. Faust*, No. 09-CV-7651 (VM) (KNF), 2011 U.S. Dist. LEXIS 76074, 2011 WL 2749523, at \*4 (S.D.N.Y. July 8, 2011) (finding willfulness under Rule 37(b) in part because the lawyer "provided no reasonable explanation for his failure"); *Stone v. Goord*, No. 07-CV-2826 (LTS) (THK), 2007 U.S. Dist. LEXIS 84041, 2007 WL 3374583, at \*2 (S.D.N.Y. Nov. 14, 2007) (same). Third, Liebowitz failed to comply with the Court's mediation order for several months, *see* Docket Nos. 6, 7 (mediation orders issued on January 17, 2019); Docket No. 14 (close of mediation on April 1, 2019); *see, e.g., Stone*, 2007 U.S. Dist. LEXIS 84041, 2007 WL 3374583, at \*3 (finding willfulness in part because of "disobedience of this Court's Order for two months"), and his failure to comply is "not isolated but rather [part of] a pattern" of non-compliance in this case and others, *see S. New England Tel.*, 624 F.3d at 148 (affirming finding of willfulness when failure to comply "was not isolated but rather formed a pattern" of non-compliance); *see, e.g., Pereira*, 2018 U.S. Dist. LEXIS 195406, 2018 WL 5999636, at \*3 ("The Court finds particularly concerning Mr. Liebowitz's repeated **[\*14]** failures to follow the orders and rules of this Court and others within the district."); *McDermott*, 2018 U.S. Dist. LEXIS 184049, 2018 WL 5312903, at \*2 (citing cases, including *Romanowicz v. Alister & Paine, Inc.*, No. 17-CV-8937 (PAE) (KHP), 2018 U.S. Dist. LEXIS 132066, 2018 WL 4762980 (S.D.N.Y. June 22, 2018), and *Ferdman v. CBS Interactive, Inc.*, 342 F. Supp. 3d 515, 2018 WL 4572241 (S.D.N.Y. 2018), in which Liebowitz has "been sanctioned for failing to comply with court orders and for failing to produce materials during discovery"); *Steeger*,

Rice v. NBCUniversal Media, LLC

2018 U.S. Dist. LEXIS 42797, 2018 WL 1363497, at *1, 3. In short, because the Court finds that Liebowitz willfully disobeyed the Court's orders, it is appropriate to impose sanctions on Liebowitz pursuant to the Court's inherent authority.

## C. Imposition of Monetary Sanctions

Under Rule 16(f), "[i]nstead of or in addition to any other sanction, the court *must* order the party, its attorney, or both to pay the reasonable expenses — including attorney's fees — incurred because of any noncompliance with this rule." Fed. R. Civ. P. 16(f)(2) (emphasis added); *see Chambers*, 501 U.S. at 42 n.8 (noting that Rule 16(f) "provide[s] for the imposition of attorney's fees as a sanction"). That is, under Rule 16(f), "the court must award fees" but "the fees that may be assessed are limited to those incurred as a result of the Rule violation." *Chambers*, 501 U.S. at 42 n.8. By contrast, the Court's inherent power to impose sanctions includes the power to impose, in its discretion, "attorney's fees representing **[*15]** the entire cost of litigation." *Id.* at 45. For example, in *Chambers*, the Supreme Court upheld the finding that "full attorney's fees were warranted due to the frequency and severity of [the lawyer's] abuses of the judicial system and the resulting need to ensure that such abuses were not repeated." *Id.* at 56.

In light of those principles, the Court finds — pursuant to Rule 16 and its inherent authority — that a single monetary sanction equal to the reasonable attorney's fees incurred by Defendant from April 18, 2019, onward is appropriate. April 18th is the date by which the parties were ordered to conduct mediation. *See* Docket Nos. 6, 7. Thus, from that point on, Liebowitz was unambiguously in violation of the Court's mediation order. And that violation was not without costs: The Court ordered early mediation because, in its experience, "cases of this nature often benefit from early mediation," Docket No. 6; *see also McDermott*, 2018 U.S. Dist. LEXIS 184049, 2018 WL 5312903, at *2 ("In the over 700 cases Mr. Liebowitz has filed since 2016, over 500 of those have been voluntarily dismissed, settled, or otherwise disposed of before any merits-based litigation."), making Liebowitz's failure to mediate a likely cause of additional legal expenses. To the extent that the award **[*16]** also covers time Defendants spent responding to Liebowitz's misconduct — including time wasted responding to settlement demands that the evidence revealed were inappropriate, *see* Lerner Decl. ¶¶ 2, 6 (stating that Defendant produced to Liebowitz evidence of its license in mid-March), and time spent on issues related to sanctions, *see* Time Records 3-4 — such compensation is proper. *See, e.g., Emanuel v. Griffin*, No. 13-CV-1806 (JMF), 2015 U.S. Dist. LEXIS 37944, 2015 WL 1379007, at *18 (S.D.N.Y. Mar. 25, 2015) (ordering the non-compliant counsel to "compensate" defense counsel "for the fees and costs associated with bringing the motion to strike" pursuant to Rule 16(f)); *see also Pichardo*, 2015 U.S. Dist. LEXIS 10722, 2015 WL 13784565, at *1 (awarding under Rule 16(f) attorney's fees incurred in preparing a motion for sanctions).[2]

---

[2] Federal law also "imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics, and provides courts with a cudgel to use, in their discretion, to deter unnecessary delays in litigation." *Huebner*, 897 F.3d at 55. Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." In light of the sanctions imposed pursuant to Rule 16(f) and the Court's inherent authority, however, the Court need not and does not address the possibility of sanctions under Section 1927. *See, e.g., Huebner*, 897 F.3d at 56 ("[E]ven if this claim were not frivolous, it would not have been an abuse of discretion to award fees in light of [the attorneys'] . . . willful

Rice v. NBCUniversal Media, LLC

In opposing a monetary sanction, Liebowitz invokes Rule 11(c)(5)(B) of the Federal Rules of Civil Procedure, which states that "[t]he court must not impose a monetary sanction . . . on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims." But "Rule 11 does not repeal or modify existing authority of federal courts to deal with abuses under the court's inherent power" and "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 48-49. Under this precedent, the Court's inherent authority to impose monetary **[*17]** sanctions is not subject to Rule 11(c)(5)(B)'s limitations. The same is true for the Court's authority to impose sanctions under Rule 16. *See Huebner*, 897 F.3d at 53-54 (imposing sanctions under Rule 16(f)(1)(B) and 16(f)(1)(C) without any reference to Rule 11); *see also* Fed. R. Civ. P. 16, Advisory Committee Note, 1983 Amendment. Indeed, Rule 16(f)'s mandatory language, which includes only two narrowly defined exceptions (for noncompliance that was "substantially justified" and circumstances that make sanctions "unjust"), suggests that its drafters did not mean for Rule 11 to limit Rule 16. To the contrary, the "intention" of Rule 16(f) was "to encourage forceful judicial management," Fed. R. Civ. P. 16, Advisory Committee Note, Subdivision (f), 1983 Amendment, a goal that would be undermined if parties could simply dismiss a case, *see, e.g., Windstream*, 775 F.3d at 135 ("[T]he harm triggering [the] . . . concerns has already occurred upon the mere filing of baseless papers [e]ven if the careless litigant quickly dismisses the action." (internal quotation marks omitted)). Thus, the Court finds that it retains the power under Rule 16(f) and its inherent

authority to impose monetary sanctions notwithstanding Rule 11(c)(5)(B) and the voluntary dismissal.

The only remaining questions are whether the sanctions should be imposed on Liebowitz alone or also on his firm and the amount of such sanctions. As to the first issue, "[b]ecause Liebowitz's 'actions **[*18]** were indistinguishable from those of [the Liebowitz Law Firm PLLC] as a firm,' the Court [imposes sanctions] against both Liebowitz and the Liebowitz Law Firm PLLC, jointly and severally." *See, e.g., Craig*, 2019 U.S. Dist. LEXIS 53973, 2019 WL 1432929, at *10 (citation omitted) (quoting *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 148 (2d Cir. 2012)).

As to the second, the attorney's fees generated on or after April 18, 2019, are $8,745.50. *See* Time Records 2-4. This is based on just over seventeen hours of work at hourly rates ranging from $180 to $570. *See id.* Even the highest of these hourly rates, at $570, is reasonable for copyright infringement work in the Southern District of New York. *See, e.g., Sid Bernstein Presents, LLC v. Apple Corps Ltd.*, No. 16-CV-7084 (GBD) (KNF), 2018 U.S. Dist. LEXIS 53626, 2018 WL 1587125, at *4 (S.D.N.Y. Mar. 29, 2018) (finding a rate of $630 per hour "within the range of fees recently authorized for similarly experienced attorneys in this District involving copyright infringement actions"); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 645 (S.D.N.Y. 2018) (approving a $540 hourly rate for a partner); *Owerko v. Soul Temple Entm't, LLC*, No. 13-CV-6420 (RLE), 2016 U.S. Dist. LEXIS 1836, 2016 WL 80664, at *2 n.1 (S.D.N.Y. Jan. 7, 2016) (citing cases awarding up to $650 per hour in S.D.N.Y.). The Court also finds that around seventeen hours of work from April 18th onward is appropriate and

---

violations of court orders." (internal quotation marks omitted)).

reasonable, particularly given that Liebowitz's inappropriate conduct created the need for Defendant to expend additional time on this case. *See* Time Records 3-4 (Defense **[\*19]** counsel's activities included a "[c]all with client re: possible Rule 11 motion," "[r]eview[ing] and revis[ing] letter to Liebowitz regarding possible Rule 11," "[t]ravel to and appear at court conference," reviewing the Order to Show Cause and Liebowitz's response, "drafting" and "[r]evising declaration in support of order to show cause," and "[c]onfer[ring] with accounting regarding billing records."). By contrast, Liebowitz's proposed award, for five hours at an hourly rate of $250 equaling $1,250 for the entire case, *see* Docket No. 30 ¶ 16, is entirely unreasonable. *Cf. Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 361 (S.D.N.Y. 2006) (approving hourly rates where the opponents did "not seem to contest the reasonableness of the rates"), *aff'd*, 249 F. App'x 845 (2d Cir. 2007).

Thus, the Court finds that Defendant's attorney's fees of $8,745.50 — which represent Defendant's reasonable attorney's fees from April 18 to May 16, 2019 — are reasonable and are properly imposed as sanctions. This sanction is, in the Court's view, sufficient but no greater than necessary to secure compliance with the Court's orders and counsel's professional duties in the future. *See, e.g., Macolor*, 2015 U.S. Dist. LEXIS 7958, 2015 WL 337561, at \*3; *Weiss v. Weiss*, 984 F. Supp. 682, 686 (S.D.N.Y. 1997) ("[S]anctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person **[\*20]** . . . ." (internal quotation marks omitted)). That conclusion is reinforced by Mr. Liebowitz's extensive pattern of non-compliance with court orders in this district. *See, e.g., Pereira*, 2018 U.S. Dist. LEXIS 195406, 2018 WL 5999636, at \*3;

*McDermott*, 2018 U.S. Dist. LEXIS 184049, 2018 WL 5312903, at \*2; *Steeger*, 2018 U.S. Dist. LEXIS 42797, 2018 WL 1363497, at \*1, 3.

## CONCLUSION

As set forth above, Mr. Liebowitz and his firm are SANCTIONED for his failure to comply with multiple court orders. **Within thirty days of this Opinion and Order**, Mr. Liebowitz and the Liebowitz Law Firm, PLLC, jointly and severally, shall pay monetary sanctions to Defendant **in the amount of $8,745.50**. **Within one week of receipt**, Defendant shall file proof of such payment. The Court continues to retain jurisdiction to impose any additional sanction as necessary.

SO ORDERED.

Dated: July 10, 2019

New York, New York

/s/ Jesse M. Furman

Jesse M. Furman

United States District Judge

---

End of Document

**Exhibit G**

No *Shepard's* Signal™
As of: December 14, 2019 9:00 PM Z

# Polaris Images Corp. v. CBS Interactive, Inc.

United States District Court for the Southern District of New York

October 9, 2019, Decided; October 9, 2019, Filed

19-CV-3670 (VEC)

**Reporter**

2019 U.S. Dist. LEXIS 175618 *; 2019 U.S.P.Q.2D (BNA) 387485; 2019 WL 5067167

**Opinion by:** VALERIE CAPRONI

POLARIS IMAGES CORPORATION,
Plaintiff, -against- CBS INTERACTIVE, INC.,
Defendant.

## Core Terms

undersigned, mediation, settlement, sanctions,
licensing, failure to comply, filing proof, show
cause, deadline, royalty

**Counsel:** **[*1]** For Polaris Images Corporation,
Plaintiff: Richard Liebowitz, Liebowitz Law
Firm, PLLC, Valleystream, NY.

For CBS Interactive Inc., Defendant: Robert
Penchina, LEAD ATTORNEY, Ballard Spahr
LLP, New York, NY.

**Judges:** VALERIE CAPRONI, United States
District Judge.

## Opinion

OPINION AND ORDER

VALERIE CAPRONI, United States District
Judge:

On August 1, 2019, this Court entered an order
(the "August 1 Order") directing counsel for
Plaintiff, Richard Liebowitz, Esq., to show
cause why sanctions should not be imposed on
him for failing to comply with this Court's May
2, 2019 order (the "May 2 Order"). *See Polaris
Images Corp. v. CBS Interactive, Inc.*, No. 19-
CV-3670, Dkt. 12. The August 1 Order also
directed Mr. Liebowitz to show cause why the
$500 sanction stemming from a different case,
that is currently being held in abeyance, should
not be immediately imposed. *Id.* Mr. Liebowitz
responded to the Court's August 1 Order with a
declaration. *See* Dkt 13. Having considered his
declaration, the Court finds that Mr. Liebowitz
has failed to provide adequate or convincing
reasons for his failure to comply with the two
explicit and simple directions contained in the
May 2 Order. In addition, the undersigned **[*2]**

Polaris Images Corp. v. CBS Interactive, Inc.

finds that Mr. Liebowitz has neglected to provide any reason whatsoever why the currently suspended $500 sanction in *Dvir v. Dancing Astronaut, Inc.*, No. 18-CV-9416, Dkt. 31, should not also be imposed. Therefore, as authorized by Fed. R. Civ. P. 16(f)(1)(C), the Court orders Mr. Liebowitz to pay a civil sanction to the Clerk of Court of $1,500.

## I. Factual Background

This case involves claims under the Copyright Act, 17 U.S.C. § 101 et seq. See *Polaris Images Corp. v. CBS Interactive, Inc.*, No. 19-CV-3670, Dkt. 1. Plaintiff Polaris Images Corporation ("Polaris") alleges that Defendant CBS Interactive Inc. ("CBSi") engaged in an unauthorized reproduction and public display of a copyrighted photograph of Susan Cox Powell, in violation of Section 501 of the Copyright Act. *Id.*

On May 2, 2019, the undersigned issued an order referring the case to the Mediation Office for settlement purposes under Local Civil Rule 83.9.[1] *See id.*, Dkt. 6. The May 2 Order unambiguously required Plaintiff "to file proof of service no more than three days after service [had] been effected" and to produce to Defendant, "by the earlier of 1) 14 days after service of process or 2) three business days in advance of any mediation session," royalty and licensing information regarding the photograph. [*3] *Id.*

Despite the simplicity and clarity of the May 2 Order, Plaintiff's counsel, Mr. Liebowitz, failed to comply with both directions. First, although service was effected on April 30, 2019, Mr.

Liebowitz did not file an affidavit of service until July 18, 2019. *See id.*, Dkt. 7. Second, as of July 30, 2019, Mr. Liebowitz had not produced the required royalty information to Defendant. *See id.*, Dkt. 10.

On August 1, 2019, in light of Mr. Liebowitz's failure to comply with the May 2 Order, the undersigned ordered Mr. Liebowitz to show cause why sanctions should not be imposed on him. *See id.*, Dkt. 12. The undersigned also ordered Mr. Liebowitz to show cause why the suspended $500 sanction in the *Dvir* case should not be imposed as well. *Id.*

## II. Analysis

Federal Rule of Civil Procedure 16(f)(1)(C) allows a district court, on motion or *sua sponte*, to impose sanctions on an attorney who "fails to obey a scheduling or other pretrial order." The Rule's "'explicit reference to sanctions' reflects the Rule's intention to 'encourage forceful judicial management'" and "vests a district court with 'discretion to impose whichever sanction it feels is appropriate under the circumstances.'" *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 53 (2d Cir. 2018) (quoting [*4] Advisory Committee's notes to 1983 amendment of Fed. R. Civ. P. 16(f)). A district court's decision to impose sanctions under Rule 16(f) does not require a finding that the party acted in bad faith. *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 53 (2d Cir. 2018); *Rice v. NBCUniversal Media, LLC*, No. 19-CV-447, 2019 U.S. Dist. LEXIS 114690, 2019 WL 3000808 at *3 (S.D.N.Y. July 10, 2019). A district court may impose sanctions under Rule 16(f) when there is "clear and convincing evidence that counsel disregarded a clear and unambiguous scheduling or other pretrial order." *Rice*, 2019 U.S. Dist. LEXIS 114690, 2019 WL 3000808

---

[1] On September 20, 2019, the Final Report from the court-ordered mediation indicated that mediation was not held, as parties represented that they reached a settlement on all issues. See *Polaris Images Corp. v. CBS Interactive, Inc.*, No. 19-CV-3670, Dkt. 15.

Polaris Images Corp. v. CBS Interactive, Inc.

at *3; *see also S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 145 (2d Cir. 2010); 6A Charles Alan Wright et al., Federal Practice and Procedure § 1531 (3d ed. 2010) ("the fact that a pretrial order was violated is sufficient to allow some sanction.").

The Court finds that a sanction under Rule 16(f)(1)(C) for Mr. Liebowitz's violations is appropriate. The Court's May 2 Order was clear and unambiguous. Mr. Liebowitz's declaration and perfunctory explanation in response to the Court's show-cause order is inadequate and wholly unconvincing.

First, Mr. Liebowitz asserts that he was unable to produce the licensing documents or take steps to initiate mediation, as directed in the May 2 Order, because defense counsel did not file a Notice of Appearance until July 30, 2019. *Polaris Images Corp. v. CBS Interactive, Inc.*, No. 19-CV-3670, Dkt. 13 ¶ 3. This is the same excuse that Mr. Liebowitz previously offered in this case and which this Court **[*5]** has already rejected twice, once in a separate case before this Court and then again in the August 1 Order. *See Walsh v. Nylon Media, Inc.*, No. 19-CV-3036, Dkt. 14; *Polaris Images Corp. v. CBS Interactive, Inc.*, No. 19-CV-3670, Dkt. 12. In an order dated June 20, 2019 in *Walsh v. Nylon Media, Inc.*, No. 19-CV-3036, Dkt. 14, the undersigned reminded Mr. Liebowitz of the elementary principle that "if a defendant fails to appear before a scheduled conference or joint-submissions deadline, it is incumbent on plaintiff's counsel to apply for an adjournment of the conference or deadline rather than ignore it altogether." The undersigned warned Mr. Liebowitz that "no amount of sophistry [would] excuse further failures to adhere to this principle." *Id.* In its August 1 Order, the undersigned clearly reiterated this precise concept to Mr. Liebowitz. *Polaris*, Dkt. 12. As a result, the undersigned finds Mr. Liebowitz's

continued reliance on the same unacceptable excuse in response to the Court's show-cause order to be close to contemptuous.

The May 2 Order was abundantly clear that the licensing information was to be produced by the earlier of 14 days after service of process or three business days **[*6]** in advance of mediation. *Polaris*, Dkt. 6. There is no conceivable reading of the May 2 Order that could result in Mr. Liebowitz believing he could simply ignore the deadline to produce the royalty information until the Defendant appeared, rather than seek an adjournment. If Mr. Liebowitz believed the royalty and licensing information was confidential and that he could not produce it until the Defendant made an appearance, he should have moved to adjourn the deadline to produce the documents.[2] Although no member of the bar of this Court should have to be reminded of this rudimentary procedure, Mr. Liebowitz was reminded of it on June 20, 2019, in the *Walsh* order; nevertheless, Mr. Liebowitz did not produce the required information and failed to request an adjournment of his time to do so.

Second, Mr. Liebowitz admits that "proof of service was filed untimely," despite the fact that the May 2 Order clearly required him to file the affidavit within 3 days of service of process. *Polaris*, Dkt. 13 ¶ 5, Dkt. 6. Mr. Liebowitz claims his conduct was due to "administrative oversight." *Polaris*, Dkt. 13 ¶ 8. This is not the first time that Mr. Liebowitz has attributed his failure to follow this **[*7]** Court's order to file proof of service within three days

---

[2] The Court also notes that counsel for CBSi disputed Mr. Liebowitz's factual assertion that he has never provided licensing information before defense counsel has appeared. Dkt. 14. The Court need not resolve this factual dispute; regardless of Mr. Liebowitz's view of the propriety of providing licensing information prior to defense counsel filing a notice of appearance, the Court ordered him to do so.

of service of process to "administrative oversight," nor is it the first time that this Court has found such an excuse to be inadequate and unpersuasive. *See Polaris*, Dkt. 12; *Dvir v. Dancing Astronaut, Inc.*, No. 18-CV-9416, Dkt. 31 (the undersigned rejected Mr. Liebowitz's excuse that his failure to file a revised proposed default judgment was the result of "administrative oversight."). Mr. Liebowitz argues that he should not be subjected to sanctions on account of "administrative errors," and that a district court's inherent power to sanction attorneys requires a showing of bad faith. *See Polaris*, Dkt. 13 ¶¶ 6-7. First, the undersigned reminds Mr. Liebowitz that a Rule 16(f)(1)(C) sanction does not require a showing of "bad faith." *See Huebner*, 897 F.3d at 53. Second, given the frequency with which Mr. Liebowitz commits "administrative errors," the undersigned is unconvinced that they are indeed good faith oversights. Mr. Liebowitz also inexplicably defends his failure to file proof of service timely by declaring that he ultimately did file the certificate "after the Court notified this office in another unrelated matter [*Pereira v. Source Digital, Inc.*, No. 19-CV-1820] [*8] that proof of service was untimely." *See Polaris*, Dkt. 13 ¶ 5. This attempted justification not only offers no legitimate explanation for his initial failure to comply with the May 2 Order, but also highlights Mr. Liebowitz's continual disregard for this Court's orders in multiple other cases. Furthermore, the order in *Pereira* admonishing Mr. Liebowitz for failing to timely file the affidavit of service in that case was entered on July 11, 2019. *See Pereira*, Dkt. 23. Mr. Liebowitz offers no explanation for why he waited 19 days after the *Pereira* order to file proof of service in *Polaris*.

Third, Mr. Liebowitz offers no reason why the undersigned should not impose the $500

sanction that is currently held in abeyance in connection with his failure to comply with a court order in *Dvir v. Dancing Astronaut, Inc.*, No. 18-CV-9416. Mr. Liebowitz's failure even to address the suspended $500 sanction, despite the August 1 Order's explicit direction to do so, is itself yet another violation of an order of this Court.

## III. Conclusion

For the reasons set forth above, the Court finds that Mr. Liebowitz failed to show cause why he should not be sanctioned pursuant to Fed. R. Civ. P. 16(f). As a result, the Court ORDERS [*9] Mr. Liebowitz to pay a civil sanction to the Clerk of Court of **$1,000** for his failure to comply with the May 2 Order.[3] In addition, the **$500** sanction that is currently held in abeyance in *Dvir v. Dancing Astronaut, Inc.*, No. 18-CV-9416, is ordered to be paid immediately. Within **15 days of this Order**, Mr. Liebowitz must pay a total **civil sanction to the Clerk of Court of $1,500;** he must file proof of payment of $1,000 in 19-CV-3670 and proof of payment of $500 in 18-CV-9416.

In addition, because the parties notified the Mediator on September 20, 2019, that they have reached a settlement resolving all issues, it is further ORDERED that this case is DISMISSED with prejudice. The Clerk of Court is respectfully directed to terminate all pending motions and deadlines and to CLOSE the case.

Within **30 days** of this order, the parties may

---

[3] Mr. Liebowitz is cautioned that future failure to comply with the requirements contained in this Court's Mediation Referral Orders to file proof of service within three days of effecting service of process and to provide the defendant with royalty information not later than the earlier of 14 days after service of process or three business days in advance of any scheduled mediation session will not be tolerated.

Polaris Images Corp. v. CBS Interactive, Inc.

apply to reopen this case. Any such application must show good cause for holding the case open in light of the parties' settlement and must be filed within **30 days**. Any request filed after 30 days or without a showing of good cause may be denied solely on that basis.

Additionally, if the parties wish for the Court to retain jurisdiction to enforce their settlement **[*10]** agreement, they must submit **within the same 30-day period**: (1) their settlement agreement to the Court in accordance with Rule 6.A of the Court's Individual Practices and (2) a request that the Court issue an order expressly retaining jurisdiction to enforce the settlement agreement. *See Hendrickson v. United States*, 791 F.3d 354 (2d Cir. 2015).

**SO ORDERED**.

**Date: October 9, 2019**

**New York, NY**

/s/ Valerie Caproni

**VALERIE CAPRONI**

**United States District Judge**

End of Document

**Exhibit H**

 Neutral
As of: December 14, 2019 8:17 PM Z

# Sands v. Bauer Media Grp. USA, LLC

United States District Court for the Southern District of New York

September 18, 2019, Decided; September 18, 2019, Filed

17-cv-9215 (LAK)

**Reporter**
2019 U.S. Dist. LEXIS 160421 *; 2019 U.S.P.Q.2D (BNA) 351350; 2019 WL 4464672

STEVE SANDS, Plaintiff, -against- BAUER MEDIA GROUP USA, LLC, Defendant.

For Defendant: Terence P. Keegan, David S. Korzenik, MILLER KORZENIK SOMMERS RAYMAN LLP.

**Subsequent History:** Later proceeding at Sands v. Bauer Media Grp. USA, LLC, 2019 U.S. Dist. LEXIS 182980 (S.D.N.Y., Oct. 22, 2019)

Motion denied by, Dismissed by, Motion granted by Sands v. Bauer Media Grp. USA, LLC, 2019 U.S. Dist. LEXIS 205558 (S.D.N.Y., Nov. 26, 2019)

**Judges:** Lewis A. Kaplan, United States District Judge.

**Opinion by:** Lewis A. Kaplan

## Opinion

## Core Terms

images, licensing, infringed, photographs, video, discovery, fair use, declaration, cases, partial summary judgment, documents, sanctions, underwear, Walking, damages, posted, costs, lace, Dog, settlements, Shooting, shot, web

**MEMORANDUM OPINION**

LEWIS A. KAPLAN, *DISTRICT JUDGE.*

Digital imaging and the Internet are among the wonders of our age. In combination, they permit the virtually instant and worldwide electronic dissemination of high quality images that can be, and often are, copied and redisseminated by others. Nonetheless, this circumstance has created problems for professional photographers and publishers of

**Counsel:** **[*1]** For Plaintiff: Richard Liebowitz, Yekaterina Tsyvkin, Liebowitz Law Firm PLLC.

Sands v. Bauer Media Grp. USA, LLC

images that were unimaginable in the relatively recent past. It has led also to the creation of a lawyer business model that has deluged this Court with photographic copyright infringement cases since early 2016.

This deluge is attributable to plaintiff's counsel in this case, Richard Liebowitz. According to the Court's records, Mr. Liebowitz, who was admitted to practice in this Court in October 2015, filed 1,110 lawsuits in this Court from the beginning of 2016 through September 16, 2019. That is an average of more than one new case on every day the Court has been open for **[*2]** business. Each and every one of those 1,110 cases has been a copyright infringement suit. Many - probably all or nearly so - have been brought on behalf of photographers who assert that their images have been infringed by Internet web sites and other publishers. This case is part of the downpour.

Of course, photographers who create copyrighted images should be fairly compensated for their work. Those who infringe by using such images in violation of the rights of a copyright holder should be held to account. On the other hand, as I noted in a prior case, "[t]here may well be justification for [the] implication [that a significant portion of the 1,110 cases]. . . [have been] strike suits, designed to extort settlements from defendants on the basis that the defense costs would exceed what plaintiff would accept in settlement."[1] Indeed, another judge of this Court has referred to Mr. Liebowitz as a "copyright troll" - one who is

"more focused on the business of litigation than on selling a product or service or licensing their copyrights to third parties to sell a product or service. A copyright troll plays a numbers game in which it targets hundreds or thousands of defendants seeking quick **[*3]** settlements priced just low enough that it is less expensive for the defendant to pay the troll rather than defend the claim."[2]

Moreover, Mr. Liebowitz has been sanctioned, reprimanded, and advised to "clean up [his] act" by other judges of this Court. As Judge Furman recently observed, "there is a growing body of law in this District devoted to the question of whether and when to impose sanctions on Mr. Liebowitz."[3] And that is what I am asked to do here by defendant's motion to dismiss the action as a sanction for alleged discovery misconduct or, alternatively, to strike portions of the evidence that plaintiff has submitted in support of a motion for summary judgment or require a bond as security for costs and fees pursuant to Local Civ. R. 54.2.

*Facts*

This case concerns two images allegedly taken by plaintiff Steve Sands of the well known

---

[1] *Konangataa v. Am. Broadcasting Cos.*, Nos, 16-cv-7382, 7383 and 7472 (LAK), 2017 U.S. Dist. LEXIS 95812, 2017 WL 2684067, at *2 (S.D.N.Y. June 21, 2017). *See also, e.g., Pereira v. 3072541 Canada Inc.*, No. 17-cv-6945 (RA), 2018 U.S. Dist. LEXIS 195406, 2018 WL 5999636, at *3 (S.D.N.Y. Nov. 15, 2018) (describing Mr. Liebowitz's litigation tactics as "an apparent attempt to increase costs and to extort unwarranted settlements").

[2] *McDermott v. Monday Monday, LLC*, No. 17-cv-9230 (DLC), 2018 U.S. Dist. LEXIS 184049, 2018 WL 5312903, at *2 (S.D.N.Y. Oct. 26, 2018); *see also Reynolds v. Hearst Communs., Inc.*, No. 17-cv-6720 (DLC), 2018 U.S. Dist. LEXIS 35453, 2018 WL 1229840, at *4 (S.D.N.Y. Mar. 5, 2018).

[3] *Rice v. NBC Universal Media, LLC*, No. 19-cv-447 (JMF), 2019 U.S. Dist. LEXIS 114690, 2019 WL 3000808 (S.D.N.Y. July 10, 2019) (citing *Pereira*, No. 17-cv-6945 (RA), 2018 U.S. Dist. LEXIS 195406, 2018 WL 5999636, at *2; *McDermott*, No. 17-CV-9230 (DLC), 2018 U.S. Dist. LEXIS 184049, 2018 WL 5312903, at *2-3; *Steeger v. JMS Cleaning Servs., LLC*, No. 17-cv-8013 (DLC), 2018 U.S. Dist. LEXIS 42797, 2018 WL 1363497, at *3 (S.D.N.Y. March 15, 2018); *Craig v. UMG Recordings, Inc.*, No. 16-cv-5439 (JPO), 380 F. Supp. 3d 324, 2019 WL 1432929, at *10 (S.D.N.Y. Mar. 29, 2019)).

model, Emily Ratajkowski.

*The Shooting of the DKNY Campaign Video and the Capture of the Allegedly Infringed Images [\*4]*

It appears that Ms. Ratajkowski was engaged by or on behalf of the women's wear company, DKNY, to appear in a video commercial promoting a new line of intimate wear and related products that was to be introduced in connection with the hash tag #GoodMorning DKNY. Plaintiff Sands, a professional photographer who allegedly had nothing to do with shooting the commercial,[4] captured two or more still images of Ms. Ratajkowski, apparently as she was performing, posing, or rehearsing for the video. He claims to hold copyright in the still images he took, as distinguished from the images on the commercial or any others shot on behalf of DKNY or others.

On January 19, 2017, the day before the photo shoot, Ms. Ratajkowski posted on her Instagram account a photo of herself clad only in underwear and reclining on a sofa or ottoman. Her accompanying [\*5] comment stated "Secret project in NYC today . . . coming to you March 2017."[5]

On the following day, January 20, 2017, Ms. Ratajkowski posted to her Instagram a photo of herself in lace underwear to which plaintiff

claims copyright,[6] It appeared with the description "Shooting today in NYC mid-January in 40 degree weather in MY UNDERWEAR. Working hard lol" followed by three emoji. Based on a screengrab of this photo submitted by defendant - the post at issue is no longer on Instagram - no photo credit appears alongside the photograph. The post made no reference to plaintiff.[7]

On January 28, Ms. Ratajkowski posted another photograph of herself to Instagram holding a cup of coffee and wearing what appears to be the same lace underwear. Again based on defendant's screengrab, the photographis uncredited and the posting makes no reference to plaintiff.[8]

The record is unclear as to how Ms. Ratajkowski obtained those two images - images allegedly shot by Mr. Sands - in order to have been able to post them on her Instagram account, in one case on the very day it was taken.

*The DKNY Campaign Goes Public*

The DKNY campaign - and, in particular, the video shot on January 20 - went fully public on [\*6] or about March 13, 2017. The video commercial appears on Instagram and remains available on web sites.[9]

The commercial opens with Ms. Ratajkowski lying in bed clad only in lace underpants. She arises, dons a lace bra, leaves an apartment, and

---

[4] Cpt. ¶ 7 & Ex. A.

    Mr. Sands asserts that he had nothing to do with making the video and was not hired by anyone to photograph Ms. Ratajkowski that day. He states that he understood that she was shooting a commercial for DKNY that day and that "[s]he was in public view at the time I photographed her and she could have been photographed by anyone." Sands Decl. (Dl27) ¶¶ 4-5.

[5] Ans. 11 n.2 & Ex. B, at 3.

---

[6] *Id.* Ex. B, at 2.

[7] *Id.*

[8] *Id.* Ex. B, at 1.

[9] *E.g.* https://www.usmagazine.com/stylish/news/emily-ratajkowski-walks-hendog-in-bra-underwear-for-dkny-w471860/ (last visited Sept. 11, 2019).

walks a dog down a New York street clad only in boots and the lace underwear. The video closes with her looking into the camera and saying "good morning New York."

The video, its promotional use by DKNY, and images of Ms. Ratajkowski as she appeared in the video were eye catching and unusual. While it often is said that "anything can happen in New York," that is an exaggeration. The frequency with which attractive models of any gender walk their dogs down New York City streets clad - in the dead of winter - only in lace underwear is virtually non-existent. Reasonable triers of fact reasonably could conclude that the events depicted in the video and in Mr. Sands' images, and the use to which images of those events was being put, were newsworthy.[10]

Defendant Bauer Media Group USA LLC ("Bauer") operates the web site FHM.com. FHM.com was among the many media outlets that ran stories about the DKNY video on March 13, 2017, its story being entitled *Emily Ratajkowski's New DKNY Ad Is Just Her Walking A Dog In Lingerie*.[11] The article was accompanied by a set of photographs that included the two images in which plaintiff claims copyright. The article reported and commented on the release of the DKNY video.

It attributed each of the photos on its web page including the two allegedly infringed Sands images, both of which had appeared on Ms. Ratajkowski's January Instagram posts - to "Instagram/emrata,""emrata" being Ms. Ratajkowski's Instagram handle.[12]

*Prior Proceedings*

*Discovery*

This action was commenced in December 2017. The Court held an initial pretrial conference on February 6, 2018, during which Bauer expressed its intention to raise a defense of fair use, plaintiff announced a $25,000 settlement demand, and Bauer stated its wish to litigate the matter - if necessary - in a speedy and efficient manner, so that the prospect of substantial legal fees would not effectively force it to **[*8]** accede to plaintiff's demand regardless of the merit and value of the claim. It was abundantly clear at the conference that the licensing history of the two allegedly infringed photos would be highly relevant to any disposition of the case. They would be relevant to, perhaps among other issues, (1) one of the key factors bearing on Bauer's fair use defense, the impact of the alleged infringement on the market for plaintiff's work, and (2) plaintiff's claim for actual damages, which were demanded in the complaint in addition to statutory damages.

Mr. Sands' counsel, a former associate of Mr. Liebowitz, readily represented at the conference that plaintiff had licensing history information for these photographs and that plaintiff would produce it. Independent of that representation, Sands was obliged by Rule 26(a)(1)(A) to identify anyone with information

---

[10] *E.g.*, Sammy Nickalls, *Emily Ratajkowsi Walks Her Dog in Lingerie, as One Does: Anything Can Happen in New York!*, Esquire (Mar. 13, 2017) (available at https://www.esquire.com/style/mens-fashion/news/a53836/emily-ratajkowski-lingerie/) (last visited Sept. 11, 2019); Jamie Feldman, *DKNY's Unrelatable Ad Shows Emily Ratajkowski Walking Her Dog in Lingerie*, HUFFPOST (Mar. 13, 2017) (available at https://www.huffpost.com/entry/emily-ratajkowski-bra_n_58c6d59ee4b0598c66986d93) (last visited Sept. 11, 2019); Alex Ungerman, *Emily Ratajkowski Walks Dog in [*7] NYC Wearing Nothing but Lingerie for DKNY - Watch!*, AOL (Mar. 13, 2017) (available at https://www.aol.com/article/entertainment/2017/03/13/emily-ratajkowski-walks-dog-in-nyc-wearing-nothing-but-lingerie/21884545/) (last visited Sept. 11, 2019).

[11] Ans. ¶ 11 &Ex. A.

[12] *Id.*

Sands v. Bauer Media Grp. USA, LLC

on documents that Sands might use to support his claims. Rule 26(a)(1)(A) certainly covered information concerning any licensing history of these photos given their relevance to the actual damages claim and their potential utility to plaintiff in meeting the fair use defense. In any case, the Court directed both sides to produce the required Rule 26(a) disclosure on or before **[*9]** March 9, 2018.[13] In addition, Bauer subsequently sought information concerning the

licensing history of the allegedly infringed photographs through requests for production of documents.[14]

Sands' Rule 26(a) disclosure identified only himself as a person likely to have such information. The documents he produced, while containing some information about other photos, contained absolutely nothing before the close of discovery concerning any licensing history of the allegedly infringed photos.[15]

*Sands' Partial Summary Judgment Motion Reveals Some Licensing History*

On September **[*10]** 7, 2018, after the close of discovery, Sands moved for partial summary judgment as to liability, which involved among

other things seeking summary judgment of dismissal of Bauer's fair use and other defenses. The motion was supported by declarations of Messrs. Sands and Liebowitz and a Ms. Halperin.[16]

Mr. Sands' declaration asserts that he licensed the two allegedly infringed photos to Getty Images on the day the images were shot, January 20, 2017, and one of the two (called the Dogwalk Photo) to Matrix Pictures, a UK stock agency.[17] He attaches to the declaration as Exhibit C copies of screen shots from the Matrix web site showing the Dogwalk Photo and others taken on the same occasion and offering them for license.[18] Mr. Sands has submitted no documentary evidence of his alleged licensing of these two photos to Getty Images or Matrix.[19]

Mr. Sands' declaration makes it abundantly clear that he was aware of his alleged licensing of his own two allegedly infringed photos — in the case of Getty from January 20, 2017 onward and in the case of Matrix from whenever he concluded that license. Yet he failed to identify either Getty or Matrix in his Rule 26(a) disclosure despite the fact that they, to Sands' **[*11]** certain knowledge, were persons with information that Sands might use in support of his claims — as indeed he used them in support of his motion for partial summary judgment.

Following the filing of the Sands motion for partial summary judgment, Bauer filed the present motion to dismiss and sought a stay of briefing of the Sands motion pending the

---

[13] DI 16, DI 17.

[14] Keegan Decl. ¶ 10.

    The document request is not of record, but Bauer's counsel asserts that it called for this information. Plaintiff does not dispute this. He does, however, claim in an unsworn statement in his memorandum that "Sands produced all documents in his possession that were responsive to Bauer's requests. [Sands Declr. 11]." DI 43, at 30. In fact, however, paragraph 11 of Mr. Sands' declaration reads, in its entirety: "At the time I took the Photographs, I personally observed other photographers on the scene taking photographs of Ms. Ratajkowski." DI 27, ¶ 11. The declaration nowhere addresses either Bauer's document request or Sands' response to it.

[15] Keegan Decl. ¶¶ 8, 11.

---

[16] The latter two are immaterial for purposes of the matters now before the Court.

[17] Sands Decl. (DI 27) ¶¶ 12-14.

[18] *Id.* & Ex. C.

[19] It of course is highly likely that he has such documentation.

Sands v. Bauer Media Grp. USA, LLC

disposition of this one. Bearing in mind that the resolution of this motion could moot the Sands motion, the Court granted that stay.

*Discussion*

Bauer contends that the conduct of Sands and his counsel warrants dismissal as a sanction under Fed. R. Civ. P. 16(f), 26(e), 37(b), and/or 37(c).[20] Alternatively, it seeks to have the Court strike Mr. Sands' licensing-related testimony and exhibit from his declaration, preclude him from asserting that the allegedly infringed photos had any licensing history or economic value, and require him, pursuant to Local Civ. R. 54.2, to post a bond in the amount of $50,000 to satisfy any judgment in Bauer's favor for costs and attorney's fees under Section 505 of the Copyright Act.[21]

The failure of Mr. Sands and his counsel, Mr. Liebowitz, to identify Getty and Matrix violated their obligations under Rule 26(a). Indeed, they so concede, calling it "a mere oversight of counsel amounting [*12] to no more than simple negligence."[22] As will appear, however, this likely was more than a mere oversight, and it should have consequences.

Rule 37(c)(1) provides:

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."

The sanctions available under Rule 37(b)(2)(A)(i)-(vi) include, among other things, dismissal of an action and prohibiting the offender from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.

The standards governing determination of sanctions issues under Rules 26 and 37(c), as outlined by the Second Circuit, are straightforward:

"In determining whether the District Court abused its discretion in imposing the sanction under [*13] Rule 37, we are governed by the standard set forth in *Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006). In *Patterson*, two defendants violated Rule 26(a)(3) by not timely disclosing the names of witnesses they planned to call at trial. *Id.* at 117. The District Court granted the plaintiff's motion to preclude, except as to one witness who was named in the original complaint and whose testimony reasonably could have been anticipated. *Id.* On appeal to this Court, we held that "[i]n determining whether the district court acted within its discretion, this Court [must] consider[ ] '(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness [es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a

---

[20] DI 40, at 6-7.

[21] 17 U.S.C. § 505.

[22] DI 43, at 34 (citation and internal quotation marks omitted).

continuance.'" *Id.* (citing *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)) (brackets in *Patterson*). Thus, although a "bad-faith" violation of . . . Rule 26 is not *required* in order to exclude evidence pursuant to Rule 37, it can be taken into account as part of the party's explanation for its failure to comply."[23]

*First*, plaintiff's excuse for the failure to identify Getty and Matrix is lame. He concedes that he was obliged to do so, but contends instead in his **[\*14]** unsworn memorandum his failure was "a mere oversight of counsel amounting to no more than simple negligence."[24] But neither plaintiff Sands nor his counsel has submitted any affidavit or declaration to support this readily advanced excuse under oath. Moreover, they certainly had a motive to withhold the licensing history of these photographs for as long as possible. As Bauer argues:

> "Withholding licensing information for the Photos kept alive the possibility that Bauer would tire of litigation expenses and give in to Sands' shakedown — a classic "copyright troll" strategy in line with the hundreds of other cases brought by Sands' counsel in this District, if not the dozens of cases filed on Sands' own behalf."[25]

Equally important, this not the first time that Mr. Liebowitz has gotten into difficulty in this Court for what at best often is a slap dash approach to pursuing the enormous volume of cases of this nature that he has filed.[26] A "mere oversight" that happens once or twice is one

thing. A pattern of discovery and related abuse is quite another, and rings of deliberate indifference to an attorney's obligation to behave in a professional, responsible, and competent manner in each and **[\*15]** every case he handles. And if the attorney has filed a deluge of cases, such that his workload is too great to discharge that obligation, the volume of cases must be reduced to a number that may be managed responsibly or the number of responsible and competent attorneys tasked with handling it must be increased.

In sum, plaintiff has offered no satisfactory excuse for his failure to comply with Rules 26(a) and (e).

*Second*, the testimony of Getty and Matrix is likely to prove important to the proper resolution of this case. Among Bauer's defenses is that of fair use. The Copyright Act provides that:

> "[T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> > (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> > (2) the nature of the copyrighted work;
> > (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> >
> > (4) the effect of **[\*16]** the use upon the potential market for or value of the copyrighted work."[27]

---

[23] *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).

[24] DI 43, at 34 (citation omitted).

[25] Def. Reply Mem. [DI 49], at 6.

[26] *See* note 3, *supra*.

[27] 17 U.S.C. § 107.

As the Second Circuit wrote recently:

> "In fair use litigation, courts undertake a "case-by-case analysis" in which each factor is considered, "and the results [are] weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994). The factors are non-exclusive, but consideration of each is mandatory. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014). Some of the factors are more important than others, with the fourth (market impact) being "the single most important element." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)."[28]

Getty and Matrix allegedly are licensed to sublicense not only the two allegedly infringed photos, but other photos from the same startling event, as well as still others of Ms. Ratajkowski. Accordingly, they almost certainly have evidence bearing substantially on the potential market for or value of the allegedly infringed photos in particular, others similar to them, and the effect, if any, of infringement on the potential market for the images. Similar evidence from them would have a significant bearing on any actual damages (which plaintiff demands in the complaint along with statutory damages) as well as on the determination of any statutory damages.

*Third*, plaintiff's withholding **[*17]** of this information has prejudiced Bauer, a fact that comes into clear focus when one considers the unusual context in which this conduct occurred.

From the very outset, defendant's objective — as it made clear in the initial conference with the Court and its adversary — was to dispose of this case with a minimum investment of time and effort. It was on that basis that the discovery plan agreed and decided upon included only limited and only written discovery followed, if appropriate, by a summary judgment motion or motions and perhaps a very short trial. Obviously important to these proceedings was the licensing history of the allegedly infringed photos, which could have a significant bearing on the fair use defense, actual damages in the event of liability, and perhaps other issues as well. And in view of the representation of plaintiff's counsel at the initial conference that plaintiff had such information, defense counsel had every right to anticipate that documents evidencing any such licensing history would be forthcoming pursuant to Rule 26(a) and their document request. But none were. And Bauer now finds itself — post the close of the discovery period — facing a motion for partial summary **[*18]** judgment motion as to liability, a previously unmade claim that these photos had been licensed to Getty and Matrix, and still no documentary evidence of any such licenses, let alone any information at all about the economic terms of any such licenses. Now it has before it a need for reopened discovery of plaintiff, Getty, and Matrix — the last of which is based in the United Kingdom and may not be subject to process here and a waste of some level of effort between the date of the initial conference and the present. Of course, much of this harm may be remedied by appropriate relief. But this simply is not the way in which this case should have been handled by plaintiff's counsel.

That said, dismissal "is a drastic remedy that should be imposed only in extreme

---

[28] *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 175-76 (2d Cir.) (footnote omitted), *cert. denied*, 139 S. Ct. 595, 202 L. Ed. 2d 428 (2018).

circumstances."[29] The fact that much of the harm that plaintiff's counsel has caused can be undone militates strongly against it Nevertheless, the imposition of sanctions is appropriate.

*Conclusion*

For the foregoing reasons, defendant's motion to dismiss the action as a sanction for alleged discovery misconduct or, alternatively, to strike portions of the evidence that plaintiff has submitted in support of a motion for summary judgment **[*19]** or require a bond as security for costs and fees pursuant to Local Civ, R. 54.2 [DI 38], is granted to the extent that plaintiffs counsel, Mr. Liebowitz, shall pay defendant's reasonable attorney's fees, for making and litigating this motion, and plaintiff shall show cause, on or before October 2, 2019, why the Court should not condition plaintiff's ability to proceed with this action on the posting of a bond or other sufficient security in the amount of $50,000 for costs and attorney's fees in this action, and otherwise denied. Plaintiff's motion for partial summary judgment [DI 25] is denied.

SO ORDERED,

Dated: September 18, 2019

/s/ Lewis A. Kaplan

Lewis A. Kaplan

United States District Judge

---

---

[29] *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988).

**Exhibit I**

 Caution
As of: December 15, 2019 5:39 PM Z

## *Ferdman v. CBS Interactive, Inc.*

United States District Court for the Southern District of New York

September 21, 2018, Decided; September 24, 2018, Filed

17 Civ. 1317 (PGG)

**Reporter**
342 F. Supp. 3d 515 *; 2018 U.S. Dist. LEXIS 162835 **; Copy. L. Rep. (CCH) P31,342; 2018 WL 4572241

STEVEN FERDMAN, Plaintiff, - against — CBS INTERACTIVE INC., Defendant.

## Core Terms

photographs, fair use, registration, transformative, summary judgment, Gallery, images, discovery, infringement, Media, license, argues, parties, weighs, documents, copies, posted, registration certificate, deposited, GameSpot, summary judgment motion, bad faith, video, articles, purposes, website, celebrity, concludes, factors, willful

**Counsel:** [**1] For Steven Ferdman, Plaintiff: Yekaterina Tsyvkin, Liebowitz Law Firm PLLC, Valley Stream, NY; Richard Liebowitz, Liebowitz Law Firm, PLLC, Valleystream, NY.

For CBS Interactive Inc., Defendant: Robert Penchina, LEAD ATTORNEY, Levine, Sullivan, Koch & Schulz, LLP(NYC), New York, NY.

**Judges:** Paul G. Gardephe, United States District Judge.

**Opinion by:** Paul G. Gardephe

## Opinion

[*520] **MEMORANDUM OPINION & ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiff Steven Ferdman sues Defendant CBS Interactive Inc. for unlicensed use of his copyrighted photographs on its website.

The parties have filed cross-motions for partial summary judgment concerning infringement, willfulness, and Defendant's affirmative defenses of fair use, failure to state a claim, and license. (Dkt. Nos. 24-27, 29-46). For the reasons set forth below, the parties' motions will be granted in part and denied in part.

[*521] **BACKGROUND**[1]

---

[1] To the extent that this Court relies on facts drawn from a party's **Local Rule 56.1** statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See *Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003)* ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's **Rule 56.1** statement, that fact will be deemed admitted." (citations omitted)). Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence. See *Cifra v. GE, 252 F.3d 205, 216 (2d Cir. 2001)* (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

Ferdman v. CBS Interactive, Inc.

Plaintiff Steven Ferdman is a professional photographer who licenses his photographs to publishers for a fee. (Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 1) His photographs have appeared in Vogue, Variety, and other publications. (Id. ¶ 2)

Defendant CBS Interactive Inc. publishes GameSpot, an internet publication accessible at **[**2]** www.gamespot.com. (Id. ¶ 13; Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 20)[2] GameSpot "provides news and commentary about video games and entertainment of interest to video game players." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 20)

In September 2016, the movie Spider-Man: Homecoming was in production, and scenes of the movie were being filmed in Queens. (Id. ¶¶ 1-2) Plaintiff took 307 photographs of the movie's production from public locations, including photographs of actor Tom Holland. (Id. ¶ 3; Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 3)

Rex by Shutterstock is one of Plaintiff's agents for purposes of licensing his photographs, and Rex receives 50% of the license fee it generates in connection with the sale or license of photographs created by Plaintiff. (Id. ¶¶ 4-5) Between September 26 and September 28, 2016, Plaintiff uploaded to Rex — for purposes of licensing — the Spider-Man photographs he had taken. (Id. ¶ 6; Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 6) Prior to the filing of the

---

[2] The parties dispute whether Plaintiffs **Rule 56.1** Counterstatement should be considered. (Dkt. Nos. 45 & 46) Plaintiff states that "[d]ue to an unfortunate and inadvertent office error, Plaintiff did not file [his **Rule 56.1** Counterstatement] at the time his Opposition brief was due." Plaintiff requests that the Court consider his **Rule 56.1** Counterstatement even though it was filed approximately one month late. (Nov. 22, 2017 Pltf. Ltr. (Dkt. No. 45) at 1) Defendant states that "Plaintiff's suggestion that he merely failed to file this document borders on sanctionable, as this document not only was not filed it never was served and likely was not even drafted until the significance of Plaintiff's failure was made clear at a settlement conference just the other day." (Nov. 25, 2017 Def. Ltr. (Dkt. No. 46) at 1 (emphasis in original)) Defendant further notes that, in many instances, "Plaintiff's statement does not identify countervailing evidence, but only [provides] arguments without citation to any evidence of record." (Id. at 2) Moreover, Plaintiff does not contest the majority of Defendant's factual assertions. Given these circumstances, Plaintiff's **Rule 56.1** Counterstatement is entitled to little weight, and its consideration by the Court will not unfairly prejudice Defendant.

instant action on February 21, 2017, Rex had sold 27 licenses concerning Plaintiff's Spider-Man photographs, generating license fees of approximately $292. (Id. ¶ 7)

On November **[**3]** 7, 2016, Plaintiff obtained a certificate of registration from the U.S. Copyright Office — VA 2-022-430 — for a group of works entitled "Group Registration of Published Photographs; Spiderman; All published 9/24/2016-9/30/2016; 307 Photographs." (Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 8; **[*522]** Ferdman Decl., Ex. B (Certificate of Registration) (Dkt. No. 26-3) at 2)[3] As discussed below, the parties dispute whether the photographs at issue in this case are included in this registration. (Id. ¶ 10)

On September 27, 2016, GameSpot published an article entitled "New Spider-Man: Homecoming Photo Shows Tom Holland Suited Up: Filming on the 2017 movie has moved from Atlanta to New York" (the "Holland Article"). (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 24; Makuch Decl., Ex. A (Holland Article) (Dkt. No. 33-1) at 2) The Holland Article reads as follows:

> With Spider-Man: Homecoming now in production, images and videos from the set have steadily emerged. The newest shot comes from Spider-Man actor Tom Holland himself.
>
> **Posted to his Instagram page**, the image celebrates the fact that shooting has shifted to Queens, which is Peter Parker's hometown. "First night in Queens and it feels like home already," Holland wrote. Here is the picture:

---

[3] The Court notes that only the odd pages of the Certificate are included in the declaration. (See id.)

Ferdman v. CBS Interactive, Inc.



Production moved to New York **[**4]** after time in Atlanta, where <u>Homecoming</u> director Jon Watts (<u>Cop Car</u>) shot a silly video of Holland **breakdancing to Daft Punk in his Spider-Man motion capture suit**. . . .

(Cmplt., Ex. B (Dkt. No. 1-2) at 9; Holland Article (Dkt. No. 33-1) at 2)[4]

**[*523]** As shown above, the Holland Article contains a copy of the photograph posted to Holland's Instagram page. That photograph was taken by Plaintiff. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 27; Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 15)[5]

On September 29, 2016, GameSpot published an article entitled "Latest <u>Spider-Man: Homecoming</u> Images Showcase Action on New York's Streets" (the "Gallery Article"). (<u>Id.</u> ¶ 29; Auty Decl., Ex. A (Gallery Article) (Dkt. No. 34-1) at 2) In relevant part, the article states:

The upcoming Marvel movie <u>Spider-Man: Homecoming</u> is currently filming in New York, and the steady stream of on-set images and videos

continues. Following **a picture posted by star Tom Holland earlier this week (http://vvww.gamespot.com/articles/new-spider-man-homecoming-photo-shows-tom-holland-/1100-6443967/)**, a host of new imagery has landed via **Collider (http://collider.com/spider-man-homecoming/)**. Check out the video below, with more in the gallery at the end of the story.

*[Video.]*

Production on <u>Homecoming</u> **[**5]** has moved to New York after time in Atlanta. . . . (Gallery Article (Dkt. No. 34-1) at 2)

At the end of the Gallery Article is a series of images of Spider-Man, including photographs that GameSpot believed had been released by the movie studio or otherwise had been made available for use by the media. (<u>Id.</u> at 3; Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 33) GameSpot obtained all of these photographs from a Twitter account that GameSpot believed was circulating studio publicity shots. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 34) Seven of the photographs in the gallery had been taken by Plaintiff, however. (<u>Id.</u> ¶ 35)

The Complaint was filed on February 21, 2017, and alleges that Defendant "infringed Plaintiff's copyright in the [Spider-Man] Photographs by reproducing and publicly displaying the Photographs on [its] Website." (Cmplt. (Dkt. No. 1) ¶ 14) The Complaint further alleges that Defendant's infringement was willful. (<u>Id.</u> ¶ 16) The parties have filed cross-motions for partial summary judgment concerning infringement, willfulness and Defendant's affirmative defenses of fair use, failure to state a claim, and license. (Dkt. Nos. 24-27, 29-45)

## DISCUSSION

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where **[**6]** the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008)* (citing *Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).*

---

[4] Bold lettering has been added to indicate that the text contains a hyperlink to another webpage.

[5] Plaintiff does not dispute Defendant's assertion that "[t]he Holland Article included a copy of the photo that Holland posted to his Instagram page and commented that 'the image celebrates the fact that shooting has shifted to Queens, which is [Spider-Man character] Peter Parker's hometown.'" (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 27)

Ferdman v. CBS Interactive, Inc.

"When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P' ship, 22 F.3d 1219, 1224 (2d Cir. 1994)* (citing **[\*524]** *Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988))*. "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" *Yi Fu Chen v. Spring Tailor, LLC, 14 Civ. 218 (PAE), 2015 U.S. Dist. LEXIS 85214, 2015 WL 3953532, at \*4 (S.D.N.Y. June 29, 2015)* (quoting *Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009))*.

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" *Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009)* (quoting *Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)* (internal quotation marks and citation omitted)). However, a "'party may not rely on **[\*\*7]** mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist,'" *Hicks v, Baines, 593 F.3d 159, 166 (2d Cir. 2010)* (alterations in original) (quoting *Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)* (internal quotation marks and citation omitted)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment . . ." *Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)*. "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citations omitted).

## II. INFRINGEMENT

Plaintiff has moved for summary judgment on his claim of copyright infringement. (Pltf. Br. (Dkt. No. 25) at 9-14)

## A. Legal Standard

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)*; see also *Mint, Inc. v. Amad, 10 Civ. 9395 (SAS), 2011 U.S. Dist. LEXIS 49813, 2011 WL 1792570, at \*2 (S.D.N.Y. May 9, 2011)* (same). With respect **[\*\*8]** to the first element, "'[a] certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright.'" *Mint, 2011 U.S. Dist. LEXIS 49813, 2011 WL 1792570, at \*2* (quoting *Hamil Am. Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999)*)

## B. Plaintiff's Discovery Violation and its Consequences

Defendant argues that Plaintiff's motion for summary judgment on infringement should be denied, because he has not established as a matter of law that the photographs at issue were registered with the Copyright Office. (Def. Opp. (Dkt. No. 35) at 4-7)

Defendant contends that "plaintiff has provided a copy of a registration certificate . . ., but he has produced no evidence demonstrating that any of the photos at issue in this case actually were covered by that registration." (Def. Opp. (Dkt. No. 35) at 4-5 (emphasis in original)) Defendant further states that while

> [t]he registration certificate submitted by Mr. Ferdman lists 307 image numbers for photos covered by that registration[,] [n]one of the image numbers listed on the registration certificate **[\*525]** matches the image numbers for the photos at issue. . . . [D]ocuments produced in discovery by Mr. Ferdman provide very different image numbers for the photos in suit and nowhere list the image numbers **[\*\*9]** appearing on the registration.

(Id. at 5 (citations omitted))

Defendant further complains that, when deposed, "Mr. Ferdman was unable to confirm what photos actually got submitted to the Copyright Office or were covered by his registration." (Id. at 6) Finally, although Ferdman submitted a declaration at summary judgment attaching copies of photographs he represents were sent to the Copyright Office (Ferdman Decl., Exs. D-2 & -3 (Dkt.

Ferdman v. CBS Interactive, Inc.

Nos. 26-6 & -7)), Defendant argues that Plaintiff is trying to "sneak into the record documents that <u>he never produced</u> in discovery. . . . These [documents] were <u>*withheld*</u> despite being requested in GameSpot's document requests and again during his deposition — when his failure to already produce them was discussed at length." (<u>Id.</u> at 6 n.1 (emphasis in original)) Defendant argues that it has been prejudiced by Plaintiff's failure to produce these materials during discovery — despite repeated requests — and that these documents should not be considered at summary judgment. (<u>Id.</u> (citing *Lujan v. Cabana Mgmt., Inc., 284 F.R.D. 50, 70-71 (E.D.N.Y. 2012))*

In response, Plaintiff argues that the certificate of registration is *prima facie* evidence of the validity of the copyright (Pltf. Reply. (Dkt. No. 44) at 4), and that Defendant has not produced evidence **[**10]** to rebut the validity of this registration. (<u>Id.</u> at 5, 7-8) Plaintiff further argues that

> Defendant mistakenly believes that it is Plaintiff who shoulders the burden (financial and otherwise) to obtain certified copies of deposits from the U.S. Copyright Office. However, as a matter of law, it is the Defendant's 'heavy burden' alone to prove invalidity of the . . . Registration.

(<u>Id.</u> at 7) Plaintiff also contends that Ferdman's deposition testimony

> that he no longer had possession of the hard copies of [the] Subject Photographs . . . does not negate his sworn affidavit that he caused copies of the same to be deposited with the U.S. Copyright Office. Given the volume and cost of keeping hard copies of photographs for a professional photographer, Ferdman doesn't keep hard copies of his works indefinitely. Having failed to gather hard evidence from the U.S. Copyright Office and having failed to show that the subject photographs are not deposited, Defendant offers nothing more than its own biased speculation as to Ferdman's credibility.

(<u>Id.</u> at 8)

The background as to Plaintiff's alleged discovery violation is as follows: Fact discovery in this case closed on August 11, 2017. (<u>See</u> Civil Case Management Plan and Scheduling **[**11]** Order (Dkt. No. 14) at 1) On May 26, 2017 — early in the discovery process — Defendant requested "[a]ll documents relating to registration of any copyright in the Photographs, including but not limited to copies of any registrations, applications to register, copies of the work that were submitted for registration to the Copyright Office, and any communications with the

Copyright Office relating to registration of the Photographs." (Penchina Decl., Ex. A (Requests for Production) (Dkt. No. 37-1) at 8, 11) Plaintiff did not produce copies of the works submitted for registration. (Penchina Decl., Ex. B (Plaintiff's Production of Documents) (Dkt. No. 37-2); <u>see id.</u> Ex. C (Ferdman Dep.) (Dkt. No. 37-3) at 7-8 (defense counsel stating: "You were asked for the application with the jpegs. You provided the application **[*526]** without the jpegs. Without the jpegs, there is nothing here that indicates — you could list numbers all you want. That's meaningless."))

Instead of producing a copy of what he had submitted to the Copyright Office, Plaintiff produced a printout from Rex by Shutterstock of images he uploaded to that website. (<u>Id.</u>) For each photograph, the printout contains a small image of the **[**12]** photograph, a date between September 26, 2016 and September 27, 2016 — consistent with the dates Plaintiff states he uploaded the photographs to Rex (Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 6) — Tom Holland's name, and an image number. (<u>See</u> Plaintiff's Production of Documents (Dkt. No. 37-2)) As Defendant notes, these image numbers do not match the image numbers listed in the Certificate of Registration. (Def. Opp. (Dkt. No. 35) at 5-6) For example, while the photograph used in the Holland Article has an image number of "6023475e SVF" printed on the document Plaintiff produced (<u>id.</u> at 3), the same image attached to Ferdman's declaration and on the Certificate of Registration has a file name of "DSC_9261.jpg." (Ferdman Decl., Ex. D-3 (Dkt. No. 26-7) at 5; <u>see also</u> Certificate of Registration (Dkt. No. 26-3) at 3 (listing "DSC_9261.jpg" as the title of an image covered by the registration))

During Plaintiff's August 9, 2017 deposition, when defense counsel asked Plaintiff how he would know if a particular image was covered by the Certificate of Registration, Plaintiff responded that he would know by "[t]he Metadata, the file name. The only thing that gives you here is the file name. . . . Each [photograph] **[**13]** has a unique file name. I can go back and see which one corresponds to which." (Ferdman Dep. (Dkt. No. 37-3) at 4) However, when Plaintiff was questioned at the deposition as to whether he has "a copy of what was submitted to the copyright office in order to obtain this registration," Plaintiff testified, "I don't." (<u>Id.</u> at 6) When asked how he knew what was covered by the registration — given that he didn't have a copy of what was submitted to the Copyright Office — Plaintiff responded that "[t]his was the first set that I did submit, so I gave [the Copyright Office] all my photos to register

Ferdman v. CBS Interactive, Inc.

for me." (Id.) Defendant repeated its request for "a copy of what was submitted to the copyright office," and explained that "[w]ithout seeing what the copyright office has, we have no idea what's covered by this registration and neither do you." (Id. at 7) When Plaintiff's counsel stated that "I know what was submitted because I was the one who did it" (id.), Defense counsel stated that

> [t]hat's not evidence. What's evidence is what was submitted to the copyright office. If photos were omitted from it accidentally, they are not covered by this registration and we are entitled to see what was submitted and that **[**14]** was asked for and there was no objection to producing that, and we'd like to see it. . . . You were asked for the application with the jpegs. You provided the application without the jpegs. Without the jpegs, there is nothing here that indicates — you could list numbers all you want. That's meaningless. . . . I want what was submitted to the copyright office, whatever it was, a copy of that. . . . If you have a copy, we're entitled to it. If you don't have a copy, I can't make you create one and I don't want you to create anything new.

(Id. at 7-8)

There is no evidence that Plaintiff produced any documents in response to defense counsel's request. On October 6, 2017, however — in support of his summary judgment motion — Plaintiff submitted a declaration stating that the photographs attached as an exhibit to his declaration **[*527]** are "a copy of the Subject Photographs that was deposited [with the Copyright Office] along with the application." (Ferdman Decl. (Dkt. No. 26) ¶ 9) Although the declaration does not explain where these copies came from, each of the photographs is identified by a file number that matches a title included in the Certificate of Registration. (Compare Ferdman Decl., Exs. D-2 & **[**15]** D-3 (Dkt. Nos. 26-6 & -7), with Certificate of Registration (Dkt. No. 26-3), and Ferdman Decl., Ex. C (Public Record of Registration) (Dkt. No. 26-4))

Before determining whether Plaintiff's failure to produce these materials during discovery warrants a discovery sanction, the Court will address Plaintiff's argument that registration is prima facie evidence of the validity of a copyright, and that Defendant has not produced evidence rebutting the validity of the registration. (Pltf. Reply (Dkt. No. 44) at 4-5, 7) This argument is not relevant, because Defendant is not challenging the validity of the copyright registration. Defendant is instead disputing whether the photographs that are the subject of this lawsuit are actually included in the

registration. Accordingly, the cases Plaintiff cites as to Defendant's burden to rebut the validity of a copyright registration (Pltf. Reply (Dkt. No. 44) at 7) are not applicable. See Mantel v. Microsoft Corp., 16 Civ. 5277 (AJN), 2018 U.S. Dist. LEXIS 53549, 2018 WL 1602863, at *5 (S.D.N.Y. Mar. 29, 2018) ("The Defendants do not seek to undermine the validity of the 059 Registration — it is not disputed that 25 of [Plaintiff's] photographs are protected by a presumptively valid copyright registration. Rather, what is disputed **[**16]** is whether [Plaintiff's] photograph of Yiru Sun is one of those 25 photographs.")

In determining whether a discovery sanction is appropriate, courts consider four factors: "'(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the [excluded evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [evidence]; and (4) the possibility of a continuance.'" 2018 U.S. Dist. LEXIS 53549 [WL] at *4 (quoting Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006)) (applying these factors at summary judgment and determining that preclusion was appropriate where plaintiff attempted to use documents not produced in discovery to demonstrate that certain photographs were included in a copyright registration); see also Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (applying four-factor test for preclusion at trial).

The Mantel court's application of the four-factor test is instructive here. In Mantel, plaintiff — a professional photographer — sued after his photograph appeared in a video featured on defendants' websites; defendants did not have a license to publish plaintiff's photograph. Mantel, 2018 U.S. Dist. LEXIS 53549, 2018 WL 1602863 at *1. As here, the photograph at issue was part of a group registration of 25 photographs — the "059 Registration" — and defendants moved for summary **[**17]** judgment on the basis that Plaintiff "cannot demonstrate using admissible evidence that he had a valid copyright." 2018 U.S. Dist. LEXIS 53549 [WL] at *3. At summary judgment, plaintiff offered two pieces of evidence to "prov[e] that his photograph [was] part of the 059 Registration: (1) his sworn declaration stating that he 'caused a copy of the Subject Photograph to be deposited with the U.S. Copyright Office as part of [his] application bearing service request #1-3653740711, dated June 16, 2016,' . . . and (2) a copy of the copyright registration application that [he] sent to the U.S. Copyright Office." Id. (internal citations omitted). The court concluded that

Ferdman v. CBS Interactive, Inc.

[e]ven assuming that this evidence would be sufficient to survive a motion for summary judgment on the issue of possession of a valid copyright, it was not **[\*528]** produced during discovery, and the Court concludes that it is appropriate in this case to prevent the Plaintiff from supplementing the factual record on this motion for summary judgment with information and material that was withheld during the course of discovery.

*2018 U.S. Dist. LEXIS 53549 [WL] at \*4*.

Turning to the four <u>Patterson</u> factors, the court found that

[Plaintiff] has provided no justification for his failure to produce documents in his **[\*\*18]** possession regarding the copyright registration except to state that Defendants also could have "obtain[ed] certified copies of deposits from the U.S. Copyright Office." However, Plaintiff represented that he had these documents in his possession, Defendants requested the documents early in the discovery process, and the Plaintiff told the Defendants that he would produce the documents to them. Defendants were entitled to rely on his representations and not seek their own certified copy of those same documents. In addition, the Plaintiff failed to produce any discovery during the months-long discovery process without seeking an extension of the deadline or even informing Defendants that other testimony or documents would be forthcoming. Indeed, the Plaintiff was put on clear notice at the post-discovery conference that late efforts to produce discovery would not be tolerated. Nevertheless, the Plaintiff's effort to rely on unproduced evidence came after that warning. As a result, although the Court recognizes that the excluded evidence is plainly important, it would be awarding gamesmanship and a failure to follow the rules if the Court allowed the evidence into the record.

<u>Id.</u> (internal **[\*\*19]** citations omitted).

The court further concluded that defendants would be prejudiced if plaintiff was permitted to use at summary judgment materials that he had not produced in discovery:

Defendants filed for summary judgment specifically because the Plaintiff had never provided testimony or documentation proving that the photograph at issue was protected by a copyright. It would thus be

highly prejudicial to Defendants to allow the Plaintiff to supplement the record with dispositive evidence after the motions for summary judgment have been fully briefed. Allowing the Plaintiff to put his testimony or his registration application into the record now would require discovery to be reopened because it would require Defendants to conduct further discovery, including potentially depositions, and to adopt a very different litigation strategy. Reopening discovery would thus delay this litigation and incur additional expenses by the parties that are difficult to quantify. Finally, although a trial date has not yet been set, and thus the fourth factor does not weigh heavily against the Plaintiff, the bell cannot be unrung with regard to the time and money devoted by the parties to summary judgment **[\*\*20]** based on the evidentiary record as developed.

<u>Id.</u> (internal citations omitted).

The same principles addressed in *Mantel* support preclusion here. As to the first *Patterson* factor, Plaintiff has offered no explanation for his failure to produce copyright application-related materials during discovery. Plaintiffs argument that Defendant could have obtained copies from the Copyright Office does not address why Plaintiff did not produce the requested materials during discovery. Defendant asked for all documents related to the copyright application both in its request for production and at Plaintiff's deposition, and Plaintiff represented that he did not **[\*529]** have a copy of what was submitted to the Copyright Office. The Court concludes that this factor favors preclusion.

As to the second *Patterson* factor — the importance of the evidence at issue — the evidence is admittedly critical to this case. However, "the mere fact that 'the evidence may be important is not sufficient to avoid preclusion where no explanation has been given for the delay.'" *Simon v. City of New York, 14 Civ. 8391 (JMF), 2017 U.S. Dist. LEXIS 1629, 2017 WL 57860, at \*6 (S.D.N.Y. Jan. 5, 2017)* (quoting *Lebada v. New York City Dep't of Educ., 14 Civ. 758 (LAK) (GWG), 2016 U.S. Dist. LEXIS 18461, 2016 WL 626059, at \*7 (S.D.N.Y. Feb. 8, 2016)*, <u>report and recommendation adopted,</u> **[\*\*21]** *2016 U.S. Dist. LEXIS 185228, 2016 WL 8453417 (S.D.N.Y. May 16, 2016))*. "[T]o hold otherwise 'would give parties the perverse incentive to spring especially large and surprising disclosures on their adversaries on the eve of trial — an extreme version of the 'sandbagging' that *Rule 26* attempts to avoid.'" <u>Id.</u> (quoting *Agence France Presse v. Morel,*

Ferdman v. CBS Interactive, Inc.

293 F.R.D. 682, 687 (S.D.N.Y. 2013)). Given that Plaintiff has offered no explanation for his failure to produce the documents at issue during discovery, the Court concludes that the importance of the evidence "is not sufficient to avoid preclusion." (Id.)

The last two factors — prejudice to Defendant and the possibility of a continuance — also weigh in favor of preclusion. Were the Court to consider the evidence at issue at summary judgment, Defendant would be unfairly prejudiced, because Defendant's opposition to Plaintiff's motion for summary judgment as to infringement is premised on the lack of evidence linking the photographs at issue to the certificate of registration. See Mantel, 2018 U.S. Dist. LEXIS 53549, 2018 WL 1602863, at *4 ("It would thus be highly prejudicial to Defendants to allow the Plaintiff to supplement the record with dispositive evidence after the motions for summary judgment have been fully briefed.").

And as the Mantel court stated,

[a]llowing the Plaintiff to put his . . . registration application into the record [**22] now would require discovery to be reopened because it would require Defendants to conduct further discovery . . . and to adopt a very different litigation strategy. Reopening discovery would thus delay this litigation and incur additional expenses by the parties that are difficult to quantify. Finally, although a trial date has not yet been set, and thus the fourth factor does not weigh heavily against the Plaintiff, the bell cannot be unrung with regard to the time and money devoted by the parties to summary judgment based on the evidentiary record as developed. Because a continuance cannot alleviate the prejudice Defendants would experience if discovery were reopened at this late stage, the Court concludes that the fourth factor does weigh in Defendants' favor.

Id.; see also Lebada v. N.Y.C. Dep't of Educ., 14 Civ. 758 (LAK) (GWG), 2016 U.S. Dist. LEXIS 18461, 2016 WL 626059, at *7 (S.D.N.Y. Feb. 8, 2016) ("[T]he fact that discovery closed many months ago 'also weighs strongly against the possibility of a continuance.'" (quoting Spotnana, Inc. v. Am. Talent Agency, Inc., 9 Civ. 3698 (LAP), 2010 U.S. Dist. LEXIS 86457, 2010 WL 3341837, at *2 (S.D.N.Y. Aug. 17, 2010))), report and recommendation adopted, 2016 U.S. Dist. LEXIS 185228, 2016 WL 8453417 (S.D.N.Y. May 16, 2016).

The Court concludes that preclusion is warranted. With these documents excluded, there is a genuine issue of material fact as to whether [**23] the photographs that are the subject of Plaintiff's infringement claim are included in the copyright registration. Although Plaintiff testified — in a conclusory fashion — that he "gave [the Copyright Office] all my photos to register for me" (Ferdman Dep. (Dkt. No. 37-3) at 6), [*530] Plaintiff also testified that he did not have a copy of what was submitted to the Copyright Office. (Id.) Given that Plaintiff submitted 307 photographs at this time, and that none of the designations on the photographs produced by Plaintiff during discovery match the designations on the Certificate of Registration, this Court cannot conclude as a matter of law that the photographs that are the subject of this action were included in the registration. In the absence of "hard evidence" linking the photographs at issue to the certificate of registration, summary judgment is inappropriate. See Mantel, 2018 U.S. Dist. LEXIS 53549, 2018 WL 1602863, at *3 ("[T]he Court concludes that the [p]laintiff cannot point to any 'hard evidence,' D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998),] that the photograph [plaintiff] took of Yiru Sun was one of the photographs registered with the Copyright Office as part of the 059 Registration.")

Accordingly, Plaintiff's motion for summary judgment on the issue of infringement will be [**24] denied.

## III. FAIR USE

The parties have cross-moved for summary judgment on Defendant's fair use defense. (Pltf. Br. (Dkt. No. 25) at 14 (moving against a fair use defense as to all the photographs); Def. Br. (Dkt. No. 30) at 11 (moving for a fair use defense only as to the photograph used in the Holland Article))

### A. Legal Standard

Under the Copyright Act, "the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. The Copyright Act provides that four factors should be considered in determining whether the use of a work is fair use:

(1) the purpose and character of the use, including

Ferdman v. CBS Interactive, Inc.

whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Id. As these factors indicate, "the determination **[\*\*25]** of fair use is an open-ended and context-sensitive inquiry." _Blanch v. Koons, 467 F.3d 244, 251 (2d Cir. 2006)_.

"Fair use is a mixed question of law and fact." _Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)_. "The fact-driven nature of the fair use determination suggests that a district court should be cautious in granting _Rule 56_ motions in this area; however, it does not protect the copyright holder from summary disposition of her claims where there are no material factual disputes." _Wright v. Warner Books, Inc., 953 F.2d 731, 735 (2d Cir. 1991)_ As the Supreme Court has explained, the four factors are not treated "in isolation, one from another'!; rather, [a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." _Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994)_.

## B. Analysis

### 1. Purpose and Character of the Use

The first fair use factor focuses on "whether the new work merely 'supersede[s] the objects' of the original creation **[\*531]** or instead adds something new." _Id. at 579_ (quoting _Folsom v. Marsh, 9 F. Cas. 342, 348, F. Cas. No. 4901 (No. 4,901)_ (C.C.D. Mass. 1841)) (internal citation omitted). "[T]he primary inquiry is whether the use 'communicates something new and different from the original or [otherwise] expands its utility,' that is, whether the use is 'transformative.'" _Fox News Network, LLC v. Tveyes, Inc., 883 F.3d 169, 176 (2d Cir. 2018)_ (quoting _Authors Guild v. Google, Inc., 804 F.3d 202, 214 (2d Cir. 2015))_. "'Although . . . transformative use is not absolutely necessary for a finding of fair use, . . . [transformative] works . . . lie at the heart of **[\*\*26]** the fair use doctrine . . . .'" _Id._ (quoting _Campbell, 510 U.S. at 579_). Indeed, "the more

transformative the work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use." _Campbell, 510 U.S. at 579_.

Although transformative use is the "primary inquiry" under this factor, _Fox News Network, 883 F.3d at 176_, courts also consider whether the use was for a commercial purpose and whether the use was in bad faith. These factors receive less weight than whether the use was transformative, however. As to commercial use, commercialism weighs against a finding of fair use. Even so, "the relative importance of this factor is determined on a sliding scale: the more transformative the work, the less important the commercial purpose," _N. Jersey Media Grp. Inc. v. Pirro, 74 F. Supp. 3d 605, 618 (S.D.N.Y. 2015)_, and it is not appropriate to deny a fair use defense based simply on the fact that the use was commercial. _NXIVM Corp. v. Ross Inst., 364 F.3d 471, 477 (2d Cir. 2004)_ (noting that Supreme Court has rejected notion that commercial nature of a use is dispositive). As to bad faith, "while the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis." _Id. at 479 n.2_; see _id. at 479_ ("[W]hile the subfactor pertaining to defendants' good or bad faith must be weighed, and while it was error for the district court **[\*\*27]** not to have fully and explicitly considered it, we find that even if the bad faith subfactor weighs in plaintiffs' favor, the first factor still favors defendants in light of the transformative nature of the secondary use."); see also 4 _Nimmer On Copyright § 13.05[A][1][d]_ ("One frequent factor recognized by courts relevant to the 'character' of the use is the propriety of the defendant's conduct.").

### a. Whether the Use Was Transformative

Defendant argues that the use of the photograph in the Holland Article (the "Holland Photograph") was transformative: "[t]he [Holland] Article reported and commented on Tom Holland's Instagram post of the photo, and discussed its significance to him and how he himself described it." (Def. Br. (Dkt. No. 30) at 13) Further, "the Photo was presented as a historic artifact — its significance was as the item which Tom Holland himself had shared, not what it incidentally depicted." (Id.) Given this transformative use, Defendant argues that its "status as a for-profit entity does not lessen the weight of the first factor in its favor." (Id.) As to the photographs in the Gallery Article (the "Gallery Photographs"), Defendant argues that these images were used "for news reporting purposes." (Def. Opp. (Dkt. No. 35) at 8)

Ferdman v. CBS Interactive, Inc.

Plaintiff **[\*\*28]** contends that the use of the photographs was not transformative: "the Subject Photographs were used by Defendant in the exact same way and in the same context as it was used by legitimate, licensed publications. Defendant has simply published an article using the Subject **[\*532]** Photographs in the same manner that was published by competitors in the cultural and entertainment marketplace. . . . Defendant merely illustrated its article at the expense of the Plaintiff." (Pltf. Opp. (Dkt. No. 43) at 12 (internal citation omitted)) Plaintiff further argues that "there are no alterations of the Subject Photographs['] colors, the background against which the subjects are portrayed, the medium, or the size of the subject matter depicted." (Id. at 13) While Plaintiff acknowledges that the articles may have some news value, "'[n]ewsworthiness itself does not lead to transformation.'" (Id. at 14 (quoting Monge v. Maya Magazines, Inc., 688 F.3d 1164, 1176 (9th Cir. 2012)))

Plaintiff also argues that Defendant used the photographs "for a commercial rather than a nonprofit educational purpose," and that this use "weighs against a finding of fair use." (Id. at 15) There is, of course, "no dispute that Defendant is a for-profit entity which disseminates content on its website" (id. at 16), and "commercial advertisements **[\*\*29]** appear alongside the Subject Photographs on Defendant's website." (Id.)

Finally, Plaintiff argues that Defendant's use was in bad faith: "Defendant's use of the Subject Photographs omits the authorship credit which appears next to the images as they appear on Rex by Shutterstock. The omission of Ferdman's name besides his photographs demonstrates Defendant's bad faith (or the absence of good faith and fair dealing) in its use of Ferdman's photographs." (Id. at 17 (internal citation omitted))

### i. Gallery Photographs

The Court concludes that Defendant's use of the Gallery Photographs was not transformative. Although "news reporting" is a use described in Section 107 and 'there is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in § 107," NXIVM Corp. v. Ross Inst., 364 F.3d 471, 477 (2d Cir. 2004) (quoting Wright v. Warner Books, Inc., 953 F.2d 731, 736 (2d Cir. 1991)), "'use of copyrighted material that "merely repackages or republishes the original" is unlikely to be deemed a fair use.'" Fox News Network, 883 F.3d at 177 (quoting Infinity Broad. Corp. v. Kirkwood, 150 F.3d

104, 108 (2d Cir. 1998)).

Here, the point of the Gallery Article is simply that the photographs exist: the Gallery Article only reports on the fact that the "steady stream of on-set images and videos continues," and provides a gallery of the images at the end of the article. (Gallery Article (Dkt. No. 34-1) at 2-3) The Article's commentary **[\*\*30]** is not new information or insight that amounts to a transformative use. Were this purpose sufficient to invoke a presumption of fair use, nearly every use of a photograph in a news article could be considered "transformative." See Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 557, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (where magazine published quotations taken from a purloined copy of an unpublished manuscript of Gerald Ford's autobiography, Supreme Court held fair use defense did not apply: "The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report' of the book.").

Two recent cases illustrate these principles. In BWP Media USA, Inc. v. Gossip Cop Media, Inc., 196 F. Supp. 3d 395 (S.D.N.Y. 2016), defendant operated a "for-profit website that presents celebrity gossip news and opines on the veracity of celebrity news stories published by unaffiliated third-party outlets," and plaintiff "own[ed] the rights to a collection of photographs and videos of celebrities that it license[d] to various print and online publications." **[\*533]** Id. at 398. Defendant posted "screen grabs" from third-party gossip websites of three images of the actress and actor Mila Kunis and Ashton Kutcher, the actor Robert Pattinson, and the model Liberty Ross to its website. Id. at 398-99. Defendant added to each image "an assessment of whether **[\*\*31]** the story that accompanied the photo on the third-party website was 'real' or 'rumor,' as displayed on a 'real-to-rumor scale' posted alongside the image." Id. at 399.

After a bench trial, the court rejected defendant's fair use defense. As to the first two images, the court held that "[n]owhere in its stories accompanying the Kunis/Kutcher or Pattinson Images does Defendant comment or report on the images in question, nor does it critique the source websites' use of those photos." Id. at 404. Although "[t]he 'new expression, meaning, or message' purportedly imbued by Defendant was a 'debunking' of each source-website's presentation of a given image[,] . . . nothing in Defendant's articles suggests that the images were misrepresented. A viewer could leave Defendant's website believing that

Ferdman v. CBS Interactive, Inc.

the third-party sites reported false stories, but without any idea that the images were in any way relevant to the deception." *Id. at 405* (emphasis in original). As to the Ross photograph, the court noted that it had "found no case . . . in which the use of an image solely to present the content of that image, in a commercial capacity, was found to be fair." *Id. at 407*. While defendant argued that the "picture is the story," the court found **[**32]** that "Defendant confuses the situation in which the photograph is the story . . . , and the scenario present here, in which the contents of the photograph are of some public interest. . . . Here . . . , the fact of the photograph is not of public interest; rather, it is the photograph's contents that are newsworthy." *Id. at 406 n.6*.

Similarly in *Barcroft Media, Ltd. v. Coed Media Grp., LLC, 297 F. Supp. 3d 339 (S.D.N.Y. 2017)*, plaintiffs were "the purveyors of entertainment-related photojournalism and owners of certain copyrighted celebrity and human interest photographs," and defendant operated "celebrity gossip and entertainment websites [and] displayed several of Plaintiffs' photographs . . . on its websites without paying licensing fees or otherwise getting authorization." *Id. at 346*. After a bench trial, the court rejected defendant's fair use defense:

> Display of a copyrighted image or video may be transformative where the use serves to illustrate criticism, commentary, or a news story about that work. See *17 U.S.C. § 107*. For instance, a news report about a video that has gone viral on the Internet might fairly display a screenshot or clip from that video to illustrate what all the fuss is about. See, e.g., *Kali Konangataa v. ABC, No. 16-CV-7382 (LAK), 2017 U.S. Dist. LEXIS 95812, 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017)*. Similarly, a depiction of a controversial photograph might fairly accompany a work of commentary **[**33]** or criticism about the artistic merit or appropriateness of the photograph. See, e.g., *Nunez v. Caribbean Inn News Corp., 235 F.3d 18, 25 (1st Cir. 2000)*. In each such case, the copyrighted work is itself the subject of the story, transforming the function of the work in the new context.

*Id. at 352*. In Barcroft Media, however, the

> use of the Images had no transformative effect because it displayed the Images in the same manner and for the same purpose as they were

originally intended to be used. Paparazzi photographs — the bulk of the Images — are designed to document the comings and goings of celebrities, illustrate their fashion and lifestyle choices, and accompany gossip and **[*534]** news articles about their lives. . . . The purposes for which [defendant] used the Images — to serve as banner images and thumbnails for "Daily Dumps" of celebrity news . . . ; to accompany articles about celebrity gossip and human interest stories . . . ; and to be included in roundups of celebrity fashion trends . . . — are all consistent with the original intent behind taking and copyrighting the Images. Thus, [defendant's] use was not transformative.

*Id. at 351-52* (internal citations omitted).

Moreover, as in *BWP Media*, defendant's articles "did not comment on, criticize, or report news about the **[**34]** Images themselves; instead, they used the Images as illustrative aids because they depicted the subjects described in its articles. [Defendant']s argument, if accepted, would eliminate copyright protection any time a copyrighted photograph was used in conjunction with a news story about the subject of that photograph. That is plainly not the law." Id. (emphasis in original).

As in BWP Media and *Barcroft Media*, the Gallery Article did not provide commentary about the photographs used other than the fact they existed: the Gallery Article merely reported that "[t]he upcoming Marvel Movie Spider-Man: Homecoming is currently filming in New York, and the steady stream of on-set images and videos continues." (Gallery Article (Dkt. No. 34-1) at 2) In other words, the Gallery Article involves "the use of an image solely to present the content of that image." *BWP Media, 196 F. Supp. 3d at 407*. Such a use is not transformative. See *Monge v. Maya Magazines, Inc., 688 F.3d 1164, 1176 (9th Cir. 2012)* (gossip magazine published stolen photographs of a celebrity couple's wedding and provided commentary on the photographs; district court granted defendant summary judgment on fair use grounds; Ninth Circuit reversed, holding that plaintiffs were entitled to summary judgment on defendant's fair use defense, because defendant's use — "wholesale copying sprinkled with written commentary — was at best **[**35]** minimally transformative").

The Court concludes that Defendant's use of Plaintiff's photographs in the Gallery Article was not transformative.

Ferdman v. CBS Interactive, Inc.

## ii. Holland Photograph

The Holland Article — in contrast to the Gallery Article and the articles at issue in the cases discussed above — provides commentary on the Holland Photograph by presenting Holland's alleged take on the Holland Photograph: **"Posted to his Instagram page**, the image celebrates the fact that shooting has shifted to Queens, which is Peter Parker's hometown. 'First night in Queens and it feels like home already,' Holland wrote. Here is the picture." (Holland Article (Dkt. No. 33-1) at 2) Accordingly, the Holland Photograph "was the story," due to Holland's posting of the photograph on his Instagram account. Defendant injected some "new meaning or message" into the photograph by reporting that the actor himself had posted the photograph and had provided commentary on it. This "transformation of the work[] into news," *Nunez v. Caribbean Int'l News Corp., 235 F.3d 18, 23 (1st Cir. 2000)* provides some support for a finding of fair use.

*Nunez* is instructive here. In that case, Nunez — a professional photographer — took photographs of Joyce Giraud — the 1997 Miss Puerto Rico Universe — for use in her modeling portfolio. *Id. at 21*. Nunez then distributed the photographs to members **[**36]** of the Puerto Rico modeling community, and a controversy ensued about whether some of the photographs were appropriate for a Miss Puerto Rico Universe. Id. A local television station displayed the photographs and conducted interviews about whether they were "pornographic," **[*535]** and Giraud was interviewed about her "fitness to retain the Miss Universe Puerto Rico crown." Id. Defendant El Vocero — a local newspaper — obtained several of the photographs "through various means," and published three of the photographs along with several articles about the controversy. Id. Nunez sued for copyright infringement, but the district court granted defendant summary judgment on fair use grounds, and the First Circuit affirmed.

The First Circuit held that the use of the photographs had an "informative" function: "[El Vocero] reprinted the pictures not just to entice the buying public, but to place its news articles in context; as the district court pointed out, 'the pictures were the story.' It would have been much more difficult to explain the controversy without reproducing the photographs. And although such an explanatory need does not always result in a fair use finding, it weighs in the favor of **[**37]** appellee." *Id. at 22* (citing *Iowa State Univ. Research Found., Inc. v. Am.*

*Broad. Companies, Inc., 621 F.2d 57, 60 (2d Cir. 1980))*. While noting that the newspaper's "use of the photographs was [not] necessarily fair merely because the photographs were used for news purposes," the First Circuit pointed out that "El Vocero did not manufacture newsworthiness, as it sought not to 'scoop' [Nunez] by publishing his photograph, but merely to provide news reporting to a hungry public. And the fact that the story is admittedly on the tawdry side of the news ledger does not make it any less of a fair use." *Id. at 22-23* (citing *Harper & Row, 471 U.S. at 561* ("[C]ourts should be chary of deciding what is and what is not news." (internal quotation omitted))).

The First Circuit went on to state that

> by using the photographs in conjunction with editorial commentary, El Vocero did not merely "supersede[ ] the objects of the original creation[s]," but instead used the works for "a further purpose," giving them a new "meaning, or message." *Campbell, [510 U.S. at 579*] . . . It is this transformation of the works into news — and not the mere newsworthiness of the works themselves — that weighs in favor of fair use under the first factor of *§ 107*.

*Id. at 23* (citations omitted).

Here, as in *Nunez*, the Holland Photograph became a part of the story that Defendant was reporting. Unlike in the Gallery Article, Defendant is not **[**38]** merely reporting that the photographs exist; rather, Defendant is reporting that the actor himself posted the photograph and provided commentary concerning the photograph. As in *Nunez*, Defendant "did not manufacture newsworthiness, as it sought not to 'scoop' [Plaintiff] by publishing his photograph, but merely to provide news reporting to a hungry public." *Id. at 22*. And although some may regard Holland's posting of the Holland Photograph to his Instagram page as not as newsworthy as the photographs in *Nunez*, "'[c]ourts should be chary of deciding what is and what is not news.'" *Harper & Row, 471 U.S. at 561* (quoting *Harper & Row Publishers, Inc. v. Nation Enters., 723 F.2d 195, 215 (2d Cir. 1983)* (Meskill, J., dissenting)).

While the Court concludes that Defendant's use of the Holland Photograph is somewhat transformative, it is not so transformative as to entitle Defendant to a fair use defense as a matter of law. First, Defendant does not argue that there are any relevant visual differences between Plaintiffs photograph and the Holland

Ferdman v. CBS Interactive, Inc.

Photograph in the Holland Article. Second, although the Holland Article comments on Holland's posting of the photograph, as in the Gallery Article, it also reports on the **[*536]** fact that "[w]ith Spider-Man: Homecoming now in production, images and videos from the set have steadily emerged." (Holland Article (Dkt. No. 33-1) at 2); see also Gallery Article (Dkt. No. 34-1) at 2 ("The **[**39]** upcoming Marvel Movie Spider-Man: Homecoming is currently filming in New York, and the steady stream of on-set images and videos continues.")) As discussed above, the use of a photograph to announce its existence is not transformative. Where — as here — reasonable jurors could disagree about whether — or the extent to which — a use is transformative, it is appropriate to deny summary judgment on a fair use defense.

In _N. Jersey Media Grp. Inc. v. Pirro, 74 F. Supp. 3d 605 (S.D.N.Y. 2015)_, for example, Jeanine Pirro and Fox News Network were sued for copyright infringement based on their use of plaintiff's photograph of three firefighters raising the American flag at the ruins of the World Trade Center on September 11, 2001. Defendants juxtaposed plaintiff's copyrighted image with the World War II image of four U.S. Marines raising the American flag on Iwo Jima, and added the phrase "#neverforget." _Id. at 609-11_. The district court denied defendants summary judgment on their fair use defense, despite acknowledging the differences between plaintiff's photograph and the image used: "Defendants did not simply copy the work wholesale. The image used by Defendants was different from the Work in five distinct ways. Fox News used a (1) cropped, (2) lower-resolution version **[**40]** of the Work, (3) which was juxtaposed with Raising the Flag on Iwo Jima and (4) in a smaller scale than the Work, and (5) added the phrase '#neverforget.'" _Id. at 615_. The court nonetheless decided that it could not

> conclude as a matter of law that the Combined Image transformed the Work sufficiently to merit protection as fair use. As Plaintiff asserts — accurately in the Court's view — the alterations to the Work are 'barely discernable' unless the viewer is specifically prompted to look for them. . . . Thus, a casual observer may believe that he is simply viewing the Work with only the hashtag added. Second Circuit authority suggests that more is required to 'transform' an image.

_Id._ The court ruled that "[m]aterial questions of fact exist concerning the purpose of the Combined Image's use, precluding a determination of the first statutory factor." _Id. at 623_.

Similarly, in _Sarl Louis Feraud Int'l v. Viewfinder Inc., 627 F. Supp. 2d 123 (S.D.N.Y. 2008)_, plaintiffs designed and marketed high-fashion clothing, and defendant operated a website that contained photographs of the current season's fashions and photographs of past collections, including photographs of plaintiff's designs. _Id. at 125_. The court held that although defendant left the "'character of the original garments unchanged,' **[**41]** a reasonable factfinder could find its secondary use highly transformative," and that summary judgment was therefore inappropriate. _Id. at 129_. "While courts have declined to find a transformative use when the defendant has 'done no more than find a new way to exploit the creative virtues of the original work,' . . . courts have found a secondary use to be transformative when it is 'plainly different from the original purpose for which [the copyrighted work was] created' — even where a secondary user has made an exact replication of a copyrighted image." _Id. at 128-29_ (citations omitted); see also _Byrne v. BBC, 132 F. Supp. 2d 229, 234 (S.D.N.Y. 2001)_ (where radio program's stated purpose was to "explore how the Irish-American media was reacting" to a criminal investigation and arrest of four Irish nationals on charges of gun running **[*537]** and radio program used a song — "Fenians" — in the broadcast, district court held that "a reasonable jury could find, on the record as it exists so far, that recording the Song [and using it in a news program] was wholly unnecessary to reporting on 'how the Irish-American media was reacting' to the FBI investigation," and that "the purpose and character of the use is a disputed issue of fact").

Here, as in _North Jersey Media Group_ **[**42]** and _Sarl Louis Feraud_, reasonable jurors could disagree about whether — or the extent to which — Defendant's use of the Holland Photograph was transformative. On one hand, a jury could give weight to the importance of reporting on the fact that Holland posted the photograph himself. On the other hand, a jury could be persuaded by the argument that — like the Gallery Photographs — the Holland Article used the Holland Photograph "solely to present the content of that image[] in a commercial capacity." _BWP Media, 196 F. Supp. 3d at 407_.

In sum, the Court concludes that Defendant's use of the Holland Photograph may have had some transformative purpose, and that the issue cannot be resolved as a matter of law.

**b. Commercial Use**

The Copyright Act instructs that in considering the first fair use factor — "the purpose and character of the use" — courts should take into account "whether such use is of a commercial nature." *17 U.S.C. § 107(1)*. "The fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use." *Harper & Row, 471 U.S. at 562*. Even so, "[t]he Supreme Court in Campbell rejected the notion that the commercial nature of the use could by itself be a dispositive consideration." *NXIVM Corp., 364 F.3d at 477; see Campbell, 510 U.S. at 584* ("If, indeed, commerciality [**43] carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of *§ 107*, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities 'are generally conducted for profit in this country.'" (quoting *Harper & Row, 471 U.S. at 592*)).

In short, although Defendant's for-profit status weighs against a finding of fair use, this factor is not dispositive here.

### c. **Bad Faith**

As discussed above, whether a defendant's use was in bad faith is generally considered under the first fair use factor. *NXIVM Corp., 364 F.3d at 479 n.2* ("[W]hile the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis."). Here, Plaintiff contends that Defendant's uses were in bad faith, because "the Subject Photographs omit the authorship credit which appears next to the images as they appear on Rex by Shutterstock. The omission of Ferdman's name besides his photographs demonstrates Defendant's bad faith (or the absence of good faith and fair dealing) in its use of Ferdman's photographs." (Pltf. Opp. (Dkt. No. 43) at 17 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 43) ¶¶ 6, 7, 15, 16); *Rogers v. Koons, 960 F.2d 301, 309 (2d Cir. 1992)* ("tearing [**44] the copyright mark off of a work suggests bad faith)))

Plaintiff has offered no evidence that Defendant obtained the images in question from Rex by Shutterstock, however, or that it removed the authorship credit itself. To the contrary — as to the Gallery Photographs — Plaintiff admits that Defendant "obtained the photos . . . from a Twitter account believed by GameSpot to be circulating studio publicity shots." (Pltf. R. 56.1 [**538] Counterstmt. (Dkt. No. 45-1) ¶ 34; see Penchina Decl., Ex. 3 (Haywald Dep.) (Dkt. No. 32-

3) at 14) Plaintiff also does not dispute that the Holland Article "included a copy of the photo that Holland posted to his Instagram page." (Id. ¶ 27) Accordingly, Plaintiff has not made a showing of bad faith.

### d. **Conclusion as to the First Fair Use Factor**

After balancing these considerations, the Court concludes that the first fair use factor cuts against a finding of fair use for the Gallery Photographs. As to the Holland Photograph, the first factor is neutral. There is a plausible transformative use; there is no evidence of bad faith; but Defendant is a commercial entity.

### 2. **Nature of the Work**

Under the second fair use factor, a court considers whether the work at issue was previously published [**45] and whether the work was informational or creative. See *Byrne v. BBC, 132 F. Supp. 2d 229, 235 (S.D.N.Y. 2001)* ("Previously published works . . . qualify for 'far less protection' against fair use."); *Mattel Inc. v. Walking Mountain Prods., 353 F.3d 792, 803 (9th Cir. 2003)* ("creative works are 'closer to the core of intended copyright protection' than informational and functional works."). As the Second Circuit has recently stated, however, "[t]his factor 'has rarely played a significant role in the determination of a fair use dispute.'" *Fox News Network, 883 F.3d at 178* (quoting *Authors Guild, 804 F.3d at 220*).

Defendant argues that the nature of the Holland Photograph and the Gallery Photographs favor fair use. The Holland Photograph "is a factual depiction of events taking place in public. . . . [Plaintiff] simply photographed other people's activities as a news event occurring on the streets of Queens." (Def. Br. (Dkt. No. 30) at 14) Defendant further argues that the Holland Photograph "was published by [Plaintiff] — both on his own Instagram page and by his provision of the Photo to Rex Shutterstock." (Id. at 15)

Plaintiff argues that "although [his] photographs were created for purposes of illustrating the making of the [Spider-Man] movie, the Subject Photographs are more creative than factual because capturing these moments involved many aesthetic decisions, including the [**46] staging of the subjects, selection of lighting and the orientation of the image against a specific background." (Pltf. Opp. (Dkt. No. 43) at 18 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 27) ¶¶ 4-5))

Ferdman v. CBS Interactive, Inc.

As to Plaintiff's creativity argument, it is undisputed that Plaintiff took his photographs from a spot accessible to the general public, and that he was not given special access to the movie set. (Ferdman Dep. (Dkt. No. 32-1) at 17-18) The fact that Plaintiff was photographing the events around him as they occurred supports a finding of fair use. See *N. Jersey Media Grp. Inc. v. Pirro, 74 F. Supp. 3d 605, 620 (S.D.N.Y. 2015)* ("The Court finds that the second factor favors a finding of fair use. There can be no dispute that the Work is a non-fictional rendering of an event of utmost historical importance, which Franklin created during the course of his duties as a news photographer. Franklin did not create the scene or stage his subjects — to the contrary, he plainly acknowledged that the photograph 'just happened.' While there can be no dispute that Franklin exhibited great artistry in carrying out his task — for which he has been rightfully recognized and rewarded — there can also be no dispute that the Work is a quintessential example of photojournalism."); see **[**47]** also *Katz v. Google Inc., 802 F.3d 1178, 1183 (11th Cir. 2015)* ("The Photo, however, is merely a candid shot in **[*539]** a public setting, and there is no evidence in the record that Magriso, the photographer, attempted to convey ideas, emotions, or in any way influence Katz's pose, expression, or clothing.")

Plaintiff likewise does not dispute that the photographs at issue had been published at the time Defendant published its articles. (Pltf. Opp. (Dkt. No. 43) at 18 n.11) As such, the second factor supports a finding of fair use.

## 3. The Amount and Substantiality of the Portion Used

Under the third fair use factor, "[t]he relevant consideration is the amount of copyrighted material made available to the public rather than the amount of material used by the copier." *Fox News Network, 883 F.3d at 178* (citing *Authors Guild, 804 F.3d at 222*) (emphasis in original).

Defendant argues that, in considering the amount of Plaintiff's work it used, "the underlying work that should be considered is not the single [Holland Photograph], but Mr. Ferdman's collection of his 307 Spider-Man photos. This is because he published all 307 as a unit by providing them all to Rex Shutterstock to offer for licensing to the public. . . . Thus, GameSpot's use of the single [Holland Photograph] in the [Holland] Article used only a tiny portion **[**48]** of the copyrighted work as a

whole — just 1/307th of it." (Def. Br. (Dkt. No. 30) at 16)

Defendant's argument is misplaced. As the title of the registration indicates, it covers a group of published photographs. (Certificate of Registration (Dkt. No. 26-3) at 2) The applicable regulation covering group registration — *37 C.F.R. § 202.4* ("Group registration") — makes clear that each individual photograph is considered a "work." See *§ 202.4(a)* ("This section prescribes conditions for issuing a registration for a group of related works . . . ." (emphasis added)); *§ 202.4(i)* ("[T]he Register of Copyrights has determined that a group of published photographs may be registered in Class VA with one application, the required deposit, and the filing fee required by *§ 201.3(c)* of this chapter, if the following conditions are met . . . All the works in the group must be photographs . . ." (emphasis added)). Group registration does not alter the status of each photograph as an individual work — rather, it is a matter of administrative convenience. See *17 U.S.C. § 408(c)(1)* ("The Register of Copyrights is authorized to specify by regulation the administrative classes into which works are to be placed for purposes of deposit and registration, and the nature of the **[**49]** copies or phonorecords to be deposited in the various classes specified. The regulations may require or permit, for particular classes, the deposit of identifying material instead of copies or phonorecords, the deposit of only one copy or phonorecord where two would normally be required, or a single registration for a group of related works. This administrative classification of works has no significance with respect to the subject matter of copyright or the exclusive rights provided by this title.")

Here, Defendant used each work — an individual photograph — in its entirety. Even so, "this factor 'weighs less when considering a photograph — where all or most of the work often must be used in order to preserve any meaning at all — than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value.'" *N. Jersey Media Grp. Inc., 74 F. Supp. 3d at 621* (quoting *Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 188 (D. Mass. 2007)*). The Holland Article reported on Holland's posting of the image on Instagram, and the Gallery Article reported on the fact that images of the movie set were being released. Given these purposes, this factor is neutral — "'no more [of the **[*540]** works] [were] taken than necessary.'" *Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 110 (2d Cir. 1998)* (quoting *Campbell, 510 U.S. at 589*); see *N. Jersey Media Grp., 74 F. Supp. 3d at 621* ("Given the express purpose of commemorating the events of 9/11, it is not clear that

Ferdman v. CBS Interactive, Inc.

Fox [**50] News' use of any less of the Work would have ensured its audience's recognition of the iconic photograph.").

**4. The Effect of the Use Upon the Market for or Value of the Original**

The fourth factor "is 'undoubtedly the single most important element of fair use,' *Fox News Network, 883 F.3d at 179* (quoting *Harper & Row, 471 U.S. at 566*), and focuses on "'whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." Id. (quoting *Authors Guild, 804 F.3d at 223*). This factor requires consideration of "'not only the . . . market harm caused by the particular actions of the alleged infringer,' but also the market harm that would result from 'unrestricted and widespread conduct of the [same] sort.'" Id. (quoting *Campbell, 510 U.S. at 590* (internal quotation marks and alteration omitted)).

As to the Holland Photograph, Defendant argues that the "uncontroverted evidence demonstrates that GameSpot's use of the Photo had absolutely no negative effect on the market for it." (Def. Br. (Dkt. No. 30) at 17) Defendant further contends that there is no evidence that Defendant "'deprived [Plaintiff] of the opportunity [**51] to exploit the value of his copyright during its peak demand.' (Def. Reply (Dkt. No. 38) at 6 (quoting Pltf. Opp. (Dkt. No. 43) at 23)) As to all of the photographs, Defendant argues that Plaintiff's claim of market harm is "belied by Mr. Ferdman's own testimony that there was no harm to his market. To the contrary, after GameSpot's posting, Mr. Ferdman has sold 'hundreds' of licenses, and he continues to 'expect these photos to sell for the rest of [his] life.'" (Def. Opp. (Dkt. No. 35) at 10 (quoting Ferdman Dep. (Dkt. No. 32-1) at 25-26; citing Def. R. 56.1 Stmt. (Dkt. No. 31) ¶¶ 41-42))

Plaintiff argues, however, that "because Defendant's use constituted a mere duplication of Ferdman's original photographs, the Court may presume market harm." (Pltf. Br. (Dkt. No. 25) at 24) Plaintiff further contends that "Defendant's use impairs the actual market for [his] photographs[,] because the Defendant's article[s] serve[] the very same purpose as those articles in which the photographs appear legitimately." (Id.) Finally, Plaintiff argues that widespread conduct of the sort Defendant

engaged in would have an adverse impact on his potential for licensing the photographs. (Id. at 25)

In *Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984)*, the [**52] Supreme Court stated that

> although every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright, noncommercial uses are a different matter. A challenge to a noncommercial use of a copyrighted work requires proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work. Actual present harm need not be shown; such a requirement would leave the copyright holder with no defense against predictable damage. Nor is it [*541] it necessary to show with certainty that future harm will result. What is necessary is a showing by a preponderance of the evidence that some meaningful likelihood of future harm exists. If the intended use is for commercial gain, that likelihood may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated.

*Id. at 451* (emphasis in original).

In Campbell, the Court clarified that this presumption of market harm only applies where the use of the work is not transformative. *Campbell, 510 U.S. at 591* ("No 'presumption' or inference of market harm that might find support in Sony is applicable to a case [**53] involving something beyond mere duplication for commercial purposes.").

For the Gallery Photographs, then, there is a presumption of market harm — Defendant's use of these photographs were not transformative. As to the Holland Photograph, however, the presumption of market is also applicable — it is a commercial use that is a "duplication of the entirety of an original" that serves as a substitute for the photograph. Id.; see *Cariou v. Prince, 714 F.3d 694, 708 (2d Cir. 2013)* ("We have made clear that 'our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work.'" (quoting *Blanch v. Koons, 467 F.3d 244, 258 (2d Cir. 2006)* (quotation marks omitted) (emphasis added))); *N. Jersey Media Grp., 74 F. Supp. 3d 605* (fourth factor weighed against fair use where image was not "substantially transformative" of the copyrighted

Ferdman v. CBS Interactive, Inc.

photograph).

Defendant's argument that its articles did not have a discernable effect on the market for Plaintiff's photographs misses the mark. The market effect factor "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood **[\*\*54]** that potential purchasers may opt to acquire the copy in preference to the original.'" _Fox News Network, 883 F.3d at 179_ (quoting _Authors Guild, 804 F.3d at 223_). Moreover, this factor requires consideration of "'not only the . . . market harm caused by the particular actions of the alleged infringer,' but also the market harm that would result from 'unrestricted and widespread conduct of the [same] sort.' Id. (quoting _Campbell, 510 U.S. at 590_).

Here, Plaintiff testified that he was "not aware" of any sales or licensing opportunities that he lost because of Defendant's use of his photographs. (Ferdman Dep. (Dkt. No. 32-1) at 12-13) Other than the license fee that Defendant did not pay for using his photographs, Plaintiff is not aware of any other damage that he suffered. (Id. at 13-14) Plaintiff further testified that there were "hundreds" of licenses issued for the photographs since the Complaint in this action was filed (id. at 25-26), and that the market for the photographs was the strongest when "the film came out," and will be strong again if "there is a sequel that comes out." (Id. at 27)

Defendant argues that this testimony "conclusively demonstrates the absence of market harm." (Def. Br. (Dkt. No. 30) at 18) The Court disagrees. Defendant's use of the photographs in its articles is a clear **[\*\*55]** substitute for the market use of Plaintiff's photographs. Indeed, Defendant's use is "'paradigmatic of the only market the photographs could reasonably have: licensing to media outfits.'" _N. Jersey Media Grp., 74 F. Supp. 3d at 623_ (quoting _Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007))_. **[\*542]** Moreover, the licensing of photographs to media outlets is a "traditional, reasonable, [and] likely to be developed market" of the sort courts consider in assessing this factor, _Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 614 (2d Cir. 2006)_ (quoting _Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 930 (2d Cir. 1994))_, and Plaintiff's unrebutted testimony shows that there is a continuing market for the photographs at issue.

5. **Balancing of the Four Fair Use Factors**

Having considered all four fair use factors "in light of the purposes of copyright," _Campbell, 510 U.S. at 578_, the Court concludes — as to the Gallery photographs — that Defendant's use of these photographs is a wholly untransformative and unaltered copy of Plaintiff's photographs, and that Defendant's use of these photographs is a perfect substitute for the intended market. In these circumstances, fair use is unavailable as a matter of law. See _BWP Media, 196 F. Supp. 3d at 407_ ("The Court has found no case . . . in which the use of an image solely to present the content of that image, in a commercial capacity, was found to be fair.").

As to the Holland Photograph, however, the fair use issue cannot be resolved **[\*\*56]** as a matter of law. As discussed above, reasonable jurors could disagree about whether the use was transformative, Unlike the Gallery Photographs, the Holland Photograph wag arguably newsworthy because Holland himself had posted the picture and commented on it. Even so, the Holland Article — like the Gallery Article — reported on the Holland Photograph as one of the "images . . . from the set [that has] steadily emerged." (Holland Article (Dkt. No. 33-1) at 2)

Given this record, the cross-motions for summary judgment on the fair use issue as to the Holland Photograph will be denied. See _N. Jersey Media Grp., 74 F. Supp. 3d at 623_ ("Weighing the results together, in light of the purposes of copyright, the Court cannot conclude as a matter of law that Defendants' use of the Work was fair. Material questions of fact exist concerning the purpose of the Combined Image's use, precluding a determination of the first statutory factor. The second factor weighs in favor of fair use, but that factor is only rarely determinative and is not so in this case. The third factor is neutral. The fourth and most important factor weighs against fair use. Accordingly, Defendants' motion for summary judgment must be denied."); _Sarl Louis Feraud, 627 F. Supp. 2d at 131_ ("The inquiry into the 'character and purpose' of the alleged infringer's **[\*\*57]** use is fact-intensive, and requires a subtle balancing of several sub-factors, each of which in turn involves the resolution of disputed facts. Depending on how those disputes were resolved, a reasonable fact-finder could find that [Defendant's] use of plaintiffs' designs is transformative, that its use did not amount to commercial exploitation, and that [Defendant] did not act in bad faith. Moreover, even if not all of these considerations were found to favor the defendant, the appropriate balance of the considerations is itself a factual question that is not, on this record, appropriately made on summary judgment"); _id. at 136_ ("Taking the

Ferdman v. CBS Interactive, Inc.

factors together, it cannot be said as a matter of law that no reasonable fact-finder could conclude that the fair use factors weigh in favor of [Defendant's use].").

## IV. WILLFULNESS

Under *17 U.S.C. § 504(c)(1)*, a copyright owner may elect to recover statutory damages between $750 and $30,000 "as the court considers just." Under *Section 504(c)(2)*, where "infringement was **[*543]** committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." "To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant **[**58]** was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 263 (2d Cir. 2005)*.

Defendant argues that Plaintiff "has come forward with no evidence that GameSpot harbored any doubts about its right to make the challenged uses," and thus that he has "presented no genuine issue to prevent entry of judgment against him foreclosing any award of enhanced statutory damages for willful infringement." (Def. Br. (Dkt. No. 30) at 20) Plaintiff argues that "[a] jury is in the best position to determine, based on the record, whether Defendant's activities were consistent with willfulness. Certainly, Ferdman has shown enough on the record to indicate that it is a genuine issue of material fact in dispute." (Pltf. Opp. (Dkt. No. 43) at 24-25) Plaintiff's opposition brief does not point to what that evidence is, however. (See id.)

While "'[g]enerally speaking, summary judgment is not a tool well suited to determining willfulness,'" *Young-Wolff v. John Wiley & Sons, Inc., 12 Civ. 5230 (JPO), 2016 U.S. Dist. LEXIS 3614, 2016 WL 154115, at *10 (S.D.N.Y. Jan. 12, 2016)* (quoting *Close-Up Int'l, Inc. v. Berov, 382 F. App'x 113, 117 (2d Cir. 2010))*, "'[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent **[**59]** or state of mind would operate as a talisman to defeat an otherwise valid motion,'" *Res, Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 141 (2d Cir. 1991)* (quoting *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985))*; see also *Lipton v. Nature Co., 71 F.3d 464, 472 (2d Cir. 1995)* ("Although courts are generally reluctant to dispose of a case on summary judgment when mental state is at issue, it is permissible to do so where there are sufficient undisputed material facts on the

record to make the question appropriate for summary judgment.").

Here, Plaintiff has submitted no evidence that Defendant used Plaintiff's photographs with knowledge of Plaintiff's copyright or with reckless disregard or willful blindness as to his rights. As to the photographs in the Gallery Article, Plaintiff does not contest that "GameSpot obtained the photos . . . from a Twitter account believed by GameSpot to be circulating studio publicity shots." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 34) As to the Holland Photograph, Plaintiff admits that the Holland Article "included a copy of the photo that Holland posted to his Instagram page." (Id. ¶ 27) In sum, there is no evidence that Defendant was either aware of the infringing activity or that it showed reckless disregard or willful blindness to Plaintiff's rights. Because Plaintiff has presented no evidence of willful infringement, Defendant's motion for summary judgment **[**60]** on this issue will be granted.

## V. AFFIRMATIVE DEFENSES

Plaintiff has moved for summary judgment on Defendant's affirmative defenses of failure to state a claim and license. (Pltf. Br. (Dkt. No. 25) at 27-28) Defendant has not responded to Plaintiff's arguments concerning these defenses, and there is no evidence in the record suggesting that Defendant obtained a license to use the photographs at issue. The Court concludes that Defendant has abandoned these defenses. See *Di Giovanna v. Beth Israel Med. Ctr., 651 F. Supp. 2d 193, 208 (S.D.N.Y. 2009)* (where plaintiff "made no **[*544]** attempt to rebut defendants' motion for summary judgment" on his retaliation claim under the Family and Medical Leave Act, district court ruled that he had abandoned the claim): *id. at 208*) it 108 (collecting cases); see also *Champion v. Artuz, 76 F.3d 483, 485 (2d Cir. 1996)* ("[L]itigants should be on notice from the very publication of *Rule 56(e)* that a party faced with a summary judgment motion 'may not rest upon the mere allegations or denials' of the party's pleading and that if the party does not respond properly, 'summary judgment, if appropriate, shall be entered' against him." (quoting *Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988)))*.

Accordingly, Plaintiff's motion for summary judgment as to these affirmative defenses will be granted.

## CONCLUSION

Ferdman v. CBS Interactive, Inc.

For the reasons stated above, Defendant's motion for summary **[\*\*61]** judgment is granted as to the issue of willful infringement. Plaintiff's motion for summary judgment on (1) Defendant's fair use defense as to the Gallery Photographs; and (2) Defendant's affirmative defenses of failure to state a claim and license is granted. The cross-motions are otherwise denied. The Clerk of Court is directed to terminate the motions. (Dkt. Nos. 24, 29, 39, 45)

This case will proceed to trial on **November 5, 2018 at 9:30 a.m.** in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order, motions <u>in limine, voir dire</u> requests, and requests to charge are due on **October 8, 2018**. Responsive papers, if any, are due on **October 15, 2018**. There shall be a pretrial conference on **November 2, 2018 at 12:30 p.m.**

Dated: New York, New York

September 21, 2018

SO ORDERED.

/s/ Paul G. Gardephe

Paul G. Gardephe

United States District Judge

---

**End of Document**

Exhibit J

**Query**     **Reports** ▪     **Utilities** ▪     **Help**     **Log Out**

CLOSED,CASREF,ECF

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:18-cv-08956-CS

Berger v. Imagina Consulting, Inc.                          Date Filed: 09/30/2018
Assigned to: Judge Cathy Seibel                              Date Terminated: 05/07/2019
Referred to: Magistrate Judge Judith C. McCarthy (Settlement)     Jury Demand: Both
Cause: 17:101 Copyright Infringement                         Nature of Suit: 820 Copyright
                                                             Jurisdiction: Federal Question

**<u>Plaintiff</u>**

**Jason Berger**                          represented by   **Richard Liebowitz**
                                                           Liebowitz Law Firm, PLLC
                                                           11 Sunrise Plaza, Suite 301
                                                           Suite 305
                                                           Valleystream, NY 11580
                                                           516-233-1660📱
                                                           Email: RL@LiebowitzLawFirm.com
                                                           *ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Imagina Consulting, Inc.**             represented by   **Craig Justin Albert**
                                                           Albert PLLC
                                                           733 3rd Ave, FL 15
                                                           New York, NY 10017-3293
                                                           646-790-5840📱
                                                           Email: Craig@AlbertPLLC.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/30/2018 | 1 | COMPLAINT against Imagina Consulting, Inc.. (Filing Fee $ 400.00, Receipt Number 0208-15637004)Document filed by Jason Berger. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Liebowitz, Richard) (Entered: 09/30/2018) |
| 09/30/2018 | 2 | REQUEST FOR ISSUANCE OF SUMMONS as to Imagina Consulting, Inc., re: 1 Complaint. Document filed by Jason Berger. (Liebowitz, Richard) (Entered: 09/30/2018) |
|  |  |  |

| 09/30/2018 | 3 | CIVIL COVER SHEET filed. (Liebowitz, Richard) (Entered: 09/30/2018) |
|---|---|---|
| 09/30/2018 | 4 | AO 121 FORM COPYRIGHT - NOTICE OF SUBMISSION BY ATTORNEY. AO 121 Form Copyright for case opening submitted to court for review.(Liebowitz, Richard) (Entered: 09/30/2018) |
| 10/01/2018 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Cathy Seibel. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (pc) (Entered: 10/01/2018) |
| 10/01/2018 | | Magistrate Judge Judith C. McCarthy is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (pc) (Entered: 10/01/2018) |
| 10/01/2018 | | Case Designated ECF. (pc) (Entered: 10/01/2018) |
| 10/01/2018 | 5 | ELECTRONIC SUMMONS ISSUED as to Imagina Consulting, Inc.. (pc) (Entered: 10/01/2018) |
| 10/01/2018 | 6 | AO 121 FORM COPYRIGHT - CASE OPENING - SUBMITTED. In compliance with the provisions of 17 U.S.C. 508, the Register of Copyrights is hereby advised that a court action has been filed on the following copyright(s) in the U.S. District Court Southern District of New York. Form e-mailed to Register of Copyrights. (pc) (Entered: 10/01/2018) |
| 11/26/2018 | 7 | FIRST RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Imagina Consulting, Inc..(Albert, Craig) (Entered: 11/26/2018) |
| 11/26/2018 | 8 | ANSWER to 1 Complaint with JURY DEMAND. Document filed by Imagina Consulting, Inc..(Albert, Craig) (Entered: 11/26/2018) |
| 11/26/2018 | 9 | NOTICE OF INITIAL COURT CONFERENCE: Initial Conference set for 12/19/2018 at 03:00 PM in Courtroom 621, 300 Quarropas Street, White Plains, NY 10601 before Judge Cathy Seibel. (kgo) (Entered: 11/26/2018) |
| 12/12/2018 | 10 | INITIAL REPORT OF PARTIES BEFORE PRETRIAL CONFERENCE. Document filed by Jason Berger.(Liebowitz, Richard) (Entered: 12/12/2018) |
| 12/18/2018 | 11 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** MOTION for Leave to Appear Telephonically for Initial Conference . Document filed by Jason Berger.(Liebowitz, Richard) Modified on 1/17/2019 (ldi). (Entered: 12/18/2018) |
| 12/18/2018 | 12 | ORDER granting 11 Motion for Leave to Appear Telephonically: The parties may appear by phone. Please call Jared in my chambers for instructions (914-390-4271 ). (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 12/18/2018) |
| 12/18/2018 | 13 | FIRST AMENDED COMPLAINT amending 1 Complaint against Imagina Consulting, Inc. with JURY DEMAND.Document filed by Jason Berger. Related document: 1 |

| | | Complaint. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Liebowitz, Richard) (Entered: 12/18/2018) |
|---|---|---|
| 12/19/2018 | | Minute Entry for proceedings held before Judge Cathy Seibel: Initial Conference held on 12/19/2018. Case Management Plan is signed. This is case is to be referred to Magistrate Judge McCarthy for settlement purposes. Submit pre-motion letter(s) by June 11, 2019; opposition due June 18, 2019. See transcript. (Status Conference set for 6/25/2019 at 11:00 AM in Courtroom 621, 300 Quarropas Street, White Plains, NY 10601 before Judge Cathy Seibel). (Court Reporter Sabrina D'Emidio) (wc) (Entered: 12/20/2018) |
| 12/20/2018 | 14 | CIVIL CASE DISCOVERY PLAN AND SCHEDULING ORDER: The case is to be tried to a jury. Deposition due by 6/19/2019. Fact Discovery due by 6/19/2019. Expert Discovery due by 8/16/2019. Case Management Conference set for 6/25/2019 at 11:00 AM before Judge Cathy Seibel. (Signed by Judge Cathy Seibel on 12/19/2018) (mml) (Entered: 12/20/2018) |
| 12/20/2018 | 15 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Settlement. Referred to Magistrate Judge Judith C. McCarthy. (Signed by Judge Cathy Seibel on 12/20/2018) (mml) (Entered: 12/20/2018) |
| 01/03/2019 | 16 | SCHEDULING ORDER: Settlement Conference set for 2/11/2019 at 02:00 PM in Courtroom 421, 300 Quarropas Street, White Plains, NY 10601 before Magistrate Judge Judith C. McCarthy; and as further set forth in this Order. SO ORDERED. (Signed by Magistrate Judge Judith C. McCarthy on 1/3/2019) (anc) (Entered: 01/03/2019) |
| 01/10/2019 | 17 | LETTER MOTION to Adjourn Conference addressed to Magistrate Judge Judith C. McCarthy from Craig J. Albert dated January 10, 2019. Document filed by Imagina Consulting, Inc.. Return Date set for 2/11/2019 at 02:00 PM.(Albert, Craig) (Entered: 01/10/2019) |
| 01/11/2019 | 18 | ORDER granting 17 Letter Motion to Adjourn Settlement Conference. The Settlement Conference scheduled for February 11, 2019 is adjourned to March 20, 2019 at 2:00 PM in Courtroom 421, 300 Quarropas Street, White Plains, NY 10601 before Magistrate Judge Judith C. McCarthy. (HEREBY ORDERED by Magistrate Judge Judith C. McCarthy)(Text Only Order) (McCarthy, Judith) (Entered: 01/11/2019) |
| 01/16/2019 | 19 | ANSWER to 13 Amended Complaint, with JURY DEMAND. Document filed by Imagina Consulting, Inc..(Albert, Craig) (Entered: 01/16/2019) |
| 03/14/2019 | 20 | LETTER MOTION to Adjourn Conference addressed to Magistrate Judge Judith C. McCarthy from Craig J. Albert dated 3/14/2019. Document filed by Imagina Consulting, Inc.. Return Date set for 3/20/2019 at 02:00 PM.(Albert, Craig) (Entered: 03/14/2019) |
| 03/15/2019 | 21 | ORDER granting 20 Letter Motion to Adjourn Conference. The Settlement Conference scheduled for March 20, 2019 is adjourned *sine die*. The parties are directed to notify the Court when they are ready to participate in a Settlement Conference. (HEREBY ORDERED by Magistrate Judge Judith C. McCarthy)(Text Only Order) (McCarthy, Judith) (Entered: 03/15/2019) |

| 03/15/2019 | 22 | PROPOSED PROTECTIVE ORDER. Document filed by Imagina Consulting, Inc.. (Albert, Craig) (Entered: 03/15/2019) |
| 03/15/2019 | 23 | STIPULATED CONFIDENTIALITY AND PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material... (Signed by Judge Cathy Seibel on 3/15/2019) (rjm) (Entered: 03/15/2019) |
| 03/15/2019 | 24 | LETTER addressed to Magistrate Judge Judith C. McCarthy from Richard Liebowitz dated 3/15/19 re: Adjournment of settlement conference. Document filed by Jason Berger.(Liebowitz, Richard) (Entered: 03/15/2019) |
| 04/05/2019 | 25 | LETTER MOTION for Discovery *(Informal Conference Request)* addressed to Judge Cathy Seibel from Craig J. Albert dated 4/5/2019. Document filed by Imagina Consulting, Inc..(Albert, Craig) (Entered: 04/05/2019) |
| 04/05/2019 | 26 | ORDER deferring ruling on 25 Motion for Discovery: Counsel should supplement the request with an explanation of the circumstances and the nature of the problem. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 04/05/2019) |
| 04/05/2019 | 27 | SUPPLEMENTAL LETTER MOTION for Discovery *(Informal Conference Request)* addressed to Judge Cathy Seibel from Craig J. Albert dated 4/5/2019. Document filed by Imagina Consulting, Inc..(Albert, Craig) (Entered: 04/05/2019) |
| 04/05/2019 | 28 | ORDER granting 27 Letter Motion for Discovery: Discovery conference to be held on 4/12/19 at 11 am. Plaintiff is to state his position, by letter of no more than 3 pages, no later than 4/9/19. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 04/05/2019) |
| 04/05/2019 | 29 | ORDER granting 25 Letter Motion for Discovery: See Doc. 28. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 04/05/2019) |
| 04/09/2019 | 30 | LETTER addressed to Judge Cathy Seibel from Richard Liebowitz dated 4/9/19 re: Discovery Status Update. Document filed by Jason Berger.(Liebowitz, Richard) (Entered: 04/09/2019) |
| 04/12/2019 | | Minute Entry for proceedings held before Judge Cathy Seibel: Discovery Hearing held on 4/12/2019. Plaintiff's counsel did not appear. The Court will issue an Order to Show Cause to Plaintiff's counsel (Richard Liebowitz, Esq.) as to why he did not appear for the proceeding today and why he should not pay the fees incurred for Defendant's counsel (Craig Albert, Esq.) for appearing today. The discovery hearing has been re-scheduled for April 18, 2019 at 12:15 p.m. See transcript. (Discovery Hearing set for 4/18/2019 at 12:15 PM in Courtroom 621, 300 Quarropas Street, White Plains, NY 10601 before Judge Cathy Seibel). (Court Reporter Angela O'Donnell) (wc) (Entered: 04/12/2019) |
| 04/12/2019 | 31 | ORDER TO SHOW CAUSE: Plaintiff is hereby ORDERED to SHOW CAUSE in writing, on or before April 17, 2019, why: 1. He failed to appear for today's discovery conference; and 2. He should not be required to pay Defendant's attorney's fees for the time expended while appearing at today's discovery conference. Further, the Court will hold what should have been today's discovery conference on April 18, 2019, at 12:15 p.m. The Clerk of Court is respectfully directed to serve this Order to Show Cause on |

| | | |
|---|---|---|
| | | Plaintiff by mail. SO ORDERED. (Signed by Judge Cathy Seibel on 4/12/2019) (ks) Transmission to Docket Assistant Clerk for processing. (Entered: 04/12/2019) |
| 04/12/2019 | | Mailed a copy of 31 Order to Show Cause, to Richard Liebowitz Liebowitz Law Firm, PLLC 11 Sunrise Plaza, Suite 301 Suite 305 Valleystream, NY 11580. (aea) (Entered: 04/12/2019) |
| 04/15/2019 | 32 | LETTER addressed to Judge Cathy Seibel from Richard Liebowitz dated April 15, 2019 re: Status Letter. Document filed by Jason Berger.(Liebowitz, Richard) (Entered: 04/15/2019) |
| 04/16/2019 | 33 | MEMO ENDORSEMENT on re: 32 Letter filed by Jason Berger. ENDORSEMENT: If Mr. Liebowitz will be back in the office on Friday, 4/19/19, or Monday, 4/22/19, I would rather do the conference in person then. If not, both parties may attend by phone on 4/18/19, but I do my civil conferences on the record and doing them by phone makes life difficult for the court reporter. So the parties should confer about whether we can do it Friday or Monday. If not, we'll do it Thursday by phone. Either way the parties should advise my courtroom deputy, Walter Clark (914-390-4077 or walter_clark@nysd.uscourts.gov), who will explain how to do the phone conference if it can't be avoided. SO ORDERED. (Signed by Judge Cathy Seibel on 4/16/2019) (mml) (Entered: 04/16/2019) |
| 04/17/2019 | 34 | LETTER addressed to Judge Cathy Seibel from Richard Liebowitz dated April 17, 2019 re: Status Letter. Document filed by Jason Berger.(Liebowitz, Richard) (Entered: 04/17/2019) |
| 04/18/2019 | | Minute Entry for proceedings held before Judge Cathy Seibel: Discovery Hearing held on 4/18/2019. Both parties appear telephonically. The Court orders Plaintiff's counsel (Richard Liebowitz, Esq.) to sign the interrogatories by April 19, 2019, or else, the Court will impose a $100 dollar-a-day sanction until they are signed. The Court also orders Plaintiff's counsel to produce 100% of documents that have been asked for by the Defendant by April 22, 2019. The Court directs Defendant's counsel (Craig Albert, Esq.) to provide the Court and Plaintiff's counsel the billing records by May 1, 2019; Plaintiff's opposition due May 15, 2019; Defendant's reply due May 22, 2019. The Court also orders Mr. Liebowitz to provide accurate supporting documentation that confirms his emergency causing him to be absent from the previously scheduled April 12, 2019 conference by May 1, 2019, or else, he will be paying for Mr. Albert's incurred expenses for appearing at the April 12 conference. See transcript. (Court Reporter Darby Ginsberg) (wc) (Entered: 04/19/2019) |
| 05/01/2019 | 35 | LETTER addressed to Judge Cathy Seibel from Craig J. Albert dated May 1, 2019 re: Time records. Document filed by Imagina Consulting, Inc..(Albert, Craig) (Entered: 05/01/2019) |
| 05/01/2019 | 36 | LETTER addressed to Judge Cathy Seibel from Richard Liebowitz dated May 1, 2019 re: Richard Liebowitz. Document filed by Jason Berger.(Liebowitz, Richard) (Entered: 05/01/2019) |
| 05/01/2019 | 37 | LETTER addressed to Judge Cathy Seibel from Craig J. Albert dated May 1, 2019 re: Report on plaintiff's failure to comply with order. Document filed by Imagina Consulting, Inc..(Albert, Craig) (Entered: 05/01/2019) |
| 05/01/2019 | 38 | |

| | | |
|---|---|---|
| | | MEMO ENDORSEMENT on re: 36 Letter filed by Jason Berger. ENDORSEMENT: This letter is not responsive to my instruction. Mr. Liebowitz was to document who passed away, when the person passed away and when Mr. Liebowitz was notified. The reason I requested documentation is that there is reason to believe Mr. Liebowitz is not being candid. So a letter from him does not advance the ball. When someone dies, there is documentation including a death certificate and (almost always) an obituary, and nowadays one's phone usually contains evidence of what one was told and when. Mr. Liebowitz may have until 5/3/19 to supplement this letter. SO ORDERED. (Signed by Judge Cathy Seibel on 5/1/2019) (mml) (Entered: 05/02/2019) |
| 05/01/2019 | 39 | MEMO ENDORSEMENT on re: 37 Letter filed by Imagina Consulting, Inc. ENDORSEMENT: At this point it seems that the absence of documents is going to hurt Plaintiff more than Defendant. Naturally Plaintiff will not be able to use anything he did not produce, and that may present insurmountable problems for him. In any event, what efforts were made to comply and when, and how it was that the first set of responses was so incorrect, can be explored via deposition. SO ORDERED. (Signed by Judge Cathy Seibel on 5/1/2019) (mml) (Entered: 05/02/2019) |
| 05/02/2019 | 40 | LETTER addressed to Magistrate Judge Judith C. McCarthy from Craig J. Albert dated May 2, 2019 re: Schedule settlement conference. Document filed by Imagina Consulting, Inc..(Albert, Craig) (Entered: 05/02/2019) |
| 05/03/2019 | 41 | NOTICE of Settlement . Document filed by Jason Berger. (Liebowitz, Richard) (Entered: 05/03/2019) |
| 05/06/2019 | 42 | LETTER addressed to Judge Cathy Seibel from Craig J. Albert dated May 6, 2019 re: Settlement and issues remaining unresolved. Document filed by Imagina Consulting, Inc..(Albert, Craig) (Entered: 05/06/2019) |
| 05/07/2019 | 43 | STIPULATION OF VOLUNTARY DISMISSAL It is hereby stipulated and agreed by and between the parties and/or their respective counsel(s) that the above-captioned action is voluntarily dismissed, with prejudice against the defendant(s) Imagina Consulting, Inc. pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. Document filed by Jason Berger. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers)..**(Liebowitz, Richard) (Entered: 05/07/2019) |
| 05/07/2019 | 44 | AO 121 FORM COPYRIGHT - CASE TERMINATED- SUBMITTED. In compliance with the provisions of 17 U.S.C. 508, the Register of Copyrights is hereby advised that a final decision was rendered on 05/07/2019 in a court action filed on the following copyright(s) in the U.S. District Court Southern District of New York. Form e-mailed to Register of Copyrights. (dt) (Entered: 05/07/2019) |
| 05/07/2019 | 45 | MEMO ENDORSEMENT on re: 42 Letter filed by Imagina Consulting, Inc. ENDORSEMENT: I'm glad the parties have resolved the case (and, I presume, the issue of Plaintiff's counsel's expenses for the April 12 conference), but there remains one open issue: Mr. Liebowitz's failure to document the death in the family that he says caused him to miss the conference. (See Doc. 38.). He was supposed to address that issue by May 3, but I will give him until May 9. Even if Defendant has been made whole, I still need to satisfy myself that there is no need for disciplinary or other inquiry. SO ORDERED. (Signed by Judge Cathy Seibel on 5/7/2019) (mml) (Entered: 05/07/2019) |
| | | |

| 05/09/2019 | 46 | DECLARATION of Richard P. Liebowitz re: 45 Memo Endorsement,, . Document filed by Jason Berger. (Liebowitz, Richard) (Entered: 05/09/2019) |
| 05/13/2019 | 47 | ORDER TO SHOW CAUSE: Mr. Liebowitz is therefore ORDERED to SHOW CAUSE in writing, no later than May 16, 2019, why he should not be referred to the Court's Grievance Committee. His response to this Order to Show Cause shall include documentation or other evidence apart from his say-so regarding the death in the family that he says prevented him from attending the April 12 conference and timely notifying the Court and Defendant's counsel of his inability to attend. SO ORDERED. (Signed by Judge Cathy Seibel on 5/13/2019) (mml) (Entered: 05/14/2019) |
| 05/16/2019 | 48 | DECLARATION of Richard P. Liebowitz in Opposition re: 47 Order to Show Cause,,. Document filed by Jason Berger. (Liebowitz, Richard) (Entered: 05/16/2019) |
| 07/26/2019 | 49 | ORDER: Accordingly, it is hereby ORDERED that, on or before August 12, 2019, Richard Liebowitz shall on pain of contempt provide this Court with a copy of the death certificate of his grandfather who he says passed away on April 12, 2019. SO ORDERED. (Signed by Judge Cathy Seibel on 7/26/2019) (mml) (Entered: 07/26/2019) |
| 08/12/2019 | 50 | RESPONSE re: 49 Order, . Document filed by Jason Berger. (Liebowitz, Richard) (Entered: 08/12/2019) |
| 08/19/2019 | 51 | MEMO ENDORSEMENT on re: 50 Response filed by Jason Berger. ENDORSEMENT: The death of a loved one is indeed a personal matter, but whether Mr. Liebowitz has been candid with the Court is a professional matter, so he is not relieved from my Order that he produce the death certificate (Doc. 49). If he is for some reason concerned about the death certificate being available on the public docket, he may provide it directly to my chambers. If he does not do so by August 26, 2019, he will be in contempt of court and subject to monetary and other sanctions, and/or referral to this Court's Grievance Committee. SO ORDERED. (Signed by Judge Cathy Seibel on 8/19/2019) (mml) (Entered: 08/19/2019) |
| 08/26/2019 | 52 | DECLARATION of Richard P. Liebowitz in Opposition re: 51 Memo Endorsement,,. Document filed by Jason Berger. (Liebowitz, Richard) (Entered: 08/26/2019) |
| 09/27/2019 | 53 | MEMO ENDORSEMENT on re: 52 Declaration in Opposition filed by Jason Berger. ENDORSEMENT: There is nothing unlawful about my August 19, 2019 order. There was also nothing unclear about it. Likewise, Mr. Liebowitz's failure to comply is apparent beyond any reasonable doubt. Finally, he has not diligently attempted to comply. To the contrary, while maintaining that the death occurred (and thus implicitly conceding the existence of a death certificate), he has repeatedly refused to provide it, even after the Court made clear that his "good faith declarations" were insufficient and after the Court agreed that the document need not be publicly filed. He has not shown or even alleged an inability to comply. Accordingly, Mr. Liebowitz is hereby declared to be in contempt of court. Should he not comply with my August 19, 2019 Order by October 2, 2019, he will (without further order) be sanctioned $100 each business day (beginning October 2, 2019) until he does comply. Said payments are to be made to the Clerk of Court on each Monday, covering the previous week. In imposing this sanction I have considered the nature of the harm, the probable effectiveness of this sanction, and the resources of a practicing lawyer. Should this sanction prove insufficient, additional or different sanctions will be considered. SO ORDERED. (Signed by Judge Cathy Seibel on 9/27/2019) (ne) (Entered: 09/27/2019) |

| 10/02/2019 | 54 | LETTER MOTION for Conference re: 53 Memo Endorsement,,,,, addressed to Judge Cathy Seibel from Richard Liebowitz dated 10/2/19., LETTER MOTION to Stay re: 53 Memo Endorsement,,,,,, addressed to Judge Cathy Seibel from Richard Liebowitz dated 10/2/19. Document filed by Jason Berger.(Liebowitz, Richard) (Entered: 10/02/2019) |
|---|---|---|
| 10/03/2019 | 55 | ORDER denying 54 Letter Motion for Conference and denying 54 Letter Motion to Stay: Mr. Liebowitz's letter does not state what purpose a conference would serve, nor does it provide any cause that would justify a stay of my September 27 Order. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 10/03/2019) |
| 10/03/2019 | 56 | SECOND LETTER MOTION for Conference re: 55 Order on Motion for Conference, Order on Motion to Stay,, addressed to Judge Cathy Seibel from Richard Liebowitz dated 10/3/19. Document filed by Jason Berger.(Liebowitz, Richard) (Entered: 10/03/2019) |
| 10/04/2019 | 57 | ORDER denying 56 Letter Motion for Conference: On 10/2/19, Mr. Liebowitz asked for a conference and a stay of my 9/27/19 Order. I denied the application, stating, "Mr. Liebowitz's letter does not state what purpose a conference would serve, nor does it provide any cause that would justify a stay of my September 27 Order." Today Mr. Liebowitz filed another letter requesting the same relief. It likewise fails to state what purpose a conference would serve or provide any cause that would justify a stay of my September 27 Order, and therefore the application is denied. As evidenced by his responses to my earlier orders regarding the death certificate, Mr. Liebowitz seems to think that it makes sense, upon learning that an submission is insufficient, to keep filing similarly insufficient sumbissions. It does not. Mr. Liebowitz is ordered to refrain from filing any further requests for a conference unless the request explains specifically the purpose to be served by the conference. Mr. Liebowitz is further ordered to refrain from filing any further requests for a stay unless the request explains specifically why a stay would be justified. Mr. Liebowitz's first payment of the contempt sanction is due in the Office of the Clerk of Court on Monday, October 7, 2019. (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 10/04/2019) |
| 10/07/2019 | 58 | LETTER MOTION for Extension of Time addressed to Judge Cathy Seibel from Richard Liebowitz dated 10/7/19. Document filed by Jason Berger.(Liebowitz, Richard) (Entered: 10/07/2019) |
| 10/07/2019 | 59 | ORDER denying 58 Letter Motion for Extension of Time: Application denied. Mr. Liebowitz has known since May that he was required to provide documentation of the death, and was specifically ordered in July to provide the death certificate. He has had plenty of time to obtain it and I cannot fathom why he did not prioritize that task. Nor do I see any reason to stay the sanctions order. Mr. Liebowitz was supposed to pay his contempt fine today, and the application for an extension came at 8:34 pm, well after the Clerk's Office closed. If that means that Mr. Liebowitz did not pay the $300 he has accrued beginning October 2, 2019, that means he is in contempt not only of my 8/19/19 Order, but also of my 9/27/19 order. I really do not want to have to pile contempt sanctions on top of contempt sanctions, so Mr. Liebowitz needs to stop trying to put off his obligations and instead he should just meet them. He needs to pay the $300 tomorrow, and he needs to submit the death certificate if he wants to stop additional payments from accruing. (HEREBY ORDERED by Judge Cathy Seibel) (Text Only Order) (Seibel, Cathy) (Entered: 10/07/2019) |

| 11/01/2019 | 60 | ORDER AND ORDER TO SHOW CAUSE: Richard Liebowitz, Plaintiff's counsel in this case, is now in contempt of my August 19, 2019 and September 27, 2019 orders. (See Docs. 51, 53.) The $100 fine he accrues each business day has plainly been ineffective to coerce compliance with the August 19, 2019 Order. Accordingly, the daily contempt sanction is hereby increased to $500 a day, effective November 6, 2019. Starting on that date, Mr. Liebowitz will be sanctioned $500 per business day (payable on Monday of each week, or Tuesday if the office of the Clerk of Court is not open on Monday) until he has complied in full with my August 19, 2019 and September 27, 2019 Orders. Further, Mr. Liebowitz is hereby ORDERED to appear before this Court in person on November 13, 2019 at 10 a.m., and there and then SHOW CAUSE why he should not be incarcerated until such time as he complies with the above-described orders (and, if applicable, the instant order). Failure to appear as directed will subject Mr. Liebowitz to arrest by the United States Marshals Service without further notice. Show Cause Hearing set for 11/13/2019 at 10:00 AM before Judge Cathy Seibel. (Signed by Judge Cathy Seibel on 11/1/2019) (mro) Transmission to Finance Unit (Cashiers) for processing. (Entered: 11/04/2019) |
| 11/13/2019 | | Minute Entry for proceedings held before Judge Cathy Seibel: Show Cause Hearing held on 11/13/2019. Plaintiff's counsel, Richard Liebowitz, Esq., appears with counsel (Richard Greenberg, Esq.) in response to the Order to Show Cause issued by the Court on November 1, 2019. The Court declines to vacate the findings of contempt based on failure to produce death certificate and failure to pay contempt sanctions, finding that Mr. Liebowitz willfully lied to the Court and willfully failed to comply with lawful Court orders. The certificate having been produced through counsel, and Mr. Liebowitz having paid $3700 in sanctions, the Court finds Mr. Liebowitz no longer in contempt. There is no further need for sanctions. The Court will defer to the Grievance Committee as to further action. Mr. Liebowitz's counsel is directed by the Court to notify chambers by 5:00 p.m. today (November 13, 2019) if anything should be redacted from his submission other than what the Court has specified. If not, the document should be filed by 5:00 p.m. today with the Court-ordered redactions. See transcript. (Court Reporter Darby Ginsberg) (wc) (Entered: 11/26/2019) |
| 11/14/2019 | 61 | LETTER addressed to Judge Cathy Seibel from Richard A. Greenberg dated 11/11/2019 re: For the reasons set forth below, I respectfully request that the Court vacate its two contempt orders, declare Richard's financial penalties satisfied, and permit him to continue to practice before this Court. (mml) (Entered: 11/14/2019) |

| **PACER Service Center** | | | |
|---|---|---|---|
| | **Transaction Receipt** | | |
| | 12/14/2019 12:59:12 | | |
| **PACER Login:** | SMRHFirmUser | **Client Code:** | 0003-000003 |
| **Description:** | Docket Report | **Search Criteria:** | 7:18-cv-08956-CS |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

**Exhibit K**

 # Party Search Results

**Search Criteria:** Party Search; Court ID: [CAN]; Last Name: [Liebowitz]; Party Role:
[ATY]; Sort: [Date Closed, Ascending]
**Result Count:** 22 (1 page)
**Current Page:** 1

| | Party Name | Case Number | Case Title | Court | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|---|---|
| 1 | Liebowitz, Richard P (aty) | 4:2019cv0... | Paunonen v. VAAS | California Northern District Court | 820 | 10/03/2019 | |
| 2 | Liebowitz, Richard P (aty) | 5:2019cv0... | Verch v. Duetto Research, Inc. | California Northern District Court | 820 | 08/17/2019 | |
| 3 | Liebowitz, Richard P (aty) | 3:2019mc... | In the Matter of Richard P. Liebowitz - NY SBN 5357702 | California Northern District Court | 890 | 09/20/2019 | |
| 4 | Liebowitz, Richard P (aty) | 4:2019cv0... | Geerds v. San Francisco Bay View Inc. | California Northern District Court | 820 | 10/08/2019 | |
| 5 | Liebowitz, Richard P (aty) | 4:2019cv0... | Zharkov v. 3DBIN, Inc. et al | California Northern District Court | 820 | 09/05/2019 | |
| 6 | Liebowitz, Richard P (aty) | 4:2019cv0... | Alvarado v. Mother Jones, LLC | California Northern District Court | 820 | 10/07/2019 | |
| 7 | Liebowitz, Richard P (aty) | 5:2019cv0... | Singer v. Pixel Labs, Inc. | California Northern District Court | 820 | 08/13/2019 | 09/08/2019 |
| 8 | Liebowitz, Richard P (aty) | 5:2019cv0... | Chevrestt v. SFG Media Group, LLC | California Northern District Court | 820 | 08/14/2019 | 09/09/2019 |
| 9 | Liebowitz, Richard P (aty) | 4:2019cv0... | Zlozower v. Amoeba Music Inc. | California Northern District Court | 820 | 08/12/2019 | 10/30/2019 |
| 10 | | 4:2019cv0... | | California Northern | 820 | 08/14/2019 | 11/14/2019 |

| | Party Name | Case Number | Case Title | Court | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|---|---|
| | Liebowitz, Richard P (aty) | | Harbus v. B3 Media, LLC | District Court | | | |
| 11 | Liebowitz, Richard P (aty) | 3:2019cv0... | Verch v. 121 Silicon Valley, Inc. | California Northern District Court | 820 | 08/17/2019 | 12/03/2019 |
| 12 | Liebowitz, Richard P (aty) | 5:2019cv0... | Johnson v. Historic Railroad Square Association | California Northern District Court | 820 | 09/19/2019 | 12/12/2019 |
| 13 | Liebowitz, Richard P (aty) | 4:2019cv0... | Kuhmstedt v. Livingly Media, Inc. | California Northern District Court | 820 | 09/19/2019 | 12/18/2019 |
| 14 | Liebowitz, Richard P (aty) | 4:2019cv0... | Tabak v. ABS-CBN International | California Northern District Court | 820 | 08/20/2019 | 12/19/2019 |
| 15 | Liebowitz, Richard P (aty) | 5:2019cv0... | Seidman v. Shareably Media, LLC | California Northern District Court | 820 | 08/22/2019 | 12/20/2019 |
| 16 | Liebowitz, Richard P (aty) | 3:2019cv0... | Santos v. Los Angeles Times Communicatic LLC | California Northern District Court | 820 | 08/28/2019 | 01/13/2020 |
| 17 | Liebowitz, Richard P (aty) | 4:2019cv0... | Westerkamp v. National Association of Social Workers | California Northern District Court | 820 | 08/28/2019 | 01/31/2020 |
| 18 | Liebowitz, Richard P (aty) | 3:2019cv0... | Hames v. The Roxie Theater | California Northern District Court | 820 | 10/09/2019 | 02/03/2020 |
| 19 | Liebowitz, Richard P (aty) | 4:2019cv0... | Stokes v. Moby Dick Bar | California Northern District Court | 820 | 09/12/2019 | 03/03/2020 |
| 20 | Liebowitz, Richard P (aty) | 3:2019cv0... | Masi v. The Young Turks, Inc. | California Northern District Court | 820 | 09/25/2019 | 03/09/2020 |
| 21 | Liebowitz, Richard P (aty) | 5:2019cv0... | Adlife Marketing & Communicatic Company, Inc. v. Popsugar Inc. | California Northern District Court | 820 | 01/17/2019 | 03/26/2020 |

|    | Party Name | Case Number | Case Title | Court | NOS | Date Filed | Date Closed |
|----|------------|-------------|------------|-------|-----|------------|-------------|
| 22 | Liebowitz, Richard P (aty) | 3:2019cv0… | Parisienne v. Gatechina, Inc. | California Northern District Court | 820 | 08/14/2019 | 03/26/2020 |

**PACER Service Center**                    **Receipt** 04/02/2020 16:11:39 932511926

| **User** | SMRHFirmUser |
|----------|--------------|
| **Client Code** | 0003-084530 |
| **Description** | All Court Types Party Search |
|  | All Courts; Name Liebowitz; Role aty; Court ID CAN; Page: 1; sort: DateTermed, ASC |
| **Billable Pages** | 1 ($0.10) |